## UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA MIAMI DIVISION

**Case No. 25-cv-21172-EIS**

DAVID W. LANGLEY ET AL, And DAVID W. LANGLEY, P.A.,

Plaintiffs,

v.

ELIZABETH   HAZAN   A/K/A   LIZA HAZAN, ET. AL.,
And SEAN MEEHAN
Defendants.

_____/

FILED BY _____ D.C.

MAR 28 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. – MIAMI

### ELIZABETH HAZAN AND SEAN MEEHAN'S RESPONSE IN OPPOSITION TO MOTION TO REMAND DOC 4 AND SUPPLEMENTAL MOTION TO REMAND DOC 7

### AND MOTION TO TRANSFER TO BANKRUPTCY COURT CASE 16-10389-RAM

Defendants, Elizabeth Hazan A/K/A Liza Hazan ("Hazan"), Sean Neil Meehan ("Meehan"), *Pro Se* Defendants, file their response in opposition to DAVID W. LANGLEY ET AL, And DAVID W. LANGLEY, P.A., ("Langley")'s Motion to Remand to State court Doc 4 and Langley's Supplemental Motion to Remand Doc 7 to State Court and file their Motion to Transfer case to Bankruptcy Court. As grounds for their response in opposition, and Motion to Transfer, Defendants Ms. Hazan and Mr. Meehan respectfully state as follows:

### BACKGROUND

Plaintiffs, DAVID W. LANGLEY ET AL, And DAVID W. LANGLEY, P.A. are Debtor in possession Ms. Hazan's former counsel from 2016 to 2022. LANGLEY were awarded administrative claims by the bankruptcy court in 2018.  Subsequently in 2022 without obtaining permission from the bankruptcy court Langley filed a foreclosure action on Hazan's homestead property. Hazan and Meehan have claims and counterclaims against Plaintiffs.

**THE BANKRUPTCY COURT SANCTIONED ATTORNEY DAVID LANGLEY FOR FILING A FRAUDULENT PETITION**

David Langley filed a bankruptcy Chapter 11 on behalf of Selective. But the case was dismissed, and the Bankruptcy Court sanctioned both attorney David Langley and Selective for filing what the bankruptcy court found to be a fraudulent petition. See attached **D" "A"** the Bankruptcy Sanctions Order" dated July 24, 2019 Order granting NLG, LLC's Motion for Rule 9011 Sanctions. Case 19-14602-RAM Doc 79.

**DAVID LANGLEY'S VIOLATION OF THE BANKRUPTCY CHAPTER 11 PLAN AND THE DISCHARGE ORDER ONLY THE BANKRUPTCY HAS JURISDICTION OVER THIS FEE DISPUTE MATTER**

Plaintiffs are violating the bankruptcy injunctions and the final orders of the bankruptcy court and District Court and Eleventh Circuit Court of Appeals affirming the Hazan's confirmed bankruptcy chapter 11 plan and Discharge Order. This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. David Langley is claiming a charging lien on Ms Hazan's homestead property in violation of the confirmed plan and the discharge and wants to foreclose on her property. As David Langley stated his motion for attorney fees and approval and enforcement of a charging lien and request for evidentiary hearing presents, at a minimum, a matter "related to" administration of the bankruptcy case to which the fees relate, and so the bankruptcy Court has subject matter jurisdiction over this Charging Lien Motion. *In re 160 Royal Palm, LLC, No.* 18-19441-EPK, 2020 WL 4792094, at 1 (Bankr. S.D. Fla. May 14, 2020). Bankruptcy venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

This is a core proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A). This Court has retained jurisdiction to determine the rights to the Debtor's Fisher Island Property. As such, this Charging Lien Motion presents a core matter. *In re 160 Royal Palm, LLC*, No. 18-19441-EPK,

2020WL 4792094, at 2 (Bankr. S.D. Fla. May 14, 2020) citing *In re Commonwealth Institutional Sec.*, 344 B.R. at 828. The statutory predicates in support of the relief requested herein are 11 U.S.C. § 105 of the United States Code (the "Bankruptcy Code"), and Bankruptcy Rule 2016. A summary proceeding in the original action represents the preferred method of enforcing an attorney's charging lien in Florida. *Everett v. City of St. Petersburg*, 2017 WL 1434785 at 3 (M.D. Fla. 2017), *Stok Folk and Kon, P.A. v. Fusion Homes, LLC*, 584 B.R. 376, 382 (S.D. Fla. 2018) (citing *Daniel Mones, P.A. v. Smith*, 486 So. 2d 559, 561 (Fla. 1986)). Case law in Florida has consistently held that the proper forum for adjudicating the validity, enforceability and amount of a charging lien is with the trial judge before whom the underlying action is pending. *CK Regalia, LLC v. Thornton*, 159 So. 3d 358, 360 (Fla. 3d DCA 2015); see also *Baker & Hostetler, LLP v. Swearingen*, 998 So. 2d 1158, 1161 (Fla. 5th DCA 2008) ("Generally, a summary proceeding in the original action represents the preferred method of enforcing an attorney's charging lien in Florida as opposed to a separate action"). An attorney's lien should be enforced in the proceeding where it arose because the parties are before the court and the subject matter is there. *In re Warner's Estate*, 160 Fla. 460, 35 So. 2d 296, 298-99 (1948). Attached as **Exhibit "B"** is the Motion by David Langley for attorney fees and approval and enforcement of a charging lien and request for evidentiary hearing.

Given the same litigation involving same property Defendants believe that removal of this action to United States District Court and Transfer to Bankruptcy Court open pending Case 16-10389-RAM is appropriate.

Moreover, Plaintiffs' alleged mortgage in the amount of $82,500.00, against Hazan's homestead property was not approved by the Bankruptcy Court, was not mentioned in Hazan's confirmed Chapter 11 plan and Hazan was discharged in the Chapter 11 Bankruptcy. Because the

alleged mortgagee DAVID W. LANGLEY ET AL, And DAVID W. LANGLEY, P.A, participated in Hazan's bankruptcy case as Debtor in possession Hazan's counsel because the plan was confirmed and the property was dealt with, therefore mortgagee's rights were not preserved in the Hazan's Chapter 11 confirmed plan therefore the alleged lien was not preserved.

The fees that Mr. Langley, Hazan's former counsel is seeking are administrative claims and not a "straight forward foreclosure action" as incorrectly alleged in Plaintiff's Motion to Remand.

**MS. HAZAN'S FORMER COUNSEL DAVID W. LANGLEY ET AL, AND DAVID W. LANGLEY, P.A.'s ALLEGATIONS ARE CATEGORICALLY FALSE AND CONTRADICTORY TO THEIR ARGUMENTS IN COURT, THE APPROVED DISCLOSURE STATEMENT AND THE CONFIRMED PLAN FILED BY LANGLEY. SAME CLAIMS WERE REPEATEDLY DENIED BY THE BANKRUPTCY COURT AND IN AN ADVERSARY PROCEEDING CASE TO REVOKE CONFIRMATION AND DISCHARGE ORDERS_18-01492-AJC**

The Debtor Liza Hazan, represented by PLAINTIFFS, DAVID W. LANGLEY, Chapter 11 plan was confirmed on June 12, 2018 [ECF 691]. After substantial consummation of the Plan, the Debtor was discharged on December 7, 2018 [ECF 766].

Plaintiffs, former Debtor in possession's counsel, are now making false allegations against Debtor Hazan who transferred an apartment in New York in 2011, *fourteen years* that had no equity at that time, and was fully disclosed to the Bankruptcy Court, and was transferred back to Hazan's husband Sean Meehan to fund the plan as stated in Hazan's Disclosure Statement and Confirmed Plan drafted and filed by Plaintiffs LANGLEY.

On May 4, 2017, *eight years ago*, the Court held hearing on Debtor Hazan's Approved Disclosure Statement, Mr. Langley, representing Ms. Hazan, argued as follows:

Page 9, lines 24-25

24      My final objection, Judge, is that in

25        **August of 2011, the debtor transferred her**

Page 10, lines 1-25

1         **condominium in New York to a gentleman named Raymond**

2         **Houle, and then it was re-transferred back to her**

3         **husband, an entity owned by her husband.**

4                        I want to tell you what the debtor says in

5         her disclosure statement.  In terms of projected

6         recovery of avoidable transfers the debtor says the

7         following: "The debtor has completed her

8         investigation with regard to pre-petition

9         transactions.  11 U.S.C. 548 fraudulent transfers

10        has a two year look back and incorporates Florida

11        Statute 726 which has a four year look back, but

12        only as to avoidance for intentional hinder, delay

13        or defraud, or lack of reasonable equivalent value,

14        which facts are not relevant to the plan in this

15        case."

16                        Well, Judge, if she made a transfer in

17        2011 of a piece of property in New York --

18                        THE COURT:  That's more than four years

19        ago.

20                        MR. BANGOS:  Exactly, Judge.  It's a six

21        year statute of limitation.  Moreover, Judge, you're

22        probably familiar with Judge Mark's decision, In re:

23        Kipnis, and in that case, Judge, Judge Mark said

24        that if the IRS is a secured creditor, the trustee

25    has up until ten years to pursue that.

      Page 11 lines 1-25

1                          THE COURT:  Is the IRS in this case?

2                          MR. BANGOS:  Yes, sir.  The IRS is owed

3     more than half a million dollars in this case.

4                          THE COURT:  Mr. Langley, is that accurate?

5                          MR. LANGLEY:  No.  As to the amount, I

6     don't believe --

7                          THE COURT:  Not as to amount, as to a

8     penny.  Is there something owed to IRS?

9                          MR. LANGLEY:  Yes.

10                         THE COURT:  Then you've got ten years.

11                         MR. BANGOS:  So the debtor ought to at

12    least say, even if she's going to give lip service,

13    say, "The debtor's been advised that this claim

14    exists," the reason why the debtor doesn't believe

15    or the reason why the debtor isn't pursuing this

16    claim, but when the debtor has a disclosure

17    statement that materially misstates the applicable

18    statute of limitations and says, "I've done an

19    investigation and there's nothing within four

20    years," and the reality is that there's a six-year

21    statute and a ten-year statute, the debtor ought to

22    address that.

23                         Those are my three principal objections,

24    Judge.

25          THE COURT:  All right.  Mr. Langley, what

Page 12 lines 1-25

1     say you, if anything?

2               MR. LANGLEY:  Judge, Mr. Bangos seems to

3     be throwing everything up against the wall.

4               THE COURT:  Let's go as to Mr. Bangos'

5     client.  Although they're defaulted, supposedly on,

6     I think, three counts, aren't there nine counts in

7     the complaint?

8               MR. LANGLEY:  Yes.

9               THE COURT:  So they're still in here, so

10    they have standing.  Mr. Bangos has had standing to

11    be heard.

12               Go ahead and tell me what you think.

13               **MR. LANGLEY:  The remaining counts are**

14    tort claims against NLG.

15               Judge, what Mr. Bangos is apparently not

16    aware of is that his client, **NLG, brought a**

17    **fraudulent transfer action raising those same**

18    **allegations in New York years ago, and it was**

19    **dismissed.  Nobody is claiming a fraudulent**

20    **transfer.  It's over five years ago.  The IRS is not**

21    **challenging it.  They never have.  They're fully**

22    **secured by the assets of the case.**

23               We're prepared to go to a June

24    confirmation hearing with a 100 percent consensual

25    plan.  He mentioned Chase.  Chase has agreed to this

2    disclosure statement.  Everybody has agreed to this

3    disclosure statement.

4    THE COURT:  Except Mr. Bangos' client.

5    MR. LANGLEY:  Except Mr. Bangos.

6    THE COURT:  And he's raised some points on

7    which it will be necessary to amend the disclosure

8    statement.

9    MR. LANGLEY:  Well, I think we can tell

10    you, Judge, Ms. Hazan has earned income of over

11    $100,000 just in the last six months.  We're

12    prepared to -- we could confirm today and meet the

13    payments on the effective date.  Everything is ready

14    to go here.  He's cherry picking some monthly

15    operating reports where there was a lower amount of

16    income.

17    There's been a significant amount of

18    income, and it's increasing, and there are

19    significant receivables out there.  By the time we

20    get to confirmation there will be quite a bit of

21    additional income coming in.  Ms. Hazan has her

22    consulting business back up and running very strong.

23    She's doing very well.

24    **We also have the New York condo owned by**

25    **REHG, controlled by her husband, which is being**

26    **viewed daily for sale.  And that's going to generate**

27    **significant funds which will be contributed towards**

28    **confirmation.**

29    **We may not only have confirmation, but a**

30    **fully paid plan within a matter of months.  There**

31    **are no financial concerns here, Judge.**

Attached as **Exhibit C is a true and correct copy of the Disclosure Statement hearing. Doc 562 case 18-01492-AJC**

**THE BANKRUPTCY COURT DISMISSED WITH PREJUDICE A CASE TO REVOKE CONFIRMATION ORDER AND DISCHARGE ORDER ADVERSARY CASE 18-01492-AJC Doc 35**

In Adversary case 18-01492-AJC Doc 35 filed by NLG a disallowed creditor in Hazan's bankruptcy case, to Revoke Hazan's Order of Confirmation and Discharge Order, for fraud, the bankruptcy court granted Hazan's Motion to dismiss the case with prejudice.

1. **The Plaintiff' arguments Fails to State a Claim for Revocation Based on a "Failure to Disclose" Regarding the NY Condo**

Plaintiffs is falsely alleging that Hazan supposedly failed to disclose the transfer of a New York condominium in her name (the "Spencer Condo") in *August 2011*, or ownership of the unit that belonged to an entity controlled by her husband Sean Meehan. Hazan represented in her Fifth Amended Disclosure Statement that was drafted, filed, argued by Plaintiffs that she had completed her investigation into "potentially avoidable transfers" but did not mention the transfer of the Spencer Condo *more than fourteen years ago*.

The Court may take judicial notice of the Disclosure Statement, which can be found at 18-01492-AJC ECF 9-3, in ruling on this Motion to Transfer and Opposition to remand motions. *Osheroff*, 776 F.3d at 811, n.4. It may also consider the Disclosure Statement because it is central to Plaintiffs' allegations. *Id.* at 811. Refuting Plaintiffs' allegations of non-disclosure, the Disclosure Statement extensively discusses the Spencer Condo. *See* Disclosure Statement at 7-8.

In fact, the Disclosure Statement warns creditors, in bold-faced type, that there is a possibility that her 2011 transfer of the Spencer condo was potentially challengeable:

> **Debtor transferred this New York Condominium in August, 2011. The Board of Managers alleges that the transfer was made without the consent of Spencer Condominium. The Board of Managers has agreed to the approval of this Disclosure Statement. The Internal Revenue Service has filed a Proof of Claim in this case. The statute of limitations for the IRS to contest the transfer has not yet run, but IRS has taken no such position and has not appeared in the case other than the filing of a Proof of Claim. The New York Condominium had no equity at the time of the transfer.**

Disclosure Statement at 7 (emphasis in original).

Plaintiffs assert that Hazan's Petition didn't state the New York Condominium and that she committed a fraud as a result of purported omissions, but these claims are merely another regurgitation of Plaintiff and other disallowed creditor NLG' tired old arguments regarding the Spencer Condo in New York. This claim must fail for the simple reason that both Plaintiffs (as counsel for debtor in possession) and Hazan opposed disallowed creditor NLG's arguments raising the same purported omission to the Court—in both its responses on behalf of Ms Hazan's objections to approval of the disclosure statement as well as its responses on behalf of Ms Hazan's objections to plan confirmation—prior to entry of the Confirmation Order. Now Mr. Langley has the audacity to come in this court and make these false allegations. The Plaintiffs argued as counsel for Ms. Hazan that there is a long prior history pertaining to the Spencer Condo, specifically including the fact that this alleged "fraudulent transfer" issue has been raised by disallowed creditor NLG on multiple occasions, both *in the bankruptcy Court* and in other proceedings, and was long ago resolved in Hazan's favor. Thus, Plaintiffs cannot state a claim that the bankruptcy Court was defrauded by Ms. Hazan by any such purported omission. *Level Propane*, 438 B.R. at 354; *Bennington*, 519 B.R. at

548.

Any purported fraud in omitting information regarding the Spencer Condo could not have "impaired" the bankruptcy Court's ability to adjudicate whether to confirm Hazan's Plan of Reorganization because the Court knew about the purported omission. Disallowed creditor NLG filed an objection to Hazan's Fourth Amended Plan in which it asserted these *very same allegations regarding the Spencer Condo* [ECF 592]. In fact, many of the allegations in the Mr. Langley's Supplemental Motion to Remand were taken *verbatim* from NLG's objection. [See ECF 592 at ¶¶ 20-22.] Notwithstanding disallowed NLG's objections, Hazan's Fourth Amended Plan was confirmed by the Court. Moreover, this claim is barred by *res judicata* because the "Spencer Condo" issues were resolved years ago in Hazan's favor by Judge Barbara Jaffe in the Supreme Court of New York, in a lawsuit filed by NLG against Hazan and others ("Respondents") *in 2014*, seeking to set aside Hazan's conveyance of the Spencer Condo as a fraudulent transfer and were also resolved by the bankruptcy court.[1] Disallowed NLG and PLAINTIFFS never appealed Judge Jaffee's order dismissing NLG's action to set aside the transfer of the Spencer condo or the Bankruptcy Court Order dismissing the adversary case.

There is nothing new about the issue. It has been adjudicated many times but in classic form, when they don't like the prior results, the PLAINTIFFS, former counsel for debtor in possession, now makes the same allegations as disallowed creditor NLG that were denied again and again in

---

[1] Copies of the following documents from that Court proceeding have been filed in this case: (i) January 29, 2014 Order to Show Cause and Verified Petition, directing the Respondents to respond to NLG's fraudulent transfer allegations; (ii) October 30, 2014 Decision and Order of Judge Jaffe on the evidence presented by Respondents; (iii) Judge Jaffe's November 13, 2014 order denying NLG's petition and dismissing the case; and (iv) Judge Jaffe's November 13, 2014 order granting the Respondents' motion to dismiss, dismissing the case and directing the Clerk to enter judgment accordingly. See ECF 9-4.

another court or another case or repeatedly in the same case, evidently hoping that at some point

they might succeed in obfuscating the fact that the Spencer Condo issues have long been resolved.

Plaintiffs' latest attempt to assert new claims against Hazan by regurgitating these "fraudulent

transfer" allegations for the umpteenth time is utterly frivolous, a blatant abuse of the judicial

system, a waste of this Court's valuable time and should be flatly rejected.

On March 12, 2019, the Bankruptcy Court the Honorable Judge Cristol ruled in favor of Ms.

Hazan and granted Ms. Hazan's Motion to dismiss NLG's complaint to revoke confirmation Order

and Discharge Order for fraud with prejudice. Similarly, Plaintiffs allege that Hazan committed a

fraud on the court by failing to disclose that the transfer of the New York condominium was

potentially voidable.  Taking judicial notice of the documents and pleadings filed in this case, the

Court notes that Hazan's Disclosure Statement states precisely the point that Plaintiffs now allege

Hazan failed to disclosure was not in her bankruptcy schedules:

> **Debtor transferred this New York Condominium in August, 2011.**
> **The Board of Managers alleges that the transfer was made without**
> **the consent of Spencer Condominium. The Board of Managers has**
> **agreed to the approval of this Disclosure Statement. The Internal**
> **Revenue Service has filed a Proof of Claim in this case. *The statute***
> ***of limitations for the IRS to contest the transfer has not yet run*, but**
> **IRS has taken no such position and has not appeared in the case**
> **other than the filing of a Proof of The New York Condominium**
> **had no equity at the time of the transfer.**

Disclosure Statement, ECF 9-3, at 7 (bold emphasis in original; italicized emphasis added).

> **This is not a new or undisclosed matter. Indeed, the New York**
> **condominium association was actively represented during these**
> **proceedings. Given that the Court was made aware of the issue, it**
> **could not have been defrauded by any alleged failure of Hazan to**
> **disclose it. *See In re Bennington*, 519 B.R. 545, 549 (Bankr. D. Utah**
> **2014) ("allegations of fraud" that "were made known to the Court**

and creditors…before the hearing on confirmation…cannot serve as a basis to revoke the Debtors' confirmation order."); *In re Level Propane Gases, Inc.*, 438 B.R. 354 (B.A.P. 6th Cir. 2010) (affirming dismissal of revocation claims where "the same allegations were known by the bankruptcy court" and had been rejected by it during the confirmation process). As such, Count I fails to state a claim.

Attached as **Exhibit "D"** is the true and correct copy of the Order granting Motion to dismiss complaint with prejudice

Defendant Hazan further argues that Plaintiffs' allegations are precluded by Res Judicata and the doctrine of equitable mootness. "Although equitable mootness is often applied on appeal, it applies to proceedings under Section 1144." *In re Delta Air Lines, Inc.*, 386 B.R. 518, 537 (Bankr.S.D.N.Y. 2008). The Eleventh Circuit has explained that in considering equitable mootness, courts should evaluate "the balance of equities, including whether a stay pending appeal has been obtained and if not, why not; whether the plan has been 'substantially consummated;' what type of relief is sought; and what the effect of granting such relief would be." *In re Ferguson*, 683 Fed. Appx. 924, 926 (11th Cir. 2017) (citing *In re Club Assocs.*, 956 F.2d 1065, 1069 n. 11 (11th Cir. 1992)). The Court has previously found that Hazan's plan has been substantially consummated. Plaintiff, DAVID W. LANGLEY ET AL, And DAVID W. LANGLEY, P.A. failed to timely seek a stay. After considering the balance of the equities, the Court should deny Plaintiffs' frivolous against reorganized and discharged Debtor Hazan and all Plaintiffs' claims are equitably moot.

## MOTION TO TRANSFER THE CASE TO BANKRUPTCY COURT

Hazan is respectfully asking the District Court to transfer the case to Bankruptcy Court open case 16-10389-RAM. Congress further provided that the District Court could refer all cases in bankruptcy and any and all related proceedings arising under, in, or related to cases in bankruptcy, to the Bankruptcy

Court. 28 U.S.C. §157(a). <u>Removal Of Cases From State Court</u> 28 U.S.C. §1452(a)

provides as follows:

> (a) A party may remove any claim or cause of action in a civil action
> other than a proceeding before the United States Tax Court or a
> civil action by a governmental unit to enforce such governmental unit's
> police or regulatory power, to the district court for the district
> where such civil action is pending, if such district court has
> jurisdiction of such claim or cause of action under section 1334
> of this title.

As the title to 28 U.S.C. §1452 itself indicates ("Removal of Claims related to

bankruptcy cases"), matters that can be removed include claims "related to" a

bankruptcy case within the meaning of 28 U.S.C. §1334(b).

In addition to 28 U.S.C. §1452(a), any civil action brought in a state court

may also be subject to removal pursuant to 28 U.S.C. §1441(a), if applicable. <u>See</u>

<u>Things Remembered, Inc. v. Petrarca</u>, 516 U.S. 124 (1995). 28 U.S.C. §1441(a)

provides as follows:

> (a) Generally. – Except as otherwise expressly provided by Act of
> Congress, any civil action brought in a State court of which the
> district courts of the United States have original jurisdiction,
> may be removed by the defendant or the defendants, to the
> district court of the United States for the district and division
> embracing the place where such action is pending.

District courts are authorized, but not required, to refer to bankruptcy judges cases under title 11, and proceedings arising under title 11, or arising in or related to cases under title 11. 28 U.S.C. § 157(a). *Schulman v. Cal. Water Res. Control Bd. (In re Lazar)*, 200 B.R. 358, 366 (Bankr. C.D. Cal. 1996) (each district court is authorized to adopt general order of reference for bankruptcy cases). *See Walls v. Wells Fargo Bank, N.A.*, 255 B.R. 38 (E.D. Cal. 2000) (district court exercising discretion *not* to refer claims involving FDCPA which might require jury trial).

Bankruptcy judges may "hear and determine" -- i.e., enter final judgments in --

a. all cases under title 11;

b. all "core proceedings" arising under title 11 or arising in a case under title 11.

28 U.S.C. § 157(b)(1).

## THIS MATTER IS A CORE PROCEEDING

This is a core proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A). This Court has retained jurisdiction to determine the rights to the Debtor's Fisher Island Property. As such, this Charging Lien Motion presents a core matter. *In re 160 Royal Palm, LLC*, No. 18-19441-EPK, 2020 WL 4792094, at 2 (Bankr. S.D. Fla. May 14, 2020) citing *In re Commonwealth Institutional Sec.*, 344 B.R. at 828.

28 U.S.C. § 157(b)(2)(A)-(O) provides examples of core proceedings including but not limited to --

(A) matters concerning the administration of the estate. *See Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.)*, 801 F.2d 60 (2d Cir. 1986) (§ 105 action by debtor to enjoin equity security holders committee from prosecuting state court action to require shareholders' meeting); *In re Mercado- Jiminez*, 193 B.R. 112 (D.P.R. 1996) (motion to vacate

1

order dismissing bankruptcy case); *In re Delta Petroleum (P.R.), Ltd.*, 193 B.R. 99 (D.P.R. 1996) (compensation of debtor's professionals); *In re Res. Tech. Corp.*, 254 B.R. 215 (Bankr. N.D. Ill. 2000) (assumption or rejection of executory contract);

   (B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan of reorganization but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a bankruptcy case; *see U.S. Abatement Corp. v. Mobil Exploration & Producing U.S., Inc. (In re U.S. Abatement Corp.)*, 79 F.3d 393 (5th Cir. 1996) (dispute over amount of creditor's claim and recoupment rights is core proceeding); *S.G. Phillips Constructors, Inc. v. City of Burlington (In re S.G. Phillips Constructors, Inc.)*, 45 F.3d 702, 705 (2d Cir. 1995) (determination of state claim against debtor); *In re Gurry*, 253 B.R. 406 (Bankr. E.D. Va. 2000) (objection to exemptions); *In re Trident Shipworks, Inc.*, 247 B.R. 513 (Bankr. M.D. Fla. 2000) (claim estimation proceeding);

   (C) counterclaims by the estate against "persons" filing claims against estate; *see Lombard-Wall Inc. v. N.Y. City Housing Dev. Corp. (In re Lombard-Wall Inc.)*, 48 B.R. 986 (S.D.N.Y. 1985); *In re RBGSC Inv. Corp.*, 253 B.R. 369 (E.D. Pa. 2000); *Colvard v. Gulf States Drilling Co. (In re Bar M Petroleum Co.)*, 63 B.R. 343 (Bankr. W.D. Tex. 1986); *see also Katchen v. Landy*, 382 U.S. 323 (1966). *But see Kamine/Besicorp Allegany, L.P. v. Rochester Gas & Elec. Co. (In re Kamine/Besicorp Allegany, L.P.)*, 214 B.R. 953, 972 (Bankr. D.N.J. 1997) (subsequent filing of "protective" or "defensive" proof of claim does not convert debtor's complaint from non-core to core proceeding). Note: 11 U.S.C. § 101(41) definition of "person" does not include "governmental units";

(D) orders in respect to obtaining credit;

(E) orders to turn over property of the estate; *see  McClatchey v. Ohio Pub. Employees Deferred Comp. Program (In re Matheney)*, 138 B.R. 541 (Bankr. S.D. Ohio 1992); *Fisher v. Ins. Co. of Pa. (In re Pied Piper Casuals), Inc.*, 50 B.R. 549 (Bankr. S.D.N.Y. 1985). *But see Roddam v. Metro Loans, Inc. (In re Roddam)*, 193 B.R. 971 (Bankr. N.D. Ala. 1996) (unliquidated, disputed state law claim is non-core, related to proceeding and not properly the subject of a turnover order);

(F) proceedings to determine, avoid or recover preferences; *see John E. Burns Drilling Co. v. Central Bank of Denver*, 739 F.2d 1489 (10th Cir. 1984); *Country Junction, Inc. v. Levi Strauss & Co. (In re Country Junction), Inc.*, 41 B.R. 425 (W.D. Tex. 1984), *aff'd*, 798 F.2d 1410 (5th Cir. 1986); *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld L.L.P.*, 201 B.R. 635 (S.D.N.Y. 1996). *But see Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) (suggesting that not all "core proceedings" are "public rights" for purposes of Article III analysis);

(G) motions to terminate, annul or modify the automatic stay; *Divane v. A & C Elec. Co.*, 193 B.R. 856 (N.D. Ill. 1996);

(H) proceedings to determine, avoid, or recover fraudulent conveyances; *see Duck v. Munn (In re Mankin)*, 823 F.2d 1296 (9th Cir. 1987). *But see Granfinanciera*, *supra*;

(I) determinations as to the dischargeability of particular debts; *LTV Steel Co. v. Union Carbide Corp. (In re Chateaugay Corp.)*, 193 B.R. 669 (S.D.N.Y. 1996) (action to determine dischargeability of CERCLA liability is "core" proceeding); *Martin v. Stoddard (In re Stoddard)*, 248 B.R. 111 (Bankr. N.D. Ohio 2000); *Fraley v. United States Dep't of Educ. (In re Fraley)*, 247 B.R. 417 (Bankr. N.D. Ohio 2000) (dischargeability of student loan debt);

(J) objections to discharges; *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld L.L.P.*, 201 B.R. 635 (S.D.N.Y. 1996); *French v. Miller (In re Miller)*, 247 B.R. 704 (Bankr. N.D. Ohio 2000);

(K) determinations of the validity, extent, or priority of liens; *see In re Weaver*, 248 B.R. 106 (Bankr. N.D. Ohio 2000); *Diversified Mortgage Co. v. Gold (In re Gold)*, 247 B.R. 574 (Bankr. D. Mass. 2000); *In re Sims*, 181 B.R. 125, 127 n.2 (Bankr. N.D. Ala. 1995) (only applies to liens on property of the estate);

(L) confirmations of plans;

(M) orders approving the use or lease of property, including the use of cash collateral; (N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate; and

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims; *see St. Clare's Hosp. & Health Ctr. v. Ins. Co. of N. Am. (In re St. Clare's Hosp. & Health Care Ctr.)*, 934 F.2d 15 (2d Cir. 1991) (action for declaratory judgment that insurer was obligated to defend medical malpractice action); *Kirk v. Hendon (In re Heinsohn)*, 247 B.R. 237 (E.D. Tenn. 2000) (proceeding is "core" if it invokes substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of bankruptcy); *Artra Group, Inc. v. Salomon Bros. Holding Co. (In re Emerald Acquisition Corp.)*, 170 B.R. 632 (Bankr. N.D. Ill. 1994) ("core" matters are ones with which bankruptcy court has greater familiarity and expertise than the district court); *New Magma Irrigation & Drainage Dist. v. Bd. of Supervisors (In re New Magma Irrigation & Drainage Dist.)*, 193 B.R. 528 (Bankr. D. Ariz. 1994) ("catch-all"

definitions of core proceedings should be relied on with great care and caution.

## CONCLUSION

Debtor Hazan agrees with David Langley that Bankruptcy Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A). This Court has retained jurisdiction to determine the rights to the Debtor's Fisher Island Property. As such, this complaint presents a core matter. *In re 160 Royal Palm, LLC*, No. 18-19441-EPK.

The bankruptcy court has jurisdiction over this dispute of the administrative fees allegedly incurred by attorney David Langley under 28 U.S.C. §§ 157 and 1334. A charging lien motion presents, at a minimum, a matter "related to" administration of the bankruptcy case to which the fees relate, and so the Court has subject matter jurisdiction over this Charging Lien Motion. *In re 160 Royal Palm, LLC, No.* 18-19441-EPK, 2020 WL 4792094, at 1 (Bankr. S.D. Fla. May 14, 2020).

2020WL 4792094, at 2 (Bankr. S.D. Fla. May 14, 2020) citing *In re Commonwealth Institutional Sec.,* 344 B.R. at 828. The statutory predicates in support of the relief requested herein are 11 U.S.C. § 105 of the United States Code (the "Bankruptcy Code"), and Bankruptcy Rule 2016."

**WHEREFORE**, Defendants, Liza Hazan a/k/a Elizabeth Hazan ("Hazan"), Sean Neil Meehan ("Meehan") respectfully ask the Court to deny Plaintiffs' Motion to Remand and Deny Plaintiffs' Supplemental Motion to Remand and Grant their Motion to Transfer this case to the Bankruptcy Court case 16-10389-RAM and grant such and other relief as the court may deem just and proper.

Dated: Miami, FL

March 28, 2025

Respectfully submitted,

Sean Neil Meehan

/s/

Sean Neil Meehan 6913 Valencia Drive
Miami, Florida 33109
Tel: (305) 487-3580
Email: seannmeehan@gmail.com

Sean Neil Meehan Pro se Defendant

/s/

Liza Hazan a/k/a Elizabeth Hazan 6913 Valencia Drive
Miami, Florida 33109)
Tel: (212) 920-6605
Email: lizahazan77@gmail.com\
Liza Hazan a/k/a Elizabeth Hazan Pro se Defendant

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that we filed the foregoing with the Clerk of the Court and a true and

correct copy of theforegoing was served via U.S. mail or email or ECF system to the parties on the

attached service list as indicated on this 28th day of March 2025.

Respectfully submitted,

Sean Neil Meehan

/s/

Sean Neil Meehan Tel: (305) 487-3580
Email: seannmeehan@gmail.com

Sean Neil Meehan Pro se Defendant

Liza Hazan a/k/a Elizabeth Hazan

/s/

Liza Hazan a/k/a Elizabeth Hazan 6913 Valencia Drive
Miami, Florida 33109
Tel: (212) 920-6605
Email: lizahazan77@gmail.com\

Liza Hazan a/k/a Elizabeth Hazan Pro se Defendant

## SERVICE LIST

<u>VIA ECF or regular mail or email</u>

David W. Langley, Esq. LAW OFFICES OF DAVID W. LANGLEY *Attorney for Plaintiffs*

8551 W. Sunrise Blvd., Suite 303 Plantation, Florida 33322.

# EXHIBIT A



**ORDERED in the Southern District of Florida on July 24, 2019.**

_____

**A. Jay Cristol, Judge**
**United States Bankruptcy Court**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re:

SELECTIVE ADVISOR GROUP, LLC,

      Debtor-in-Possession.

_____/

Case No. 19-14602-BKC-AJC
Chapter 11

### ORDER GRANTING NLG, LLC'S MOTION FOR RULE 9011 SANCTIONS

THIS CAUSE came before the Court for hearing on June 25, 2019 upon NLG, LLC's

Motion for Rule 9011 Sanctions (ECF 63) (the "Motion"). The Motion seeks sanctions under

FRBP 9011 for Selective Advisors Group, LLC's ("Selective") failure to disclose a prior

bankruptcy filing on its voluntary petition filed on April 09, 2019. Selective filed a response

arguing that this error was caused by a simple oversight and that it was rectified within 9 days by

the filing of an amended petition on April 18, 2019. Selective argues that such amendment was

1

within Rule 9011's "safe harbor" period.  At the hearing, and after consideration of the proffers and representations of all interested parties, the Court granted the Motion premised upon the following undisputed facts.

Selective filed a voluntary petition under Chapter 11 of the Bankruptcy Code on April 9, 2019. Question 9 on the second page of the bankruptcy petition requires disclosure of all "prior bankruptcy cases filed by or against the debtor within the last 8 years?" Under penalty of perjury, Sean N. Meehan, as Selective's Manager and authorized representative, responded by checking the box "No" and leaving Question 9 otherwise blank, with no disclosure of any prior bankruptcy case.  The petition was filed by Attorney David W. Langley, without any prior bankruptcy cases disclosed.

However, the petition is admittedly not accurate.  Selective did in fact previously file a petition for relief under Chapter 11 of the Code on May 18, 2015 in the Eastern District of New York, Case No. 8-15-72153. At the hearing, Selective's counsel admitted that both Selective and Selective's counsel knew of Selective's prior bankruptcy case at the time of the filing of the petition in this case, but that the failure to disclose it was a simple oversight.

From the undisputed facts, the Court concludes that Selective violated Rule 9011 when it filed a petition that falsely stated no prior bankruptcy cases were filed by this Debtor in the last 8 years. Rule 9011(b) provides that:

**(b) Representations to the court**

By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

2

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Fed. R. Bankr. P. 9011(b). Pursuant to Rule 9011(c), the court may impose sanctions "upon the attorneys, law firms, or parties that violated subdivision (b) or are responsible for the violation." Fed. R. Bankr. P. 9011(c). *See In re Mroz*, 65 F.3d 1567, 1572 (11th Cir. 1995) (Bankruptcy Code allows sanctions only if the objectionable court paper is signed in violation of Rule 9011). Typically, the party seeking Rule 9011 sanctions must comply with Rule 9011's "safe-harbor" provision; however, the "safe-harbor" provision in Rule 9011(c)(1)(A) does not apply "if the conduct alleged is the filing of a petition in violation of subdivision (b)." Fed. R. Bankr. P. 9011(c)(1)(A). *See also* Fed.R.Bankr.P. 9011 Advisory Committee's note to 1997 amendment; *In re Gordy*, 12-60020, 2013 WL 5488657, at *3 (Bankr. S.D. Ga. Oct. 1, 2013); *In re Smith*, 257 B.R. 344, 351 (Bankr. N.D. Ala. 2001). The bankruptcy petition is excluded from the "safe harbor" provision of Rule 9011 because its filing has immediate serious consequences, such as the invocation of the automatic stay. *In re Smith*, 257 B.R. at 351.

Rule 9011(c)(2), Fed.R.Bankr.P., describes the scope of the sanctions that may be awarded for violations:

**(2) Nature of sanction; limitations**

A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. Subject to the limitations in subparagraphs (A) and (B), the sanction may consist

3

of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.

Thus, if the Court concludes Selective and/or its counsel violated Rule 9011(b), the Court, in its discretion, may impose appropriate sanctions, as limited by subsection (c)(2).

The Court's inquiry focuses on "the merits of the pleading gleaned from the facts and law known or available to the attorney at the time of the filing" while avoiding "using the wisdom of hindsight" and testing "the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted." *See In re Mroz*, 65 F.3d at 1572; *see also Souran v. Travelers Ins. Co.*, 982 F.2d 1497, 1506 (11th Cir.1993). Here, Selective filed a bankruptcy petition just 4 years ago on May 18, 2015 in the Eastern District of New York, effectively staying the proceedings in the same state court case they sought to stay by the filing of the petition herein, that is, Judge Shlomo Hagler's case in the Supreme Court of New York, Index No. 101875/2012. In fact, Selective filed a motion to enforce the automatic stay on April 12, 2019, specifically seeking to stay Judge Hagler's case in the Supreme Court of New York, knowing full well that the prior New York bankruptcy case was dismissed with prejudice, indefinitely.

At the hearing on June 25, 2019, Selective's counsel admitted that both Selective and he knew of Selective's prior bankruptcy case in New York at the time of the filing of the petition in this case, but stated they mistakenly failed to note it in the petition. However, the Court does not believe that such omission is a "simple oversight" or mistake. The petition is signed under penalty of perjury and should be taken seriously. It requests very specific, but limited, information. Selective or, at the very least, Selective's counsel should have known at the time of the filing herein that disclosure of the New York bankruptcy case was required in the petition in this case.

4

Instead, the petition in this case falsely represents that no prior bankruptcy petition was ever filed, and neither Debtor nor counsel provided any reasonable explanation to excuse the blatant omission.

The Court believes Selective and Selective's counsel's filing of a bankruptcy petition in this case with a false representation as to Selective's prior bankruptcy filing in New York violates the provisions of Rule 9011. Additionally, Selective's correction of the petition within 9 days of the original filing to reflect the prior bankruptcy case is ineffective. The "safe harbor" provision in subdivision (c)(1)(A) does not apply as the challenged paper is the petition, which is explicitly excluded under the "safe harbor" provision of Rule 9011. Fed.R.Bankr.P. 9011 Advisory Committee's Note to 1997 amendment. *In re Gordy*, 12-60020, 2013 WL 5488657, at *3; *In re Smith*, 257 B.R. at 351.

Accordingly, the Court granted NLG, LLC's Motion at the hearing on June 25, 2019 and requested an affidavit of fees and costs from the movant. On July 1, 2019, NLG, LLC filed a Notice of Affidavit of Juan Ramirez seeking attorney's fees in the amount of $31,070.00. On July 2, 2019, Selective objected to the fees and costs in the Affidavit, arguing that they should be limited to the failure to initially disclose Selective's prior bankruptcy case and not awarded for the filing or arguing of the Motion to Dismiss or other pleadings in this case. Selective further argues that counsel's hourly rate of $650.00 per hour is excessive and many of the time entries in this case are also excessive.

The Court recognizes that Juan Ramirez is an experienced attorney and acknowledges his service as a state court judge for 24 years at both the trial and appellate levels. However, the Court finds that the rate of $650.00 per hour is excessive for the services rendered in this case as the issues presented were not complex and did not require any specialized knowledge of any particular

5

law. The Court further finds that many of the time entries are excessive as they relate to matters that had nothing to do with the accuracy of the petition or the Motion itself. For instance, movant filed motions and objections in the case that were denied or withdrawn because relief was inappropriate or unauthorized by law. *See* ECFs 20, 35, 59. Moreover, the Court finds no basis to award compensation to movant for appearing at a hearing that was canceled by the Court when counsel was notified in advance of the cancelation. *See* ECF 29. The Court believes that after reduction of the hourly rate and the elimination of charges for matters unrelated to the sanctionable conduct, movant is entitled to a total amount of $9,500.00 in fees and costs as sanctions. Accordingly, it is

**ORDERED AND ADJUDGED** that NLG, LLC's Motion for Rule 9011 Sanctions is **GRANTED** and movant, NLG, LLC, is entitled to sanctions in the total amount of $9,500.00 against Selective Advisor Group, LLC and David Langley, Esq., jointly and severally.

###

Copies furnished to:
Juan Ramirez, Esq.
David Langley, Esq.
Astrid Gabbe, Esq.
Chris Kosachuk
Sean Meehan
AUST

6

Page 1

1          UNITED STATES BANKRUPTCY COURT
              SOUTHERN DISTRICT OF FLORIDA
2

3                          Case No.:  19-14602-AJC

4    In re:

5    SELECTIVE ADVISOR GROUP, LLC,

6         Debtor.
     _____/
7

8

9

10

11                    ECF # 63

12                 June 25, 2019

13

14

15          The above-entitled cause came on for

16   hearing before the HONORABLE A. JAY CRISTOL, one of

17   the Judges of the UNITED STATES BANKRUPTCY COURT, in

18   and for the SOUTHERN DISTRICT OF FLORIDA, at 301 N.

19   Miami Avenue, Miami, Miami-Dade County, Florida, on

20   Tuesday, June 25, 2019, commencing at or about

21   2:02 p.m. and the following proceedings were had:

22

23

24          Transcribed from a digital recording by:
                Helayne Wills, Court Reporter
25

Page 2

1  **APPEARANCES:**

2

   ADR MIAMI, LLC, by
3  JUAN RAMIREZ, JR., ESQ.,
   on behalf of NLG, LLC, and Juan Ramirez

4

5  DAVID W. LANGLEY, ESQ.,
   on behalf of Liza Hazan

6

7  ALSO PRESENT:
   ECRO - Electronic Court Reporting Operator

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1          THE COURT:  That brings us to Selective

2    Advisor Group.  Appearances, please.

3          MR. RAMIREZ:  Juan Ramirez on behalf of

4    NLG, LLC.

5          MR. LANGLEY:  Good afternoon, Your Honor.

6    David Langley appearing on behalf of Selective

7    Advisor Group.

8          THE COURT:  Very well.  This is a motion

9    for sanctions.  Your motion, Mr. Ramirez.

10          MR. RAMIREZ:  Judge, nice to be back.

11    We've been gone for a while.  I'm sure you missed

12    us, right?

13          THE COURT:  Absolutely.

14          MR. RAMIREZ:  Judge, this case you're

15    familiar with it, because you dismissed it.  In

16    argument we're going to rely pretty much on your

17    order dismissing the case with prejudice.  I think

18    you set off a lot of the factors that I think

19    warrant sanctions.

20          I'm going to jump to Page 3, in which you

21    said, "Moreover, the timing of the filing to avoid

22    proceedings in the New York action, in addition to

23    the debtor's failure to list the prior case on the

24    original bankruptcy petition in this case certainly

25    creates suspicion as to whether this petition was

Page 4

1    filed in good faith."

2               I submit to you that it more than creates

3    suspicion, and I'm going to go over the case to

4    argue that it is a classic poster child case for

5    sanctions.

6               You then said that "Debtor is in the

7    business of acquiring judgments and collecting on

8    them."

9               Actually, they've only had this one

10   judgment from New York, the judgment by confession,

11   which the Court knows very well.

12              So let me first discuss the petition,

13   which has 18 questions.  They used one of these

14   forms.  All they had to do was check off the

15   different boxes.  There are 18 boxes, not very

16   complicated, and as you know, they checked off

17   Number 9 that said, "No prior bankruptcy."

18              I'm also going to argue that they lied

19   when they answered Number 10.  In Number 10 they

20   said that there was a business partner or affiliate

21   of the debtor, and then they say Hazan was such a

22   business partner or affiliate of the debtor.

23              Actually, Judge, you did the bankruptcy.

24   You know Selective was not -- Hazan was not a

25   partner or affiliate of Selective.  Throughout all

Page 5

1   these years they've kept the two apart.  They had --

2   at the adversary proceeding they had different

3   lawyers, and they have always to the Court put a

4   front that they are not partners with each other and

5   they're not affiliated with each other.

6           They didn't list any asset -- Hazan didn't

7   list any ownership interest in Selective, and now

8   the only reason they checked off that box and claim

9   to have Hazan as a business partner is so they could

10  have the case fall in front of you instead of be

11  assigned at random to other judges.

12          We then filed a motion to dismiss with

13  prejudice on April 12th.  They didn't do anything to

14  correct that until April 18th.  They waited six days

15  to correct this very blatant error.  They didn't

16  correct any of the others.

17          There were a lot of other things that they

18  did change, though.  All of a sudden in the space of

19  a couple of weeks the assets jumped from zero to

20  50,000, now they jumped to 100,000 to 500,000.  The

21  estimated liabilities, which were zero to 50,000,

22  now jumped from 50,000 to 100,000.

23          So although there are only 18 questions,

24  there were a lot of mistakes in that initial filing.

25  When we get to the declaration, when they filed the

Page 6

1   schedules they disclosed the fact that the
2   corporation basically is nothing but a shell.  They
3   have no cash, no deposits, no accounts receivable,
4   no investments, no inventory.  They have no
5   furniture, no machinery, no real property, no
6   intangible or intellectual property.
7           The only thing they claim to have as an
8   asset is $123,470.71 that they claim you awarded to
9   them in the final judgment on the adversary.  But if
10  you read the final judgment on the adversary, you
11  did nothing of the sort.  You said -- after you
12  mentioned the amount you said, "Whether the various
13  satisfactions and other documents filed by Selective
14  waive Selective's right to collect any further
15  balance is an issue between Selective and NLG."  You
16  didn't award that money.  You just said it was an
17  issue for Selective and NLG.
18          And that's precisely what NLG was trying
19  to do in New York in front of Judge Shlomo Hagler.
20  They had scheduled a hearing, and they were able to
21  delay that hearing by several months by filing this
22  bankruptcy petition.  What's most galling is that
23  they had done that before, and for the same premise,
24  for delaying a resolution of that judgment by
25  confession in New York.

Page 7

1          And the Court has said, "How can you

2    revisit this after so many years have passed?"

3          Well, we've tried to have the Judge rule

4    on our motion to vacate since 2014.  He has neither

5    granted nor denied it.  If he had denied it we could

6    have taken an appeal, but he just keeping adjourning

7    and putting it off and allowing Selective to use all

8    kinds of chicanery to put the thing off.

9          Besides the two bankruptcy petitions, they

10   also filed a notice of removal, which was two and a

11   half years too late.  So they have been trying to

12   delay a decision on the merits in that proceeding,

13   and now they're claiming, "Oh, my God, you can't

14   undo it, because so much time has gone by."

15         It's their fault that so much time has

16   gone by.  We are entitled to a ruling from Judge

17   Hagler, and hopefully he will do that in the next

18   couple of years.

19         THE COURT:  Well, you don't want to rush

20   him.

21         MR. RAMIREZ:  Huh?

22         THE COURT:  You don't want to rush him.

23         MR. RAMIREZ:  No, I don't want to rush

24   him, Judge.  He took -- we had a hearing on

25   June 20th, and he took the case under advisement.

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 8

1          One of the curious things in that hearing

2     is that they argued vehemently that that judgment

3     has been satisfied.  You cannot vacate a judgment

4     that doesn't exist anymore, that's been satisfied.

5     It was satisfied in 2015.  And yet on the petition

6     they're listing 123,000 as something that they're

7     still owed on that satisfied judgment.

8          The Judge asked them point blank, "What is

9     it, satisfied or it's not satisfied?"  Because it

10    shifts from one hearing to another.

11         "No, Judge.  It's satisfied.  We're not

12    trying to collect any money on that judgment."

13         Well, tomorrow we have a hearing in front

14    of another Judge in which they are indeed trying to

15    collect on that judgment.

16         I'm going to use the same case law that

17    was cited by Selective in their response to our

18    motion, and that is In re:  Phoenix Piccadilly.  The

19    Court listed all kinds of factors that the Court can

20    consider.  Every single factor in this case argues

21    in favor of sanctions.

22         Debtor has only one asset.  Here it's

23    questionable whether they even have one asset,

24    because I submit to you that asset was satisfied.

25         They have few unsecured creditors whose

Page 9

1    claims are small in relation to the claims of the

2    secured creditors.  Well, if you vacate that

3    judgment in New York, we go back to being a secured

4    creditor, and our claim is going to be 6 million as

5    opposed to several thousand for these attorneys.

6    And they're only attorneys.  They're not really

7    secured creditors of any debts that Selective has

8    incurred.

9          They have few employees.  They have no

10   employees actually.  That's one of the factors.

11         Number 4, the property is subject to a

12   foreclosure.  Well, you know it is.  Hazan's

13   property on Fisher Island is subject to foreclosure

14   and that's being litigated.  We have still an appeal

15   pending.  We're supposed to have a hearing tomorrow

16   with Judge Moreno, but with the appointment of two

17   new judges, now that case has been reassigned to

18   Judge Rodney Smith.  So I don't know if that's going

19   to delay the appeal.  I suspect it will.

20         The fifth criteria is the debtor's

21   financial problems involve essentially a dispute

22   between the debtor and the secured creditors, which

23   can be resolved in the pending state court action.

24   In fact, we had a motion to vacate that we tried to

25   resolve that, and they were able to put it off by

Page 10

1   filing this.

2          Six, the timing of the debtor's filing

3   evidences an intent to delay or frustrate.  We had

4   that happen here.  The filing of the first

5   bankruptcy was done the day before the hearing on

6   the motion to vacate.  The second filing was done

7   three business days before the bankruptcy -- the

8   bankruptcy was filed three business days or so

9   before the hearing on the motion to vacate.

10          So we have every single criteria, except

11  ours is double, because they did it twice.  We could

12  have asked for sanctions the first time they filed

13  for bankruptcy.  And we didn't, because we just

14  wanted to get the case resolved back in 2015.  We

15  didn't want to bog down with a sanction hearing and

16  all that.  So we went back to state court hoping to

17  get a ruling, and low and behold, we are four years

18  later and still don't have the ruling.

19          Another thing that the case mentions is

20  the venue.  Well, they picked the venue here because

21  they're here, but the only asset they have is in New

22  York, so they filed in New York before.  Why

23  couldn't they file in New York?  NLG is a Delaware

24  corporation, and they reside in Pennsylvania.  So

25  they picked the venue so that they could get the

Page 11

1    case in front of you, but it was certainly not a

2    proper venue as far as the defendants.

3            They made it intentionally very difficult

4    to travel to Miami.  In fact, Mr. Kosachuk has had

5    to appear by phone, and we had problems before with

6    CourtCall, and this is not a convenient venue for

7    him.

8            So for all those reasons I urge the Court

9    to find what you came very close to doing the first

10   time, which is finding bad faith, find that this was

11   done in bad faith.  And then, unlike what they did,

12   we would request a hearing on the amount at a later

13   date.

14           Thank you.

15           THE COURT:  Response.

16           MR. LANGLEY:  Yes.  May it please the

17   Court.  David Langley for Selective.

18           Judge, we believe that this case was filed

19   in good faith.  We filed a response --

20           THE COURT:  Good faith has got nothing to

21   do with this.  This is a motion for sanctions, and

22   the sanctions are predicated on the fact that the

23   person who filed that petition didn't disclose a

24   prior bankruptcy in New York, which is a potential

25   perjury violation.  So the thing we really have to

Page 12

1    decide is whether we should have this person

2    prosecuted for perjury and put in prison, or whether

3    there should be monetary sanctions.

4              Let's not talk about bad faith.  I don't

5    think there's any good faith on either side of this

6    case.  We're here on a specific discrete issue.

7              You're not disputing that the petition was

8    filed, and it omitted stating that there had been

9    the prior petition in New York; is that correct?

10             MR. LANGLEY:  That's correct, Judge.  If I

11   could explain.

12             THE COURT:  That's what we're here about.

13   It would appear to be a sanctionable matter.  As I

14   said, it appears most likely the question should be

15   whether it should be prison or money.

16             What do you have to say?

17             MR. LANGLEY:  Well, first, Judge, if I can

18   address Rule 11, as soon as it was brought to our

19   attention that that had been missed, as counsel

20   pointed out, as Judge Ramirez pointed out, within

21   six days we corrected that, well within the safe

22   harbor period.

23             THE COURT:  I disagree.

24             MR. LANGLEY:  I'm sorry, Judge?

25             THE COURT:  Safe harbor and Rule 11 are

Page 13

1    entirely different than a sworn false statement

2    under penalty of perjury in a petition.  You don't

3    cure that under Rule 11.  But anyhow, go ahead.

4              MR. LANGLEY:  Yes, Judge.  If I could

5    explain the circumstances.

6              I understand how Your Honor might see

7    this.  If you look at the date that we filed this,

8    it was the date that we had a hearing before Your

9    Honor.  With a client living on Fisher Island that's

10   hard to get to, and I'm up in Broward, it's not easy

11   to get together and go over things.

12             The reason this was filed on this

13   particular day was because we had a hearing and I

14   went across the street with Mr. Meehan and sat down

15   on the benches in front of the federal building, and

16   we went over the pleadings on my phone, the

17   petition.

18             At that point we were just filing the

19   initial petition, not the schedules, which is why,

20   as the Judge points out, the numbers jumped up.  The

21   numbers weren't there to begin with.  That wasn't a

22   misfiling.

23             But in any event, Judge, we missed it, and

24   I'm sorry that we missed it.  My client certainly

25   knew there had been a prior bankruptcy.  We were

Page 14

1  sitting there looking at the petition on the phone.

2  I didn't realize that we had missed the prior

3  filing.  We were trying to get the basic information

4  correct, and we filed it.

5          As soon as it was brought to my attention

6  we fixed that.  We disclosed it.  It's not like we

7  were trying to hide that.  We knew about it, they

8  knew about it.  It wasn't something we were trying

9  to conceal.  Certainly, when this was filed, it

10  wasn't filed for that particular purpose, to try to

11  avoid any disclosure of that issue.  It wasn't

12  intentional.

13          My client, I'm certain, didn't understand

14  the consequences of, you know, what all those little

15  things on the -- he's not an attorney.  He read

16  through the petition, as I did.  We missed the fact

17  that we hadn't disclosed something, and we've

18  corrected it.

19          I don't know if you'd like me to address

20  any of the other issues, the reasoning behind this.

21  Because I think there's a lot more outside of what

22  goes on in this courtroom that Your Honor is not

23  aware of, that prompted this.

24          THE COURT:  Well, I'm not interested in

25  what's going on outside this courtroom.  I'm

Page 15

1   interested in what's going on in this courtroom, and

2   in that petition was a perjurous statement made, and

3   as I said, it appears very clear that it's not cured

4   by Rule 11, and that sanctions are appropriate.  As

5   I said, I think the question is, should the

6   sanctions be criminal prosecution or should they be

7   a monetary sanction.

8           Do you have any thoughts on that issue?

9           MR. LANGLEY:  Yes, Judge.  Certainly for

10  criminal, there was no criminal intent here.  Not on

11  my part, certainly, and not on the part of

12  Mr. Meehan.  As I said, there were -- you know, it's

13  not like we're trying to disclose something -- fail

14  to disclose something.  We knew everybody knew about

15  it.  There was no purpose, no point, no intent to

16  try to conceal anything.  It was a mistake.  It was

17  an honest mistake.  We didn't get it listed.

18          We had a lot going on.  We had 15 matters

19  before Your Honor on the other cases.  We had a lot

20  of things going on.  My client was drowning with all

21  the pleadings that are being filed in six different

22  pending actions by NLG, in which, in our opinion,

23  they're trying to win the case, not on the merits,

24  but financially by running Selective out of money.

25          And that's why we filed this, and we filed

Page 16

1  it to try to, you know, bring some resolution to

2  those matters, to try to resolve all these issues,

3  which are the same issues you heard at trial two

4  years ago, just over and over and over again, in six

5  other proceedings, three different District Courts

6  here, two state courts here, including the Gordo

7  case, where we're going in tomorrow, and the Hagler

8  case up in New York.

9         It was our opinion that once NLG realized

10 they had lost the trial, that the appeal had been

11 dismissed twice, just waiting on it to get dismissed

12 again, that their decision was to try to win, not

13 legally, not on the merits, but financially, by just

14 filing so many pleadings in so many different cases,

15 with Mr. Kosachuk filing using other people's

16 credentials, just to run my client out of money.  We

17 were trying to put a stop to that.

18         We filed in a hurry and were reviewing the

19 case on the phone.  There was certainly no intent on

20 his part or my part to try to mislead the Court or

21 deceive the Court.  There was certainly no criminal

22 intent, Judge.

23              THE COURT:  Anything further?

24              MR. LANGLEY:  Again, if you want me to --

25              THE COURT:  I don't want you to do

Page 17

1   anything.  You need to do whatever you think is
2   appropriate to represent your client properly.
3          MR. LANGLEY:  Okay, Judge.  I would like
4   to address, again -- I understand you, when we had
5   the motion to dismiss, you saw this as Selective
6   filing this bankruptcy, the timing, filing for a
7   strategic purpose, and again, I would suggest the
8   timing was because that was the day I had a chance
9   to meet with Mr. Meehan, and the purpose was
10  financial, not strategic.  It's closely related, I
11  would grant that.
12          But again, this case started out -- the
13  Hazan case and the adversary involving Selective
14  started out in a fairly normal fashion.  If you
15  recall, there were a couple of attorneys that
16  represented NLG, filed a motion for stay relief.
17  Geoffrey Aaronson handled that.  Fully briefed.  You
18  made a decision.  That moved on.
19          Then the adversary was filed.  The
20  Genovese law firm represented NLG.  Things moved
21  along fairly normally.  The pleadings were
22  relatively good.  The matters were all briefed.  We
23  have hearings, everything proceeded fairly normally.
24          Genovese didn't get paid.  They sued, got
25  a judgment.  Then came Jim miller.  He didn't get

Page 18

1   paid.  He withdrew.  Then Nick Bangos came in.  He

2   didn't get paid.  He withdrew.

3           Then everything changed, Judge.  Judge

4   Ramirez came in to handle the hearings.  He's

5   appeared in New York court, not as an attorney, but

6   as an interested party, claiming he's owed hundreds

7   of thousands of dollars by NLG.  I think it's fair

8   to assume -- and not to disparage Judge Ramirez in

9   any way, but I think it's fair to assume that he's

10  not getting paid by the hour to come to these

11  hearings.

12          And we know that Astrid Gabbe is not

13  getting paid.  She basically admitted that to me

14  when I spoke to her the one time on the phone where

15  she's ever communicated with anybody.  She wasn't

16  aware of who I was, who I represented.  She didn't

17  know anything about the case.  She didn't know that

18  you had threatened $100,000 in sanctions against her

19  the day before.  She didn't know that a pleading had

20  been filed the night before under her name.  She

21  didn't know anything about anything.

22          She made it clear she rents out her

23  credentials to Kosachuk so he can file these

24  pleadings.  And so the purpose is, what they've been

25  doing since that period, since Gabbe got involved,

Page 19

1   was file as many pleadings in as many different

2   courts as possible to just run up the fees for

3   Ms. Hazan and for Mr. Meehan.  That's what they've

4   been doing, and that's what we were trying to put a

5   stop to.

6         It does make sense for all of these cases

7   involving all of these same issues that were already

8   tried once to be in front of Your Honor.  That to us

9   made perfect sense.  But the issue behind that

10  wasn't so much the strategic sense as the financial,

11  to be able to get through the appeal and have the

12  case decided on the merits, not to have one party

13  outrun the other financially, wear the other one

14  down financially and win the case on financial

15  resources, not on the merits.

16        That's what was behind this, no bad

17  intent.  No bad intent as far as the timing, and no

18  intent to deceive Your Honor.  I've been appearing

19  before you for over 30 years.  I don't think I've

20  ever been accused of saying anything at all the

21  least bit misleading or dishonest, and I would tell

22  you very sincerely we were not trying to hide the

23  New York prior filing from the Court, and we brought

24  it about and we've been ready to discuss it.

25        Before we even filed this case, Judge, I

Page 20

1    was in contact with the trustee up there to discuss

2    with him reopening that case to set aside the -- to

3    revise the order, because the order had the words

4    "with prejudice" in there, but the transcript showed

5    that there was a request for a finding in that case

6    of bad faith, and the Judge said, "No, there's no

7    finding of bad faith."  Section 349 says you have to

8    have bad faith to dismiss with prejudice.

9             So we were aware of that case and we're

10   dealing with it, and it was simply an oversight that

11   we did not list it until Mr. Ramirez brought it to

12   our attention, and we then moved quickly to amend.

13   I'm not sure what else I can tell you, Judge, other

14   than that we had no bad intentions when we filed

15   this.

16             And, Judge, just to point out, you've been

17   hearing all these things for two years.  There have

18   been many cases -- many issues where NLG has filed

19   things that you felt were inappropriate.  You've

20   told them to get rid of a lis pendens or there would

21   be sanctions, and they promptly went out and filed a

22   second one.  You threatened them with punitive

23   damages.  They went out and they filed a third one.

24   Prior to that they moved to enter a clerk's default

25   against a plaintiff, something that doesn't exist,

Page 21

1   and you said that was improvident, and they turned

2   right around and did it again.

3          One of the last hearings we had we were

4   arguing a motion that had been priorly -- that had

5   been filed prior to that and had been denied.  It's

6   just pleading after pleading, action after action.

7   Writs of garnishment being served on the debtors by

8   NLG and by Mr. Kosachuk, issue after issue, where it

9   was clear that NLG and its parties, its attorneys,

10  could be subject to sanctions.  At one point you

11  even threatened $100,000 in sanctions.

12         And now for them to be seeking sanctions

13  against us, against me, against Selective, is just

14  inequitable, Judge.  I understand how you feel about

15  what we missed here, but to sanction us, when NLG

16  has done so many things that were improper --

17         THE COURT:  And they've been sanctioned

18  for it.

19         MR. LANGLEY:  Pardon me?

20         THE COURT:  And they've been sanctioned

21  for doing things.

22         MR. LANGLEY:  One time for $9,500.

23         THE COURT:  I believe it's a good number.

24         MR. LANGLEY:  Yes, I know, Judge, and that

25  was for hundreds of thousands of dollars spent by

Page 22

1   the parties on this side, and an award of $9,500

2   that hasn't been paid.

3              Again, Judge, just two years worth of

4   fighting with these folks and misrepresentation

5   after misrepresentation, and improper filings and

6   pleadings and actions one after the other.  To

7   sanction us at this date I think would just be

8   inequitable, Judge.

9              Thank you.

10             THE COURT:  Anything further?  Thank you.

11             Okay.  The Court has determined that

12  there's been an action subject to sanctions in the

13  failure to disclose under penalty of perjury the

14  prior case, and the Court will grant the motion for

15  sanctions and award appropriate sanctions.

16             The Court will prepare the order awarding

17  the sanctions. The Court will direct Mr. Ramirez to

18  file an affidavit of whatever legal expenses were

19  incurred in this matter.

20             Can you do that by the 2nd of July or do

21  you need more time?

22             MR. RAMIREZ:  No, Judge.  I can do it.  I

23  can do it.

24             THE COURT:  Very well then.  Send in such

25  an affidavit, and the Court will review it and make

Page 23

1    a determination.  The Court will give the opposing

2    side the benefit of the doubt as far as whether or

3    not there should be criminal proceedings, and we'll

4    stay with monetary sanctions as the way to go in

5    this matter.

6                I thank you both for coming today and

7    helping me to work up this case.  Good luck and

8    we'll see you again soon, I'm sure.

9                MR. RAMIREZ:  Thank you, Judge.

10               (Thereupon, the hearing was concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 24

1                          **CERTIFICATION**

2

3      **STATE OF FLORIDA:**

4      **COUNTY  OF  DADE:**

5

6                    I, HELAYNE F. WILLS, Shorthand

7      Reporter and Notary Public in and for the State of

8      Florida at Large, do hereby certify that the

9      foregoing proceedings were taken by electronic

10     recording at the date and place as stated in the

11     caption hereto on Page 1; that the foregoing

12     computer-aided transcription is a true record of my

13     stenographic notes taken from said electronic

14     recording.

15                    WITNESS my hand this 28th day of

16     June, 2019.

17

18

19     _____

                      **HELAYNE F. WILLS**
20           **Court Reporter and Notary Public**
            **In and For the State of Florida at Large**
21        **Commission No:   GG123092   Expires 8/2/2021**

22

23

24

25

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 22

1    the parties on this side, and an award of $9,500
2    that hasn't been paid.
3              Again, Judge, just two years worth of
4    fighting with these folks and misrepresentation
5    after misrepresentation, and improper filings and
6    pleadings and actions one after the other.  To
7    sanction us at this date I think would just be
8    inequitable, Judge.
9              Thank you.
10             THE COURT:  Anything further?  Thank you.
11             Okay.  The Court has determined that
12   there's been an action subject to sanctions in the
13   failure to disclose under penalty of perjury the
14   prior case, and the Court will grant the motion for
15   sanctions and award appropriate sanctions.
16             The Court will prepare the order awarding
17   the sanctions. The Court will direct Mr. Ramirez to
18   file an affidavit of whatever legal expenses were
19   incurred in this matter.
20             Can you do that by the 2nd of July or do
21   you need more time?
22             MR. RAMIREZ:  No, Judge.  I can do it.  I
23   can do it.
24             THE COURT:  Very well then.  Send in such
25   an affidavit, and the Court will review it and make

Page 23

1   a determination. The Court will give the opposing

2   side the benefit of the doubt as far as whether or

3   not there should be criminal proceedings, and we'll

4   stay with monetary sanctions as the way to go in

5   this matter.

6           I thank you both for coming today and

7   helping me to work up this case. Good luck and

8   we'll see you again soon, I'm sure.

9           MR. RAMIREZ: Thank you, Judge.

10          (Thereupon, the hearing was concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 24

1                        **CERTIFICATION**

2

3    **STATE OF FLORIDA:**

4    **COUNTY  OF  DADE:**

5

6                I, HELAYNE F. WILLS, Shorthand

7    Reporter and Notary Public in and for the State of

8    Florida at Large, do hereby certify that the

9    foregoing proceedings were taken by electronic

10   recording at the date and place as stated in the

11   caption hereto on Page 1; that the foregoing

12   computer-aided transcription is a true record of my

13   stenographic notes taken from said electronic

14   recording.

15                WITNESS my hand this 28th day of

16   June, 2019.

17

18

19   _____

                    **HELAYNE F. WILLS**
20             **Court Reporter and Notary Public**
           **In and For the State of Florida at Large**
21        **Commission No:  GG123092  Expires 8/2/2021**

22

23

24

25

# EXHIBIT B

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION
### www.flsb.uscourts.gov

In re:

LIZA HAZAN                                    Case No. 16-10389-AJC
a/k/a ELIZABETH HAZAN,
                                             Chapter 11

      Debtor.

_____/

## MOTION TO APPROVE ATTORNEY'S FEES AND FOR APPROVAL AND ENFORCEMENT OF A CHARGING LIEN
### And
### REQUEST FOR AUTHORITY TO RECORD A *LIS PENDENS*
### And
### REQUEST FOR EVIDENTIARY HEARING

     Movant, David W. Langley, P.A., files this Motion to Approve Attorney's Fees and for Imposition and Enforcement of a Charging Lien, and for authority to record a *lis pendens*, and in support states:

## INTRODUCTION

    1.    This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. A charging lien motion presents, at a minimum, a matter "related to" administration of the bankruptcy case to which the fees relate, and so the Court has subject matter jurisdiction over this Charging Lien Motion. *In re 160 Royal Palm, LLC, No.* 18-19441-EPK, 2020 WL 4792094, at 1 (Bankr. S.D. Fla. May 14, 2020).

    2.    Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

    3.    This is a core proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A). This Court has retained jurisdiction to determine the rights to the Debtor's Fisher Island Property. As such, this Charging Lien Motion presents a core matter. *In re 160 Royal Palm, LLC*, No. 18-19441-EPK,

1

2020 WL 4792094, at 2 (Bankr. S.D. Fla. May 14, 2020) citing *In re Commonwealth Institutional Sec.,* 344 B.R. at 828.

4.      The statutory predicates in support of the relief requested herein are 11 U.S.C. § 105 of the United States Code (the "Bankruptcy Code"), and Bankruptcy Rule 2016.

5.      A summary proceeding in the original action represents the preferred method of enforcing an attorney's charging lien in Florida. *Everett v. City of St. Petersburg*, 2017 WL 1434785 at 3 (M.D. Fla. 2017), *Stok Folk and Kon, P.A. v. Fusion Homes, LLC*, 584 B.R. 376, 382 (S.D. Fla. 2018) (citing *Daniel Mones, P.A. v. Smith,* 486 So. 2d 559, 561 (Fla. 1986)). Case law in Florida has consistently held that the proper forum for adjudicating the validity, enforceability and amount of a charging lien is with the trial judge before whom the underlying action is pending. *CK Regalia, LLC v. Thornton*, 159 So. 3d 358, 360 (Fla. 3d DCA 2015); see also *Baker & Hostetler, LLP v. Swearingen,* 998 So. 2d 1158, 1161 (Fla. 5th DCA 2008) ("Generally, a summary proceeding in the original action represents the preferred method of enforcing an attorney's charging lien in Florida as opposed to a separate action"). An attorney's lien should be enforced in the proceeding where it arose because the parties are before the court and the subject matter is there. *In re Warner's Estate*, 160 Fla. 460, 35 So. 2d 296, 298-99 (1948).

6.      "Federal courts, although they recognize no common-law lien in favor of attorneys, give effect to the laws of the states in which they are held." *Property Cas. Co. of Am. v. Paramount Lake Eola, L.P.,* No. 6:08–cv–805–Orl–28GJK, 2010 WL 2977981, at 5 (M.D. Fla. June 21, 2010).

7.      A charging lien "is available where there has been an attempt to avoid the payment of fees, or a dispute as to the amount involved." *Sinclair, Louis, Siegel, Heath, Nussbaum and Zavertnik, P.A. v. Baucom*, 428 So. 2d 1383 (Fla. 1983).

2

## FACTUAL BACKGROUND

8.     Movant has been attorney of record for the Debtor, Liza Hazan, ("Debtor") in the above styled cause since entering an appearance on September 6, 2016.  Counsel's representation was approved by the Court on October 19, 2016.

9.     Movant has handled many significant matters for the Debtor in this case and related cases and was trial counsel for Ms. Hazan in the Adversary Proceeding, Case No. 16-1439-AJC.

10.     Movant's Retainer Agreement with the Debtor, a copy of which is attached as Exhibit A, states:

> It is specifically agreed that David W. Langley, P.A. shall and is hereby granted all general, possessory and retaining liens and all equitable, special and **attorneys' charging liens** upon the client's interest in any and all real and personal property within the jurisdiction of the court for any balance due, owing and unpaid at the conclusion of the case or the sooner termination of employment. Such lien(s) shall relate back to the date of initial employment and shall be superior in dignity to any other lien subsequent to the date hereof. (emphasis added).

11.     Movant has provided billing statements to the Debtor throughout the representation during which time all objections raised by the Debtor were addresses by Movant. Copies of Movant's billing statements are attached as Composite Exhibit B.

12.     The Debtor has been unable to pay all fees as they have been incurred, but has at all times represented that all fees would be paid on the sale of the Debtor's Fisher Island property. Movant has repeatedly requested that the Debtor commit in writing to the payment of all fees on the closing of the sale of her home. While the Debtor has stated that she intends to pay fees at closing, she has at all times refused to commit to an amount or to provide the Movant with binding written assurance that Movant would actually be paid.

13.     The Debtor has also refused to agree to pay Movant for future services at counsel's current reduced billing rate. As a result of these conflicts, and other issues, Movant's representation

3

of the Debtor has terminated.

14.    All fees and costs requested by Movant are for services rendered and expenses incurred in this action and the related adversary proceedings and appeals and ancillary proceedings (the Proceedings).

15.    Movant obtained a Final Judgment in Ms. Hazan's favor in the Adversary Proceeding, eliminating the second mortgage on her Fisher Island home and dispensing with a foreclosure action against the home. Movant also negotiated a settlement with the first mortgage holder, JP Morgan Chase Bank, to allow for confirmation of the Debtor's Plan without objection from Chase, allowing the Debtor to remain in the home for over six years since this bankruptcy action was filed. Ms. Hazan now has the home listed for sale for $26,000,000.00.

16.    The Debtor presently owes Movant the sum of no less than $168,125.63 for attorney's fees and costs incurred in the Proceedings. This includes time dating back to 2016. Movant's billing statements are attached as Composite Exhibit B.

17.    While Movant has periodically received partial payments from the Debtor, the Debtor has at all times maintained a past due balance. Further, at times the ability of the Debtor to pay her attorneys has been seriously in question. As a result of these and other factors set forth below, Movant requests a fee multiplier of 2.5. See *In re Miniscribe Corp*, 309 F.3d 1234 (10th Cir.2002) and discussion below.

18.    A charging lien is necessary in order to protect Movant's fees and costs until such time as said fees and costs are paid.

19.    The lien is claimed against the Debtor's Fisher Island Property, as the Debtor has retained this Property only as a result of Movant's successful efforts.

20.    Movant requests the Court approve the amount of fees sought by Movant, along

4

with the requested multiplier, find that an attorney's charging lien exists for that amount against any money, property or assets obtained by or on behalf of the Debtor as a result of Movant's efforts in this case, particularly including the Fisher Island Property, and authorize Movant to record a Lis Pendens against the Debtor's Fisher Island Property to protect Movant's interests.

## MEMORANDUM OF LAW

In a Bankruptcy case, state law determines whether a lien has been created in the context of a bankruptcy proceeding. *In re Washington*, 242 F.3d 1320, 1322 (11th Cir. 2001).

The Florida Supreme Court defines charging liens as "an equitable right to have costs and fees due an attorney for services in the suit secured to him in the judgment or recovery in that particular suit." *Sinclair, Louis, Siegel, Heath, Nussbaum & Zavertnik, P.A. v. Baucom,* 428 So.2d 1383, 1384 (Fla.1983).

In order to impose a charging lien, Florida law requires:

(1) a contract between the attorney and client; (2) an express or implied understanding that payment is either contingent upon recovery or will be paid from the recovery; (3) an attempt by the client to avoid paying or a dispute as to the amount of the fee; and (4) a timely notice of a request for a lien.

*In re Washington,* 242 F.3d at 1323 (*citing Baucom* at 1385).

An attorney's charging lien attaches to a judgment or recovery of assets, and there is a cash res out of which counsel may be compensated for services performed. *In re Jarax Int'l, Inc.*, 81 B.R. 715, 717 (Bankr. S.D. Fla. 1987), citing *Beach v. Townsend (In re TLC of Lake Wales, Inc.)*, 13 B.R. 593, 595 (Bankr.M.D.Fla.1981).

As stated by this Court in *In re Jarax*, Judge Paskay discussed the Florida common law attorney's charging lien in detail in his case of *Beach v. Townsend (In re TLC of Lake Wales, Inc.),*

5

13 B.R. 593 (Bankr.M.D.Fla.1981).  In *Matter of TLC of Lake Wales, Inc.*, Judge Paskay stated:

> Under Florida law, a charging lien attaches to the judgment, and an attorney who
> has a charging lien is entitled to have the judgment enforced. *Nichols v. Kroelinger*,
> 46 So.2d 722 (Fla.1950). Although the charging lien does not attach until after
> judgment or recovery has been obtained, it relates back and takes effect from the
> date of the attorney's first commencement of services. *Randall v. Archer*, 5 Fla. 438
> (1854).
> A charging lien is subject to any rights in property which are valid against the client
> at the time the lien attaches, 4 Fla.Jur.2d Attorney's at Law, s 162, but the lien is
> "superior to a creditor's claim in whose favor execution has been levied and to a
> subsequent attachment, garnishment, trustee process or other lien on the money or
> property involved subsequent in point of time." 7 Am.Jur.2d, Attorney's at Law, s
> 289. *Matter of TLC of Lake Wales, Inc.*, 13 B.R. 593, 595 (Bankr. M.D. Fla. 1981).

Judge Paskay went on to find that the Bankruptcy Court had the authority to determine the

amount of fees, even if for services rendered in another court[1], starting:

> This leaves for consideration whether this Court has authority to determine the
> reasonableness of the fee and fix the amount of Townsend's compensation.
> Although there have been no counter affidavits filed on behalf of the Trustee
> disputing the amount of fees requested by Townsend, **the Court is satisfied that it
> has inherent authority to determine the reasonableness of said fees.** See e. g. *In
> re E. C. Ernst, Inc.*, supra at 320; *In re Miller*, supra at 32. See especially *In re Land
> Investors, Inc.*, 544 F.2d 925, 932 (7th Cir. 1976). But see, *United States v.
> Transocean Air Lines*, 356 F.2d 702 (5th Cir. 1966), which held that the Bankruptcy
> Court did not have jurisdiction to reassess fees already determined by the District
> Court. In the *Land Investors*, supra case, the Court found that because the Court in
> which the attorney's services were rendered had not determined the amount of fees,
> the Bankruptcy Court was free to exercise jurisdiction and determine the amount.
> This Court is, therefore, satisfied that in the present instance, *Transocean*, supra is
> not controlling and because the State Court did not determine the reasonableness of
> fees, this Court has the power to do so. Land Investors, supra at 932. *Matter of TLC
> of Lake Wales, Inc.*, 13 B.R. 593, 596 (Bankr. M.D. Fla. 1981). (emphasis supplied).

In this case, Movant's representation of the Debtor was approved by this Court on October

19, 2016. In electronic and verbal communications with Movant, Debtor has at all times

represented to Movant that payment will be paid from the proceeds of the sale of her Fisher Island

---

[1] This Court, as well, has awarded fees incurred in other courts, including various appeals and
ancillary matters. *In re Rosenberg*, No. 09-13196-BKC-AJC, 2017 WL 1102864, at 3 (Bankr.
S.D. Fla. Mar. 16, 2017).

Property. The Retainer Agreement also specifically provides for a charging lien. See Exhibit A. The Debtor has been unable to pay Movant's fees in a timely manner and a dispute has arisen between the Debtor and Movant as to payment of fees and costs.

Movant is simultaneously filing a Notice of Charging lien and Retaining Lien with the Court.

Although an attorney's charging lien attaches to a judgment for the client, this equitable lien relates back to the commencement of the services rendered by the attorney on behalf of the client and takes effect from that time. *Miles v. Katz*, 405 So.2d 750, 752 (Fla. 4th DCA 1981). An attorney's charging lien has priority over any judgment lien obtained after commencement of an attorney's services. Id, *In re Washington*, Supra, at 1323.

<u>Lodestar Multiplier</u>

Bankruptcy Courts have allowed a lodestar multiplier where exceptional results were obtained and other Johnson factors were present, such as the risk of non-payment. See *In re Miniscribe Corp*, 309 F.3d 1234 (10th Cir.2002), *In re Computron Software, Inc.*, 6 F.Supp.2d 313 (D.N.J. 1889) (finding a 2.5 multiplier "fair"), *In re Biskup*, 236 BR 332 (Bankr.W.D.Pa. 1999)(2.76 multiplier).

This Court has awarded a fee based on a multiplier where "the prospect of being paid was extremely risky" and "that payment, if any, would not occur for many years". *In re Transcapital Fin. Corp.*, No. 06-12644-BKC-AJC, 2010 WL 2926537, at 2 (Bankr. S.D. Fla. July 21, 2010).

In computing the reasonable value of the discharged attorney's services, the trial court can consider the totality of the circumstances surrounding the professional relationship between the attorney and client. Factors such as time, the recovery sought, the skill demanded, the results obtained, and the attorney-client contract itself will necessarily be relevant considerations. *In re*

7

*Transcapital,* supra, citing *Searcy Denney et al v. Poletz*, 652 So.2d 366, 371 (Fla.1995).  When the dispute is between a client and the client's attorney, the lodestar amount is not the only relevant or controlling factor, rather it is merely a starting point. Id.  Here, Movant no longer represents the Debtor and a dispute has arisen as to the payment of Movant's fees.

In *In re Transcapital*, Peter Russin, then a retained expert witness, now Judge, testified that in Florida, multipliers range from 1.5 to 5.0 for contingent representation in commercial matters depending on the amount of risk of non-payment, the time frame in which a firm may have to wait for the possibility of payment, and the type of case involved, citing *Florida Patient's Compensation Fund v. Rowe,* 472 So.2d 1145 (Fla.1985), as modified by *Standard Guaranty Insurance Co. v. Quanstrom*, 555 So.2d 828 (Fla.1990) and *Kuhnlein v. Department of Revenue*, 662 S.2d 309 (Fla.1995). See *Johnson v. Ga. Highway Express Inc.*, 488 F.2d 714 (5th Cir.1974). In *Transcapital*, this Court approved a 2.5 multiplier.

Here, Movant was the third attorney retained by the Debtor.  Although the Debtor signed a retainer agreement based on an hourly rate, the Debtor was unable to provide an initial retainer and the Debtor's ability to pay was very limited.  Full payment was always contemplated to be contingent on a successful outcome, absent which the Debtor had no ability to pay.  Movant also undertook the representation knowing that this case would not be fully resolved for some time. It has taken just short of six years since Movant was retained for the Debtor to be able to list her Fisher Island Property for sale, and it may still be some time before a closing is completed and Movant paid.

Movant also contends that he has obtained exceptional results for the Debtor.  This Chapter 11 case was filed one day before a scheduled foreclosure sale on NLG LLC's claimed $4,876,654.29 second mortgage.  Movant successfully challenged that mortgage, saving the

8

Debtor's home as well as the amount of that mortgage. The Fisher Island Property is now listed for sale for $26,000,000.00, with liens against the Property estimated to be between seven and eight million dollars.

Movant entered an appearance on behalf of the Debtor on September 6, 2016 and has handled many of the major issues in this case and the related adversary proceedings and a number of the appeals, many of which were aggressively pursued by NLG and Chris Kosachuk. Movant tried the adversary case to a successful conclusion, then obtained the dismissal of the first appeal of the Final Judgment and was involved to a limited extent in the second appeal and the appeal to the Eleventh Circuit. Movant also obtained Debtor's confirmation of her Plan. Movant also has been actively representing the Debtor during the past year since the Eleventh Circuit upheld this Court's ruling, in responding to the many attacks by NLG, LLC and then by Chris Kosachuk.

Movant has been representing the Debtor since 2016 with only partial payment, risking the possibility of non-payment if the Debtor was not ultimately successful in this litigation, as well as the added risk that the subject Property may not be of sufficient value to pay all secured claims with enough left over to allow the Debtor to pay her attorneys.

Movant requests a 2.5 multiplier to compensate for the risk undertaken, the lengthy delay in payment and the difficulty in responding, often with a need for urgency and expedited treatment, to respond to the constant attacks by NLG and Kosachuk.

<u>Lis Pendens</u>

Movant has a good faith concern that the Fisher Island Property may be sold before an evidentiary hearing can take place on this Motion and therefore requests Court authorize Movant to record a *Lis Pendens* against the Fisher Island Property pursuant to Florida Statute 48.23(3).

9

**WHEREFORE**, Movant, David W. Langley, P.A., respectfully requests the Court award reasonable attorney's fees and costs incurred in this action in the amount of $420,314.07 in favor of Movant and against the Debtor, approve and enforce the charging lien in favor of Movant against the Debtor's Fisher Island Property, grant Movant the right to record a *Lis Pendens* against the Fisher Island Property, and grant such other and further relief as the Court deems just and proper.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida, and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A); and that a true copy of the above document was filed electronically and served via CM/ECF and by mail to attached service list to all parties of interest on this 25th day of July, 2022.

<div style="margin-left:40%">

DAVID W. LANGLEY
Former Attorney for Debtor
8551 W. Sunrise Blvd., Ste 303
Plantation, Florida 33322
Telephone:     954-356-0450
Facsimile:     954-356-0451
E-mail: dave@flalawyer.com
By:     /s/ David W. Langley
           David W. Langley, Esq.
           Florida Bar Number 348279

</div>

## SERVICE LIST

16-10389-AJC Notice will be electronically mailed to:

Geoffrey S. Aaronson, Aaronson Schantz Beiley P.A.
gaaronson@aspalaw.com, 5408891420@filings.docketbird.com

Joel M. Aresty, Esq., Joel M. Aresty P.A.
aresty@mac.com

Elizabeth J Campbell on behalf of Creditor JMB/Urban 900 Development Partners, Ltd
ecampbell@lockelord.com, marian.scott@lockelord.com

Elizabeth J Campbell on behalf of Plaintiff JMB/Urban 900 Development Partners, Ltd
ecampbell@lockelord.com, marian.scott@lockelord.com

Rebecca N Casamayor on behalf of Creditor Valencia Estates Homeowners' Association, Inc.
rcasamayor@dhaberlaw.com

Robert P. Charbonneau, Esq. on behalf of Creditor Fuerst, Ittleman David & Joseph, P.L.
rpc@ecccounsel.com,
nsocorro@ecclegal.com;bankruptcy@ecclegal.com;bankruptcy.ecc@ecf.courtdrive.com

Adam A Diaz on behalf of Creditor U.S. Bank National Association
adiaz@shdlegalgroup.com, southerndistrict@shdlegalgroup.com

Jeffrey S Fraser on behalf of Creditor SouthEast Financial, LLC
bkfl@albertellilaw.com

Michael A Friedman on behalf of Attorney Michael Friedman
mfriedman@gjb-law.com, gjbecf@gjb-law.com;jsardina@gjb-law.com

Michael A Friedman on behalf of Creditor NLG, LLC
mfriedman@gjb-law.com, gjbecf@gjb-law.com;jsardina@gjb-law.com

Robert C Furr, Esq on behalf of Creditor Board of Managers of Spencer Condominium
mortman@furrcohen.com, atty_furrcohen@bluestylus.com

Astrid Gabbe on behalf of Counter-Claimant NLG, LLC
astridgabbe@gmail.com

Astrid Gabbe on behalf of Creditor NLG, LLC
astridgabbe@gmail.com

Astrid Gabbe on behalf of Defendant NLG, LLC
astridgabbe@gmail.com

Joe M. Grant, Esq. on behalf of Creditor Selective Advisors Group, LLC
jgrant@msglaw.com, jenna-munsey-
6083@ecf.pacerpro.com;efile@msglaw.com;mg197ecfbox@gmail.com

Joe M. Grant, Esq. on behalf of Plaintiff Selective Advisors Group, LLC

jgrant@msglaw.com, jenna-munsey-
6083@ecf.pacerpro.com;efile@msglaw.com;mg197ecfbox@gmail.com

Robert A Gusrae on behalf of Creditor Fisher Island Community Association, Inc.
ROBERT.GUSRAE@GMAIL.COM

David B. Haber, Esq. on behalf of Creditor Valencia Estates Homeowners' Association, Inc.
dhaber@dhaberlaw.com,
ngomez@dhaberlaw.com;rcasamayor@dhaberlaw.com;dbhpaservice@dhaberlaw.com

Tamara D McKeown on behalf of Defendant Liza Hazan
tdmckeown@mckeownpa.com

James B Miller on behalf of Counter-Claimant NLG, LLC
bkcmiami@gmail.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

Ashley Prager Popowitz on behalf of Creditor Real Time Resolutions, Inc.
Ashley.popowitz@mccalla.com, flbkecf@mccalla.com

Steven G. Powrozek, Esq. on behalf of Creditor JPMorgan Chase Bank, National Association
spowrozek@logs.com, electronicbankruptcynotices@logs.com

Eric J Silver on behalf of Other Professional Drew Dillworth
esilver@stearnsweaver.com,
rross@stearnsweaver.com;larrazola@stearnsweaver.com;cgraver@stearnsweaver.com

Michael W Simon on behalf of Creditor S&S Collections, Inc.
ppaoletti@simonsigalos.com, dgasser@simonsigalos.com

Andrew D. Zaron, Esq. on behalf of Creditor JPMorgan Chase Bank, National Association
azaron@leoncosgrove.com, jgomez@leoncosgrove.com


*Notice will be sent by Mail and email: 'elizabeth hazan' <elizabethhazan07@gmail.com>*
Elizabeth Hazan
6913 Valencia Drive
Miami Beach, FL 33109

# EXHIBIT C

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI-DADE DIVISION
### www.flsb.uscourts.gov

In re:

                                  CASE NO.:  16-10389-AJC

LIZA HAZAN,
       Debtor.                            CHAPTER 11

_____/

## FIFTHAMENDED DISCLOSURE STATEMENT

### *Table of Contents*

| | | | |
|---|---|---|---|
| I. | **INTRODUCTION** | | **page 2** |
| | A. | **Purpose of This Document** | |
| | B. | **Deadlines for Voting and Objecting;** | |
| | | **Date of Plan Confirmation Hearing** | |
| | C. | **Disclaimer** | |
| II. | **BACKGROUND** | | **page 4** |
| | A. | **Description and History of the Debtor's Business** | |
| | B. | **Insiders of the Debtor** | |
| | C. | **Management of the Debtor Before and During the Bankruptcy** | |
| | D. | **Events Leading to Chapter 11 Filing** | |
| | E. | **Significant Events During the Bankruptcy Case** | |
| | F. | **Projected Recovery of Avoidable Transfers** | |
| | G. | **Claims Objections** | |
| | H. | **Current and Historical Financial Conditions** | |
| III. | **SUMMARY OF THE PLAN OF REORGANIZATION** | | **page 13** |
| | **AND TREATMENT OF CLAIMS AND EQUITY INTERESTS** | | |
| | A. | **What is the Purpose of the Plan of Reorganization?** | |
| | B. | **Unclassified Claims** | |
| | | 1. | *Administrative Expenses* |
| | | 2. | *Priority Tax Claims* |
| | C. | **Classes of Claims and Equity Interests** | |
| | | 1. | *Classes of Secured Claims* |
| | | 2. | *Classes of Priority Unsecured Claims* |
| | | 3. | *Class[es]of General Unsecured Claims* |
| | | 4. | *Class[es] of Equity Interest Holders* |
| | D. | **Means of Implementing the Plan** | |
| | E. | **Risk Factors** | |
| | F. | **Executory Contracts and Unexpired Leases** | |
| | G. | **Tax Consequences of Plan** | |
| IV. | **CONFIRMATION REQUIREMENTS AND PROCEDURES** | | **page 27** |
| | A. | **Who May Vote or Object** | |

  B.  **Votes Necessary to Confirm the Plan**
     1.  *Votes Necessary for a Class to Accept the Plan*
     2.  *Treatment of Nonaccepting Classes*
  C.  **Liquidation Analysis**
  D.  **Feasibility**
     1.  *Ability to Initially Fund Plan*
     2.  *Ability to Make Future Plan Payments*
        *And Operate Without Further Reorganization*
V.  **EFFECT OF CONFIRMATION OF PLAN**     **page 31**
  A.  **Discharge Of Debtor**
  B.  **Modification of Plan**
  C.  **Final Decree**

**EXHIBITS**
**Exhibit A** Historical Earnings and Assets
**Exhibit B** Liquidation Analysis
**Exhibit C** Cash on hand on the effective date of the Plan
**Exhibit D** Projections of Cash Flow and Earnings for Post-Confirmation Period
**Exhibit E** Ballot

**INTRODUCTION**

   This is the fifthamended disclosure statement (the "Disclosure Statement") in the Chapter 11 case of Liza Hazan (the "Debtor"). This Disclosure Statement contains information about the Debtor and describes theFourthAmended Plan of Reorganization (the "Plan") filed by the Debtor on November 15, 2017. A full copy of the Plan is filed herewith. ***Your rights may be affected. You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.*** This Plan provides classes of claims; classes of priority claims, classes of secured claims, and classes of unsecured claims and equity. Unsecured creditors holding allowed claims will receive distributions which the proponent of this Plan has valued at dividend of 41% to 100% of total allowed claims accrued for up to sixty months and paid every six months with the first payment due in month 6, while undisputed unsecured claims are paid by 7/11/18.

  A.  **Purpose of This Document**

This Disclosure Statement describes:

       The Debtor and significant events during the bankruptcy case,
       How the Plan proposes to treat claims or equity interests of the type you
       hold (*i.e.,*what you will receive on your claim or equity interest if the plan
       isconfirmed),
       Who can vote on or object to the Plan,
       What factors the Bankruptcy Court (the "Court") will consider when
       deciding whether to confirm the Plan,
       Why the Proponent believes the Plan is feasible, and how the treatment

of your claim or equity interest under the Plan compares to what you wouldreceive on your claim or equity interest in liquidation, and

The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement. This Disclosure Statement describes thePlan, but it is the Plan itself that will, if confirmed, establish your rights.

**B.      Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

The Court has not yet confirmed the Plan described in this Disclosure Statement. This sectiondescribes the procedures pursuant to which the Plan will or will not be confirmed.

> 1.      *Time and Place of the Hearing to [Finally Approve This Disclosure Statement and] Confirm the Plan*
>
> 2.      *Deadline For Voting to Accept or Reject the Plan*

If you are entitled to vote to accept or reject the plan, vote on the enclosed ballot andreturn the ballot inthe enclosed envelope to Clerk Bankruptcy Court U.S. Courthouse C. ClydeAtkins United States Courthouse301 North Miami Avenue, Room 150 Miami, FL 33128. Seesection IV.A. below for a discussion of votingeligibility requirements.

Your ballot must be received by the date indicated in the order of the court or it will not be counted.

> 3.      *Deadline For Objecting to the Adequacy of Disclosure and Confirmation of the Plan*

Objections to this Disclosure Statement or to the confirmation of the Plan must be filed with the Courtand served pursuant to orders served herewith.

> 4.      *Identity of Person to Contact for More Information*

If you want additional information about the Plan, you should contact:

<div align="center">

David W. Langley
Counsel for Debtor
8551 W. Sunrise Blvd., Suite 303
Plantation, FL 33322
954-356-0450
dave@flalawyer.com

</div>

**C.      Disclaimer**

***The Court must approve this Disclosure Statement as containing adequate information toenable parties affected by the Plan to make an informed judgment about its terms. TheCourt***

<div align="center">3</div>

*has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted.*

## II.    BACKGROUND

### A.    Description and History of the Debtor's Business

Debtor works as a business consultant specializing in identifying locations for high-end restaurants and retailers around the world. She has historically earned in excess of $350,000 per year. As part of her consulting business, Debtor presently has an exclusive contract to place new locations for an international beauty and skin care company selling luxury brand products to high-end clientele. The Debtor has several projects under contract that will provide sufficient income to confirm and fund her plan. The Debtor presently has closed contracts that will earn her significant funds (comparable to past earnings) in the next six months.

Debtor works with other major hospitality brands, restaurants, lounges and nightclubs that will earn her millions of dollars of income in the near future.

The Debtor's primary asset is her homestead residence located at 6913 Valencia Drive, Fisher Island, Florida (the "Property") scheduled at $12,000,000.00.

Additionally debtor has scheduled household furniture, dishes and china, household electronics and clothing, shoes and accessories and jewelry, fixtures and art valued at $327,500.

The equity in the Fisher Island Property would support a refinancing, which could also be used to support funding a plan if necessary.

In addition to the foregoing, Debtor's husband controls a corporation, Real Estate Holdings Group, L.D.C. which owns a condominium in New York City in the Spencer Condominium, Unit 1A at 1 East 62nd Street, New York, New York 10065. Real Estate Holdings Group, L.D.C. has committed to contribute funds from the proceeds of refinancing and ultimate sale of the condominium unit to Debtor's estate to fund the plan in order to assure the Debtor's successful reorganization and completion of the plan.

### B.    Insiders of the Debtor

Debtor is an individual and constitutes Debtor's insiders as defined in §101(31) of the United States Bankruptcy Code (the "Code"). For the past two years there has been no salaries paid except professional earnings.

### C.    Management of the Debtor Before and During the Bankruptcy

During the two years prior to the date on which the bankruptcy petition was filed, the officers, directors, managers or other persons in control of the Debtor (collectively the "Managers") were the Debtor.

The Managers of the Debtor during the Debtor's Chapter 11 case have been: The Debtor.

After the effective date of the order confirming the Plan, the directors, officers, and voting trustees of the Debtor, any affiliate of the Debtor participating in a joint Plan with the

Debtor, or successor of the Debtor under the Plan (collectively the "Post Confirmation Managers"), will be: The Debtor.

### D.    Events Leading to Chapter 11 Filing

Debtor sought relief under Chapter 11 in order to end years of litigation between multiple creditors in various disputes across the country, to bring all matters into a single forum, and to fashion a Plan of Reorganization, which will resolve all disputes without needlessly jeopardizing the Debtor's equity in her various assets.

In 2007 Debtor purchased the property located at 6913 Valencia Drive, Fisher Island, Florida (the "Property") now scheduled at $12 million for $5.1 million from NLG, LLC ("NLG") through its then claimed principal Chris Kosachuk. The Debtor has been involved in litigation with NLG and Kosachuk since that time as more fully described below.

### Chase Bank

In March 7, 2007 Debtor signed a first promissory note and mortgage with Washington Mutual Bank in the amount of $3,825,000. JP Morgan Chase Bank claims to now own the Washington Mutual Bank promissory note and mortgage signed by Debtor in March 7, 2007.

Chase filed a foreclosure action in August 2013, which remains pending as case 2013-CA-025902. Chase did not file an assignment of mortgage to itself until 5/26/16. The maturity date of the Loan is August 2051.

### NLG

### NLG FL litigation

NLG's self-titled manager Chris Kosachuk provided a gift of equity or an "equity contribution" of $1,275,000 stating that Debtor does not have to pay back the amount of $1,275,00 on the closing statement and also had Debtor execute a note and second mortgage on the Fisher Island property for that same amount from Debtor after Closing.

NLG sued within four months of the closing in 2007, and has pursued Debtor to this date in an attempt to wrongfully obtain Debtor's property. Litigation between the parties has occurred in four states, multiple courts and has continued for over a decade, and continued in this court, costing Debtor millions in legal fees, adversely affecting her health and her career, and putting her in the financial position of having to seek relief in a Chapter 11 reorganization.

Chris Kosachuk asserted that he was the manager and representative of NLG. Kosachuk has testified that he transferred NLG in 2007 to Luxcom, a Russian company. In 2012 Chris Kosachuk testified that NLG is now owned by Meridian Trust Company located in BVI but he could not recall to whom he reported. In 2014 Chris Kosachuk testified in deposition that NLG is now owned by Meridian Trust Company located in Nevis and the owner of Meridian Trust Company is Ernie Dover. From prior to the purchase date, more than a decade ago, to today, the

parties have had multiple disputes and have engaged in litigation in multiple courts in Florida, New York, Pennsylvania and Delaware. Final orders have been entered in various courts setting forth the rights of these parties. But the litigation nevertheless has continued, and was now in this Court.

NLG obtained a judgment on the promissory note signed by Debtor on April 28, 2008. ("The Scola Judgment").NLG also sued Debtor for foreclosure in 2011. In 2014, Judge Peter Lopez assigned NLG's judgment against Debtor, the Scola Judgment along with all NLG's rights, claims and benefits against Debtor to Selective Advisors Group, LLC. ("Selective")  and also ordered Selective to provide a partial credit in theamount of $2,746,953.34 which amount includes principal and interest through August 31, 2014(representing the full amount of the Scola judgment) at the 11% interest per annum. Selective did so.

NLG appeared in this case but failed to timely file a proof of claim. NLG is merely a notice party. NLG is not a secured creditor in this case. Selective is listed in Debtor's schedule as her secured creditor. On May 13, 2016 NLG moved for stay relief in this court (D.E. 66) but said relief was denied (D.E. 176) on August 23, 2016. Selective Advisors Group, LLC, an affiliate of Debtor's husband, owns NLG's claim through execution on a judgment against NLG. On August 23, 2016 the bankruptcy court entered its decision denying NLG's motion for relief from the automatic stay. ECF 176.
In June 12, 2017 NLG moved again for Relief for Stay D.E. 475. Said Motion was denied on June 28, 2017. D.E. 500.

### NLG NY Litigation

NLG domesticated the judgment obtained against debtor on April 28, 2008 ("the Scola Judgment") in New York in 2014.New York Supreme Court Judge Barbara Jaffee,having recognized the Miami-Dade Judge Peter Lopez Order of Assignment of the NLG's Judgment ("The Scola Judgment") against the Debtor to Selective Advisors Group, LLC ("Selective") and having accepted the Selective's Satisfaction of NLG's Judgment against the Debtor Ordered on November 5, 2014:

"That the caption of the case, *NLG, LLC vs Elizabeth Hazan,* be changed to substitute Selective Advisors Group, LLC as Plaintiff in place of NLG and that the New York County Clerk is directed to accept for filing the Florida Court Order of assignment, judicially assigning the underlying Florida judgment from plaintiff to Selective; it is further

ORDERED, that the County Clerk is directed to reflect on the docket of this case that the Florida judgment between plaintiff against defendant, domesticated here, has been satisfied; it is further

ORDERED, that the County Clerk is directed to accept for filing the satisfaction of Judgment or other appropriate satisfaction piece; and it is further

ORDERED, that the County Clerk is directed to remove and strike any judgments of record in this action under Index No. 108020/08."

NLG also filed a lawsuit in New York alleging Debtor fraudulently transferred the New York condo (described below). On November 2014, Hon. Judge Barbara Jaffee dismissed bothactions filed by NLG.

**Spencer Condominium**

Debtor bought a condominium in New York City on Fifth Avenue and 62nd Street on December 2005 in the Spencer Condominium, Unit 1A of 1 East 62nd Street, New York, New York 10065 ("The New York Condominium").

**Debtor transferred this New York Condominium in August, 2011. The Board of Managers alleges that the transfer was madewithout the consent of Spencer Condominium. The Board of Managers has agreed to the approval of this Disclosure Statement. The Internal Revenue Service has filed a Proof of Claim in this case. The statute of limitations for the IRS to contest the transfer has not yet run, but IRS has taken no such position and has not appeared in the case other than the filing of a Proof of Claim. The New York Condominium had no equity at the time of the transfer.**

Debtor's husband controls the corporation, Real Estate Holdings Group LDC which now owns the condominium. The Spencer Condominium Board of Managers has been involved with The Debtor and REHG in litigation since 2008 resulting in a confidentialsettlement agreement executed in March 2015. Spencer Condominium disputes that the Settlement Agreement is enforceable at this time, but in March 2017 Judge Singh of the New York Supreme Court has ordered the parties to comply with the Settlement Agreement; The settlement includes a resolution of the following lawsuits:

*Board of Managers of Spencer Condominium v. Elizabeth Hazen, et al;*
> No. 111644/09.
*Real Estate Holding Group, LDC v. Board of Managers of Spencer Condominium et al;*
> No. 154149/2012
*Real Estate Holdings Group, vs. Spencer Condominium*
> No. 159254/2013

All three cases have been dismissed and settled and REHG is presently hiring a real estate broker to list the condominium unit for sale to satisfy thealleged mortgages (alleged creditors of this Debtor) as well as toresolve the assessments allegedly due the Board of Managers.The unit will be listed for sale.

On July 21, 2016 Debtor filed the following motions: Motion for Relief from Stay Spencer Condominium, (D.E. 115), Motion to Seal or for in Camera Review (D.E. 116) and Motion for Abstention (D.E. 117). All three Debtor's Motions have been withdrawn without prejudice. On February 24, 2017 Debtor filed three new motions in this case: A Motion to Seal, D.E. 387, A Motion for Abstention D.E. 388, A Motion for Relief from Stay D.E. 389 and An Amended Motion for Stay relief Spencer Condominium litigation and request for expedited Hearing, D.E. 390.Debtor also filed an objection to Spencer'sProof of Claim.  On March 1, 2017,This Court granted the agreed Order granting Debtor's Amended Motion for Order for Stay relief Spencer Condominium litigation and request for expedited Hearing, D.E. 392. The Court ruled as follows: "The Debtor's Motion is granted. The automatic Stay is lifted solely for the purpose of permitting the New York Supreme Court to exercise jurisdiction over the litigation

between the Debtor and Spencer Condominium and related parties and thestipulation for settlement therein. The 14 day Stay period pursuant to Bankruptcy Rule 4001(a)(3) is waived. No property of theestate will be affected by this Order".

In the case of *Real Estate Holdings Group, vs. Spencer Condominium*No. 159254/2013in July 27, 2016, Real Estate Holdings Group, L.D.C. ("REHG") Owner of The New York Condominium filed an Order to Show Cause to enforce the confidential Stipulation of settlement executed by thepartiesin March 2015. In March 2, 2017, Honorable Judge Singh granted Plaintiff REHG's Motion to enforce the Confidential Settlement with Spencer Condominium as the stay has been vacated and ordered the parties to comply with the terms of the settlement within 30 days of the Order. The matter was adjourned to April 25, 2017 (2:30pm) to monitor compliance.

On April 25, 2017 Honorable New York Supreme Judge Singh granted the Plaintiff REHG's Motion to enforce the terms of the settlement agreement dated 3/2015 and ruled as follows: "After a conference held today the Court finds that all parties are in compliance with the terms of stipulation dated 3/2015."

In the case of*Board of Managers of Spencer Condominium v. Elizabeth Hazan*No. 109083/2008 Spencer has obtained an award in the amount of $109,554.86.This awardwas never converted to a judgmententered or recorded in any court. However the parties have agreed that this amount of alleged money owed by the Debtor to Spencer prior to her transfer of ownership of the New York condo in 2011 over six years ago shall be paid by REHG and not by the Debtor in theplan. Spencer has no standing to object to the Debtor's plan or object to her confirmationandis bound by theirconfidential Stipulation of Settlement executed on March2015 and enforced by New York Judge Singh in April 25, 2017.

### Reorganization

The Debtor intends to reorganize her debts and liabilities through a combination of: (a) negotiating and/or litigating as may be necessary, resolutions with certain secured and unsecured creditors; and (b) making distributions funded by her assets and income from her consulting work, or if necessary, refinancing and contributions from her husband's companies.

To date, the Debtor's efforts have focused on negotiating resolutions with several creditors, litigatingwith two other creditors, conferring with counsel to begin formulating the structure and terms of a proposedPlan, and expanding her consulting income for the eventual benefit of her estate and creditors.

E.    **Significant Events During the Bankruptcy Case**

*    Date of Order for Relief under Chapter 11 on 1/11/16.

*    Meeting of Creditors Chapter 11 held on 2/17/16 at 2PM.

*    Deadline for complaint re dischargeability was 4/18/16.

    \*      Professionals approved by the court
             Geoffrey Aaronson appointed 5/3/16 DE 85 nunc pro tunc to petition date.
             Joel Arestywas substituted as counsel for Debtor in Possession on
             7/29/2016 (D.E. 126).
             David W. Langley entered an appearance as counsel for the Debtor on
             9/6/2016 and was approved by the Court on October 19, 2016.

    \*      Contested claim disallowance proceedings: pending; see claim treatments.

    \*      Claims bar, proofs of claim due 5/17/16; For a governmental unit: 7/11/16

    \*      Debtor hasmanaged her affairs to enhance the value of her assets. Post
             petition, the bankruptcy filing, has allowed Debtor toreorganize allowing
             Debtor to propose a plan for payment of creditors.

    \*

### ADVERSARY PROCEEDINGS *Selective Advisors and Elizabeth Hazan v. NLG, LLC*, Adv. Case No. 16-1439-AJC

On August 21, 2016 Selective filed an Adv. Case No. 16-1439-AJC D.E.1. On 10/21/2016 Debtor moved to amend the Complaint to add Debtor, Liza Hazan as Plaintiff. On October 20, 2016. D.E.8. NLG filed their answer and their counterclaims. D.E5 and D.E 6.

On 11/08/16 Plaintiffs Selective and Hazan filed their motions to dismiss Count I and Count II of NLG's counterclaims and Motion for Judgment on the pleading D.E. 11 and D.E. 12. On December 6, 2016 Plaintiffs Selective and Hazan filed their Motion for leave to file Amended Complaint against NLG to add a count under Florida Statute § 65.08and Florida Statute § 65.011for quieting title and a count for damages. D.E. 32. On December 19, 2016 This Court ordered the parties to submit Orders on Plaintiffs' motions to dismiss NLG's counterclaims and Plaintiffs' motions for Judgment on the Pleadings. In December 23, 2016 Debtor Hazan amended her Complaint to add additional Counts D.E. 40. In 12/30/2016 This Court entered an Order granting Plaintiff's Motion to amend and allowing Second Amended Complaint. On January 3, 2017 Plaintiffs filed their Second Motion to Amend Complaint to add additional Tort claims, D.E 47 and D.E 48, adding additional torts.

On 01/13/17 NLG's counsel, Michael Friedman, filed his expedited Motion to Withdraw as attorney of record for NLG citing irreconcilable differences D.E 54. In 01/23/17 thisCourt granted Michael Friedman's Motion to Withdraw, D.E 61, andalso granted Plaintiffs Selective and Hazan's Second Motion to amend Complaint. D.E 62.

On 02/22/17 NLG's third counsel filed his notice of appearance - James Miller, D.E.75. On 03/01/17 NLG's third counsel filed his expedited motion to withdraw citing once again irreconcilable differences and also filed his motion to allow NLG to extend time to meet the Court's deadlines. D.E. 76. On 03/03/2017 Plaintiffs Selective and Hazan filed their Motion for Default against NLG for failing to answer Plaintiffs' Third Amended Complaint. D.E. 85.On 03/10/17 this court denied NLG's motion to extend time. D.E. 94.

On 03/17/17 this Court granted in part Plaintiff's Motion for Default against Defendant NLG and denied Plaintiffs' motion for judgment on pleadings as moot because of the subsequent

filings and amendments. This Court granted a Default in favor of Plaintiffs and against Defendant NLG and ruled as follows:

> The Court also finds that the withdrawal and retention of multiple counsel by theDefendant does not constitute "cause" or "excusable neglect" warrantingan extension of time to comply with filing requirements. The Court set deadlines in this case for the filing of pleadings, specifically the filing of aresponsivepleading to the second amended complaint; but the Defendant did not meet those deadlines and has failed to demonstrate sufficient cause existsto extend those deadlines. Accordingly, the Court believes the Plaintiff is entitled to a default…"D.E 100.

NLG moved to vacate the default in March 24, 2017 (D.E. 104). The Court denied the Motion on April 20, 2017 (D.E. 112).

Former counsel for NLG (its fourth) filed an Expedited Motion to Withdraw on May 4, 2017. This follows an expedited Motion to Withdraw filed by prior counsel, James Miller, in March 1, 2017 which followed an Expedited Motion to Withdraw filed by the Genovese firm on January 12, 2017. NLG's initial counsel moved to withdraw in the main case on September 12, 2016.

The default against NLG, LLC was set aside in May 8, 2017 D.E 132 and the Court entered an order setting the matter for trial in July 13, 2017. The Trial in the Adversary proceedings 16-10389-AJC was concluded on July 13, 2017 and Proposed Orders by all parties were submitted on August 14, 2017.

In November 1, 2017 Honorable Judge AJ Cristol issued Final Judgment on Counts I, II and III of Plaintiffs' Selective and Liza Hazan aka Elizabeth Hazan Third Amended Complaint and NLG's Amended Counterclaim as follows:

"The Scola Judgment obtained by NLG against the Debtor, and all rights, claims and benefits held by NLG against Debtor related to said Judgment, were judicially assigned to Selective pursuant to the Lopez Assignment Order, and the right to foreclose securing the debt traveled to the assignee Selective. Although NLG's right to foreclose against Hazan, as established by the Third District of Appeal, had been assigned to Selective,the Gordo Foreclosure Judgment granted NLG the right to foreclose, Assuming the validity of the Gordo Foreclosure Judgment, the Debtor exercised her right to redeem the property by satisfying said judgment prior to the foreclosure sale. Satisfactions of the Note and Mortgage are recorded in the official records and several courts have recognized that Debtor's Debt to NLG has been paid, including the New York State Supreme courts, wherein Judge Jaffe found that NLG's judgment on the Note, the Scola Judgment, was judicially assigned to Selective and was thereafter satisfied. Upon satisfaction, NLG was credited for the Scola Judgment and Mortgage to partially satisfy NLG's debt to Selective under the domesticated Quebec Judgment.

The Court believes that credit should, however, be adjusted to reflect the amounts determined to be due and owing by the Gordo Foreclosure. NLG was owed $4,876,654.29 from Hazan on account of the Note and Mortgage, pursuant to the Gordo Final Judgment. Giving full faith and credit to the Gordo Foreclosure Judgment and viewing the amount determined in the judgment to

be the greater amount NLG established it was owed for the Note and Mortgage pursuant to the Lopez Assignment Order, Selective should give credit to NLG for $4,878,654.29, which credit will leave the mortgage redeemed.

This Court concludes that NLG has no further rights to any claims against Debtor with respect to the Note and Mortgage, as the public records of Miami-Dade County reflect that the Scola Judgment and consequently the Mortgage were assigned and satisfied, and the property fully redeemed prior to foreclosure sale, as provided in the Gordo case, as provided in the Gordo foreclosure sale, as provided in the Gordo Foreclosure Judgment. NLG's Proof of Claim #17, having been filed after the bar date, it is disallowed and the Court finds that NLG has no standing in this case based upon the note, claim or lien emanating therefrom. Accordingly it is

ORDERED AND ADJUDGED that Count I, II and III of Plaintiff's Third Amended Complaint and NLG's Amended Counterclaim are GRANTED IN PART AND DENIED IN PART as follows:

1. NLG, LLC's judgment on the promissory note, the Scola Judgment, recorded at Book 26406, Page 3259-3260, CFN2008R0446831, also recorded at Book 26357 Pages 3948-3949 CFN20080361591, the Note and the Mortgage recorded at Book 25559 Pages 4266-4272 CFN2007R0410013, NLG, LLC's foreclosure Judgment entered in favor of NLG and against CFN200R0410013 NLG, LLC's foreclosure Judgment entered in favor of NLG and against Elizabeth Hazan on December 4, 2015, the Gordo Foreclosure Judgment recorded at Book 29902 Pages 3737-3742 CFN20150812181 affecting Debtor's homestead Property known as 6913 Valencia Drive, Miami Florida 33109 with the following legal description:

    LOT 7, Block 2, LINDISFARNE ON FISHER ISLAND SECTION 10
according to the Plat thereof, recorded in PLAT Book 157 Page 64, of the
    Public Records of Miami-Dade County, Florida.

have been satisfied and paid, and are deemed **SATISFIED OF RECORD** and Debtor hasgood title to said Property against the claims or purported claims by, through, under, oragainst it by NLG, LLC and the title to the property is forever quieted as to all claims ofNLG, LLC.

2. Selective shall give credit to NLG, LLC in the amount of $4,876,654.29 toward NLG'soutstanding debt to Selective pursuant to the Quebec Judgment.

3. NLG's proof of claim #17 is disallowed and NLG, LLC has no claim against the Debtor Liza Hazan a/k/a Elizabeth Hazan under the Note, Mortgage or any court order.

4. Counts IV, V, VI, VIII, and IX of Plaintiff's Third Amended Complaint are set for trial by separate order."

**Valencia Estates Homeowners' Association**

The Debtor has entered into a Stipulation for Settlement with Valencia Estates Homeowners' Association, Inc. The Debtor has agreed to approval of the stipulation by this Court and the Association has agreed to support the Debtor's reorganization.

### F.    Projected Recovery of Avoidable Transfers

The Debtor has completed her investigation with regard to prepetition transactions.

11 USC 547(b) preferences limits the look back for an insider preference to one year. Florida statute726.106(2) likewise has a one year limitation.

11 USC 548 fraudulent transfers has a two year look back, and incorporates Florida Statute 726 whichhas a four year look back, but only as to avoidance for intentional hinder delay or fraud, or lack of reasonableequivalent value, which facts are not relevant to the plan in this case.

**The Internal Revenue Service has filed a Proof of Claim in this case. The statute of limitations for the IRS to contest a transfer is ten years and has not yet run. IRS has not challenged any transfers in this case and has not appeared in the case other than to file of a Proof of Claim. Debtor transferred the New York Condominium more than six years ago, in August, 2011.The Debtor contends that the New York Condominium had no equity at the time of the transfer.**

### G.    Claims Objections

The Debtor has not completed claim objections but the current plan reflects the objectionscontemplated.

### H.    Current and Historical Financial Conditions

The identity and fair market value of the estate's assets are listed in an Exhibit A and B to thisstatement. Debtor is the source of this information and Debtor's experience with her assets is the basis of valuation.

Debtor's income based on consulting is not a regular monthly income which wouldlend itself to making monthly payments. Debtor's income, while significant, is sporadic, as a result of which payments are proposed on quarterly or bi-yearly basis.

I. Taxes

Debtor has tax liabilities as evidenced by priority claim in plan Class 1.

### III.    SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITYINTERESTS

### A.    What is the Purpose of the Plan of Reorganization?

As required by the Code, the Plan places claims and equity interests in various classes and describesthe treatment each class will receive. The Plan also states whether each class of claims or equity interests isimpaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by thePlan.

### B.    Unclassified Claims

Certain types of claims are automatically entitled to specific treatment under the Code. They are notconsidered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in theirview, their treatment under the Plan does not comply with that required by the Code. As such, the PlanProponent has *not* placed the following claims in any class:

### 1.    *Administrative Expenses*

Administrative expenses are costs or expenses of administering the Debtor's Chapter 11 case whichare allowed under §507(a)(2) of the Code. Administrative expenses also include the value of any goods sold tothe Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcypetition. The Code requires that all administrative expenses be paid on the effective date of the Plan, unless aparticular claimant agrees to a different treatment.

### 2.    *Priority Tax Claims*

Priority tax claims are unsecured income, employment, and other taxes described by §507(a)(8) of theCode. Unless the holder of such a §507(a)(8) priority tax claim agrees otherwise, it must receive the presentvalue of such claim, in regular installments paid over a period not exceeding 5 years from the order of relief.

See class 1 below

### C.    Classes of Claims and Equity Interests

The following are the classes set forth in the Plan, and the proposed treatment that they will receiveunder the Plan:

*Classes of Priority Unsecured Claims*

Certain priority claims that are referred to in §§507(a)(1), (4), (5), (6), and (7) of the Code are required to be placed in classes. The Code requires that each holder of such a claim receive cash on the effective dateof the Plan equal to the allowed amount of such claim. However, a class of holders of such claims may vote toaccept different treatment.

The following chart lists all classes containing claims under §§507(a)(1), (4), (5), (6), and (a)(7) of theCode and their proposed treatment under the Plan:

*Classes of Secured Claims*

Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that aresubject to setoff) to the extent allowed as secured claims under §506 of the Code. If the value of the collateralor setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will[be classified as a general unsecured claim].

The following chart lists all classes containing Debtor's secured prepetition claims and their proposedtreatment under the Plan:

General unsecured claims are not secured by property of the estate and are not entitled to priorityunder §507(a) of the Code.

The following chart identifies the Plan's proposed treatment of Class contains general unsecured claimsagainst the Debtor:

*Class[es] of Equity Interest Holders*

Equity interest holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtor.With respect to an individual who is a debtor, the Debtor is the equity interest holder.

| Admin | Description | Treatment |
|-------|-------------|-----------|
| | Geoffrey Aaronson | Mr. Aaronson has agreed to accept payment in the amount of $142,686.86 in fees and $2,313.13 in costs reimbursement,from a third party in full satisfaction of this claim.<br><br>SETTLED |
| | Joel Aresty | Attorney Joel Aresty has agreed to accept $35,000.00 in fees and $1,500.00 in costs payable as follows: $3000 within 5 days of entry of Order Approving Settlement followed by 19 payments of $1500 starting May 1, 2016 and an additional $5000 at confirmation.Stipulation |

| | | |
|---|---|---|
| | | amended between the parties on November 1, 2017. Monthly payments in the amount of $1000 starting on November 1, 2017 Remaining Balance owed $28,000.<br><br>SETTLED |
| | David W. Langley | Paid as awarded or agreed. |
| | US Trustee | paid in full at confirmation |

**Priority Claims**

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 1 | **IRS**<br><br>**Claim #3** | yes | The $24,663.00 priority tax claim will be paid within five years of the petition date. Equal Payments of $2,674.34 every six months to include interest on anyunpaid claim amounts after theeffective date of the plan at 3%. |

**Secured Claims**

**6913 Valencia Drive Property Fisher Island Florida**

| | | | | |
|---|---|---|---|---|
| 2 | **Chase Bank** | | yes | **First Secured Mortgage –**<br>The claim bar date has passed in this case, and Chase has not filed a Proof Of Claim.   Chase was scheduled as |

| | | | | disputed, contingent and unliquidated. |
|---|---|---|---|---|
| | | | | The Original note in the amount of $3,825,000.00 signed by Debtor on March 2007 in favor of Washington Mutual Bank. Chase Bank filed an Assignment of mortgage on 5/26/16 alleging an interest in the loan. Debtor has obtained stay relief on November 16, 2016 to continue State Court litigation regarding the alleged default, ownership of the loan and standing issues.  If the State Court enters a final order finding and determining the validity, amount and enforceability of the mortgage and the assignment thereof, Debtor shall commence making payments of principal and interest on the balance found by a court of competent jurisdiction to be due and owing, at the interest rate provided in the loan documents amortized over the remaining original term of the loan (maturity date 2051) commencing 30 days after the State Court Order becomes final. |
| | | | | Pending adjudication of Chase's alleged interest in the loan and the subject property Chase shall have adequate protection in the form of an equity cushion that exceeds the amount of the loan.  See *In re DiMaria*, 202 B.R. 634 (S.D. Fla 1996). |
| | | | | **Chase has agreed to withdraw all objection to this Disclosure Statement and the Debtor has agreed that any objections to confirmation are preserved.** |

| | | | | |
|---|---|---|---|---|
| | | | yes | Selective Advisors Group, LLC ("Selective") is the rightful assignee of the satisfied second mortgage previously held by NLG ("NLG"). Selective is the rightful assignee of the satisfied promissory Note, Mortgage and Judgment previously held by NLG gainstThe Debtor in the amount of $1,618,068.00 plus interest at 11% per annum ("the Scola Judgment") from April 28, 2008,

Selective has recorded a Satisfaction of this Mortgage and Judgment against the Debtor and her property on August 20, 2014 and August 21, 2014.per the Final Order of Assignment of Hon. Judge Peter Lopez entered on August 20, 2014. |
| 3 | **Selective Advisors Group, LLC** | | yes | On August 21, 2016, Selective sued NLGin this bankruptcy Court**ADVERSARY PROCEEDINGS** *Selective Advisors and Elizabeth Hazan v. NLG, LLC,* **Adv. Case No. 16-1439-AJC** for avoidance of NLG's alleged claimed lien on Debtor's Homestead property on Valencia Drive Fisher Island Florida. On January3, 2016 Hazan, additional Plaintiff and Selective filed their Motion to amend theirComplaint to add a count seeking to Quiet Title to the property, and a number oftort claims,which motion was granted on January 23, 2016.

The Trial in the Adversary proceedings 16-10389-AJC was concluded on July 13, 2017 and Proposed Orders by all parties were submitted on August 14, 2017. |

In November 1, 2017 Honorable Judge AJ Cristolissued Final Judgment on Counts I, II and III of Plaintiffs' Selective and Liza Hazan aka Elizabeth Hazan Third Amended Complaint and NLG's Amended Counterclaim as follows:

"The Scola Judgment obtained by NLG against the Debtor, and all rights, claims and benefits held by NLG against Debtor related to said Judgment, were judicially assigned to Selective pursuant to the Lopez Assignment Order, and the right to foreclose securing the debt traveled to the assignee Selective . Although NLG's right to foreclose against Hazan, as established by the Third District of Appeal, had been assigned to Selective, the Gordo Foreclosure Judgment granted NLG the right to foreclose, Assuming the validity of the Gordo Foreclosure Judgment, the Debtor exercised her right to redeem the property by satisfying said judgment prior to the foreclosure sale. Satisfactions of the Note and Mortgage are recorded in the official records and several courts have recognized that Debtor's Debt to NLG has been paid, including the New York State Supreme courts, wherein Judge Jaffe found that NLG's judgment on the Note, the Scola Judgment, was judicially assigned to Selective and was thereafter satisfied. Upon satisfaction, NLG was credited for the Scola Judgment and Mortgage to partially satisfy NLG's debt to Selective under the domesticated Quebec Judgment.

The Court believes that credit should, however, be adjusted to reflect the amounts determined to be due and

owing by the Gordo Foreclosure. NLG was owed $4,876,654.29 from Hazan on account of the Note and Mortgage, pursuant to the Gordo Final Judgment. Giving full faith and credit to the Gordo Foreclosure Judgment and viewing the amount determined in the judgment to be the greater amount NLG established it was owed for the Note and Mortgage pursuant to the Lopez Assignment Order, Selective should give credit to NLG for $4,878,654.29, which credit will leave the mortgage redeemed.

This Court concludes that NLG has no further rights to any claims against Debtor with respect to the Note and Mortgage, as the public records of Miami-Dade County reflect that the Scola Judgment and consequently the Mortgage were assigned and satisfied, and the property fully redeemed prior to foreclosure sale, as provided in the Gordo case, as provided in the Gordo foreclosure sale, as provided in the Gordo Foreclosure Judgment. NLG's Proof of Claim #17, having been filed after the bar date., it is disallowed and the Court finds that NLG has no staning in this case based upon the note, claim or lien emanating therefrom. Accordingly it is

ORDERED AND ADJUDGED that Count I, II and III of Plaintiff's Third Amended Complaint and NLG's Amended Counterclaim are GRANTED IN PART AND DENIED IN PART as follows:

1. NLG, LLC's judgment on the promissory note, the Scola Judgment, recorded at Book 26406, Page 3259-3260,

CFN2008R0446831, also recorded at Book 26357 Pages 3948-3949 CFN20080361591, the Note and the Mortgage recorded at Book 25559 Pages 4266-4272 CFN2007R0410013, NLG, LLC's foreclosure Judgment entered in favor of NLG and against CFN200R0410013 NLG, LLC's foreclosure Judgment entered in favor of NLG and against Elizabeth Hazan on December 4, 2015, the Gordo Foreclosure Judgment recorded at Book 29902 Pages 3737-3742 CFN20150812181 affecting Debtor's homestead Property known as 6913 Valencia Drive, Miami Florida 33109 with the following legal description:

LOT 7, Block 2, LINDISFARNE ON FISHER ISLAND SECTION 10according to the Plat thereof, recorded in PLAT Book 157 Page 64, of the Public Records of Miami-Dade County, Florida.

have been satisfied and paid, and are deemed **SATISFIED OF RECORD** and Debtor has good title to said Property against the claims or purported claims by, through, under, or against it by NLG, LLC and the title to the property is forever quieted as to all claims of NLG, LLC.

2.  Selective shall give credit to NLG, LLC in the amount of $4,876,654.29 toward NLG'soutstanding debt to Selective pursuant to the

| | | | | |
|---|---|---|---|---|
| | | | | Quebec Judgment.<br><br>3. NLG's proof of claim #17 is disallowed and NLG, LLC has no claim against the Debtor Liza Hazan a/k/a Elizabeth Hazan under the Note, Mortgage or any court order.<br><br>4. Counts IV, V, VI, VIII, and IX of Plaintiff's Third Amended Complaint are set for trial by separate order." . |
| 4 | **6913 Valencia LLC** | | yes | **Second Secured Mortgage** in the amount of $2,000.000.00 plus accrued interest from March 14, 2012.<br><br>The Debtor does not contest the validity or extent of 6913 Valencia LLC's Mortgage on her Homestead property claim.<br><br>Insider claim will subordinate and not be paid until all other allowed claimsbut reserves right to vote for the plan |
| 5 | **Valencia Estates Community Assn, Inc claim #10** | | yes | **Valencia Estates Community Association's ("Valencia")**Claim#10 in the amount of $195,072.14. Treated in settlement as follows:<br><br>1. Debtor paid $2,193.17 Aug 17, 2016 for due maintenance.<br><br>2. Debtor has paid 4 months in advance for September, October, November and December 2016 assessments for a total amount of $4,484.00as per the Stipulation.<br><br>3. Debtor has paidthe 2016 special assessment in the amount of |

| | | | | $6250.00as per the Stipulation. |
|---|---|---|---|---|
| | | | | 4. The Parties agreed that Claim Number 10 shall be paid in the amount of $195,000.00 with 3.5% interest in the Chapter 11 Plan, over forty-eight (48) months, with one payment on the Effective Date of $4,062.00, and payments every five (5) months thereafter in the amount of $20,312.50 following the Effective Date until paid in full, with the interest payments to be made annually on the twelfth month. |
| | | | | **Valencia Estates Community Association, Incwithdrew its objections to Debtor's disclosure and has agreed to vote for Debtor's plan.** |
| | | | | <u>Claim settled.</u> |
| | | | | Agreed Order Approving Stipulation of Settlement of Claim # 10 filed by Valencia Estates Homeowners' Association entered on 11/18/16 D.E 302. |
| | | | | All Valencia's post petitions regular assessments and special assessment in 2016 have all been paid and are current. |
| | | | | A Post petition special assessment dated on September 15, 2017 to be paid as follows: $1,041.66 every month in addition to the monthly assessments starting at confirmation date for a period of five years. |
| | | | | In October, 2017, Debtor incurred |

| | | | | |
|---|---|---|---|---|
| 6 | | | | substantial damages caused jointly and severally by both Fisher Island Community Association Inc("FICA") and Valencia Estates Community Association Inc("VALENCIA") to her homestead property fence. TheDebtor's Homestead residence is damaged and the fence needs to be completely removed and replaced. Debtor is planning to bring an action for damages against Fisher Island Community Association Inc and Valencia Estates Community Association Inc jointly and severally. This will offset some or the entirety of Valencia's post-petitionspecial assessment in the amount of $62,500.00 assessed on September 15, 2017 and also offset the FICA's post petitions assessments in the amount of $46,555.48. |
| 6 | **Fisher Island Community Ass'n, Inc Claim #18** | | yes | FICA's Late filed Proof Of Claim in the amount of $216,278.97 in 10/20/16 –**Disputed by Debtor and Disallowed by this Court.**<br><br>The Debtor has filed an objection to the amount of the Claim challenging Fisher Island's standing as a "party in interest." In re E.S. Bankest, L.C. 321 B.R. 590 (Bankr. S.D. Fla. 2005). Fisher Island Community Association, Inc. did not timely file a Proof Of Claim and its Motion to Allow a Late Filed Claim has been deniedin November 16, 2016.<br><br>Claimant 3343 West Commercial |

Blvd. 100 (Fisher Island Community Association).

Order granting Fisher Island Community Association, Inc.'s Motion for relief from Stay entered on 11/23/16

**Claim Disallowed Claim by this Court.No payment through Plan.**

**Debtor plans to reinstate stay and pay the net amount if any of all FisherIsland Community Association's post petitions feesin the amount of $46,555.48 less the damages caused to Debtor by FICAand Valencia (more explained below) after the filing of the petition at confirmation date. Debtor will obtain a discharge for all the prepetition fees.**

In October, 2017, Debtor incurred substantial damages caused jointly and severally by both Fisher Island Community Association Inc ("FICA") and Valencia Estates Community Association Inc ("VALENCIA") to her homestead property's fence on Fisher Island. The Debtor Homestead residence's fence is substantially damaged and needs to be completely removed and replaced. Debtor is planning to bring an action for damages against FICA and VALENCIA. This will offset some or the entirety of Valencia's post petition special assessment in the amount of $62,500 assessed on September 15, 2017 and also offset the FICA's post petitions assessments in the amount of

| | | | | |
|---|---|---|---|---|
| | | | | $46,555.48.<br><br>    FICA has also caused substantial damages to the Debtor by denying access to all Debtor's guests and all business associates for years and has singled out the Debtor for many years. FICA has enjoined the Debtor to enjoy her home and conduct business. FICA has also endangered the Debtor's life by allowing access to the alleged principal of NLG, LLC a former creditor of the debtor, on Fisher Islandwho has caused Debtor harassment, trespassing her home,intimidation and caused Debtor additional damages that will be set for trial at a later date in **ADVERSARY PROCEEDINGS** *Selective Advisors and Elizabeth Hazan v. NLG, LLC,* **Adv. Case No. 16-1439-AJC** |
| 7 | **Miami-Dade Water andSewer claim #7** | no | yes | **Claim #7 $1502.54 to be paid on the EffectiveDate of The Plan** |
| 8 | **IRS claim #3** | no | yes | $393,985.17 - Secured claim shall be paidover ten years with interest Equal paymentsin the amount of $22,948.00 every 6 months to include interest on anyunpaid claim amounts after the effectivedate of the plan at 3%. |
| 9 | **Miami-Dade County Tax Collector**<br><br>**Claim #6** | no | yes | $57649.47 Miami-Dade County Tax Collector Secured claim on 6913 Valencia Drive property Fisher Island FL 33109 has been paid in full.<br><br>**Claim #6  paid in full**. |

**Other Disputed Claims**

| **Class #** | **Description** | **Insider** | **Impairment** | **Treatment** |
|---|---|---|---|---|

| 10 | **Real Time Resolutions, Inc claim #8** | no | yes | Claim #8 in the amount of $322,846.72 allegedly secured second mortgage Line of credit on property located at 1 East 62nd Street Apt 1 A NYC NY 10065 is disputed by Debtor.<br><br>Alleged Creditor has agreed to complete stay relief in settlement of this claim in this case and has agreed tosupport Debtor's plan of reorganization and vote the entire amount of its alleged claim in favor of Debtor's plan. (ECF 163)<br><br>**Claim settled.** |

| Class # | Description | Insider | Impairment | Treatment |
|---------|-------------|---------|------------|-----------|
| 11 | **Board of Managers Spencer Condominium claim #14** | no | yes | The Debtor disputes the Claim#14 filed by The Board of ManagersSpencer Condominium ("Spencer"). The parties reached a Confidential Stipulation Of Settlement in March 2015 in New York.TheDebtor is only personally liable for the amount of $109,554.86 representing the alleged disputed outstanding maintenance feesowed by Debtor prior to her transfer of ownership of the property located at 1 East 62nd Street Apt 1 A NYC NY 10065.This amount will be paid by Real Estate Holdings Group, L.D.C. ("REHG"),the owner of the |

|  |  |  |  | New York condominium located at 1 East 62nd Street Apt 1A, New York, NY 10065. REHG, Spencer and Debtor Hazan and other parties are bound by the Confidential Stipulation of Settlementexecuted in March 2015 ("Settlement").The vast remaining portion of the Spencer Condo Boardof Managers' claimis to be paid by the owner of the unit,REHG,per the Settlement executedin March 2015 by the parties.<br><br>**On March 1, 2017 this Court granted Debtor's Motion for Stay relief, allowingtheNew York Court toexercise jurisdiction over and enforce the confidential Settlement Agreement.**<br><br>**On March 2, 2017, New York Supreme Court Judge Singh granted REHG's Motion to Enforce TheConfidential Stipulation entered in March 2015 between the parties.**<br><br>On April 25, 2017 Honorable New York Supreme Judge Singh ordered that the Plaintiff REHG's Motion to enforce the terms of the settlement agreement dated 3/2015 is granted . "After a conference held today the Court finds that all parties |
|---|---|---|---|---|

|  |  |  |  | are in compliance with the terms of stipulation dated 3/2015." |
|  |  |  |  | The Deadline for *Board of Managers of Spencer Condominium* toFile Complaint to determine the Debtor's Dischargeability of Certain Debt has expired. |
|  |  |  |  | **No payment through the plan. Claim settled.** |
|  |  |  |  | **SETTLEMENT ENFORCED BY NEW YORK COURT** |

**Convenience Class Undisputed Unsecured Small Claims**

**Paid in full on the Effective Dateat confirmation**

| Class # | Description | Insider? (Yes or No) | Impairment | Treatment |
|---|---|---|---|---|
| 12 | IRS Claim #3 | no |  | 1085.00 |
|  | American InfoSource T Mobile Claim #2 | no |  | 1130.00 |
|  | American InfoSource Direct TV Claim # 9 | no |  | 461.00 |
|  | FPL Claim #11 | no |  | 2906.93 |
|  | Mount Sinai | no |  | 3,240.00 |
|  | Mount Sinai | no |  | 295.91 |
|  | HSBC Bank USA NA | no |  | 1070.66 |
|  | Sterling Emerg Svc | no |  | 2445.30 |

| | | | |
|---|---|---|---|
| | Bank of America NA has waived all prepetition fees | no | 0.00 |
| | Wells Fargo Claim #12 | no | 323.24 |
| | Real Time Resolutions ("RTR") Claim #5 Although Debtor settled this claim for $12,000 after misrepresentations made by alleged creditor Real Time Resolutions that it had a valid claim. Debtor,afterfurther investigation has determined that the statute of limitations has run and that Claim #5 is not a valid claim. Real time Resolutions has sued the debtor in case 08-47664 CA 32 in Miami-Dade County Court in October 21, 2008. The case 08-47664 CA 32 was dismissed in for lack of prosecution on January 08, 2010. The Statute of limitations has run. | no | 0.00 |
| | **S&S Collections Simon &Sigalos claim #13 partial paid amount $1740.96** | no | 0.00 |
| | Total | | 12958.04 |

**Settled Unsecured Claims**

**Allowed Undisputed Unsecured Claims**

| Class # | Description | Insider? (Yes or No) | Impaired | Treatment |
|---------|-------------|---------------------|----------|-----------|
| 13 | **JMB Urban 900 Dev. claim #4\*** | no | X | Claim # 4 in the amount of $664,380.47. Claim # 4 will be paid 41% of the amount or 275,000.00 per settlement before the second anniversary of the entry of the agreed final judgment on or before July 20, 2018 in favor of JMBin case **Adversary proceedings 16-01188-AJC. Adversary proceeding case closed on 7/22/16 and Case settled 16-01188-AJC. DOC 21 Case 16-01188-AJC Order approving agreed final Judgment in favor of JMB entered on July 20, 2016..**<br><br>**CLAIM SETTLED** |
| | **S&S Collections Simon &Sigalos claim #13** | no | X | Claim # 13 in the amount of$21,242 **Claim settled** for 41% $8,709.22.Amount of $1740.96 moved to convenience class. Amount of $1740.96 paid by third party on July 10, 2017. Remaining balance owed $6,968.04 to be paid same treatment as JMB.<br><br>**CLAIM SETTLED** |

| | | | | |
|---|---|---|---|---|
| | **Southeast Financial LLC** | no | X | Stipulation Of Settlement DE 98 approved by this Court DE 101.<br><br>Vehicle owned by Holdings Trust Management Group LLC. Southeast Financial LLC's Secured Lien is guaranteed by the Debtor.<br><br>Secured claim allowed $17,000 value to be paid at 5.25% for 48 months payments in the amount of $393 began on August 1, 2016 and are current.<br><br><div align="center">CLAIM SETTLED</div> |
| | | | | |

<div align="center">

**Disputed Unsecured Claims**

**not paid until and unless allowed**

**and then paid within 5 years after confirmation**

</div>

| | | | | |
|---|---|---|---|---|
| | **Cross & Simon<br>Claim #1** | no | | Claim #1 in the amount of $11,023.83 Legal Bill for corporation other than Debtor.<br><br>**Unallowed claim.**<br><br>**No payment through Plan** |

| | | | | |
|---|---|---|---|---|
| | **Newman Ferrara LLP<br>claim #15** | no | | Claim #15 in the amount of $24,818.44 Legal bill Legal work for Corporation other than the Debtor.<br><br>**The Claims bar date has passed. No payment through plan. Unallowed claim.** |

| | | | | |
|---|---|---|---|---|
| | | | | |
| **FuerstIttleman David & Joseph, P.L.** <br><br> **Claim #16** | **no** | | Disputed Proof of Claim filed after Claim Bar Date. FuerstIttleman David & Joseph, P.L. is not a creditor of this Debtor. Debtor has filed an objection to this claim. FuerstIttlemanDavid & Joseph, P.L. have agreed that they are not a creditor of this estate. <br><br> **No payment through plan.Unallowed Claim.** | |

### Unsecured Scheduled Disputed and No Claim Filed
### Therefore Disallowed

| | |
|---|---|
| Allied Collection | 318 |
| ATT Mobility | 3919 |
| First National Collection | 246.08 |
| Focus Mgt | 772 |
| Marzec Law Firm | 0 |
| Mount Sinai Medical | 31414.15 |
| Ray Garcia PA | 7026.15 |
| Verizon | 1758 |
| US Bank NA | Unknown <br><br> The Debtor entered into a Stipulation of Settlement with US Bank NA (D.E. 345) granting the parties complete stay relief which was approved by the Court by Order dated 1/18/2017, D.E. 371. |

| | US Bank did not file a proof of claim and will not be paid through the Plan. |
|---|---|
| NLG, LLC | NLG, LLC did not timely file a proof of claim and **NLG, LLC's alleged Claim has been judicially** assigned per The Final Order entered by Judge Peter Lopez on August 2014. **NLG, LLC will not be paid through the Plan.**<br><br>NLG, LLC has no standing in this case and is not a creditor of the Debtor's Estate.<br><br>NLG appeared in this case but failed to timely file a proof of claim. NLG, LLC is merely a notice party. NLG, LLC is not a secured creditor in this case. Selective Advisors Group, LLC ("Selective"), is listed in Debtor's schedule as her creditor.<br><br>The Trial in the Adversary proceedings 16-10389-AJC was concluded on July 13, 2017 and Proposed Orders by all parties were submitted on August 15, 2017.<br><br>In November 1, 2017 Honorable Judge AJ Cristol issued Final Judgment on Counts I, II and III of Plaintiffs' Selective and Liza Hazan aka Elizabeth Hazan Third Amended Complaint and NLG's Amended Counterclaim as follows:<br><br>"The Scola Judgment obtained by NLG against the Debtor, and all rights, claims and benefits held by NLG against Debtor related to said Judgment, were judicially assigned to Selective pursuant to the Lopez Assignment Order, and the right to foreclose securing the debt traveled to the assignee Selective . Although NLG's right to foreclose against Hazan, as established by the Third District of Appeal, had been assigned to Selective, the Gordo Foreclosure Judgment granted NLG the right to foreclose, Assuming the validity of the Gordo Foreclosure Judgment, the Debtor exercised her right to redeem the property by |

satisfying said judgment prior to the foreclosure sale. Satisfactions of the Note and Mortgage are recorded in the official records and several courts have recognized that Debtor's Debt to NLG has been paid, including the New York State Supreme courts, wherein Judge Jaffe found that NLG's judgment on the Note, the Scola Judgment, was judicially assigned to Selective and was thereafter satisfied. Upon satisfaction, NLG was credited for the Scola Judgment and Mortgage to partially satisfy NLG's debt to Selective under the domesticated Quebec Judgment.

The Court believes that credit should, however, be adjusted to reflect the amounts determined to be due and owing by the Gordo Foreclosure. NLG was owed $4,876,654.29 from Hazan on account of the Note and Mortgage, pursuant to the Gordo Final Judgment. Giving full faith and credit to the Gordo Foreclosure Judgment and viewing the amount determined in the judgment to be the greater amount NLG established it was owed for the Note and Mortgage pursuant to the Lopez Assignment Order, Selective should give credit to NLG for $4,878,654.29, which credit will leave the mortgage redeemed.

This Court concludes that NLG has no further rights to any claims against Debtor with respect to the Note and Mortgage, as the public records of Miami-Dade County reflect that the Scola Judgment and consequently the Mortgage were assigned and satisfied, and the property fully redeemed prior to foreclosure sale, as provided in the Gordo case, as provided in the Gordo foreclosure sale, as provided in the Gordo Foreclosure Judgment. NLG's Proof of Claim #17, having been filed after the bar date., it is disallowed and the Court finds that NLG has no standing in this case based upon the note, claim or lien emanating therefrom. Accordingly it is

ORDERED AND ADJUDGED that Count I, II

and III of Plaintiff's Third Amended Complaint and NLG's Amended Counterclaim are GRANTED IN PART AND DENIED IN PART as follows:

1. NLG, LLC's judgment on the promissory note, the Scola Judgment, recorded at Book 26406, Page 3259-3260, CFN2008R0446831, also recorded at Book 26357 Pages 3948-3949 CFN20080361591, the Note and the Mortgage recorded at Book 25559 Pages 4266-4272 CFN2007R0410013, NLG, LLC's foreclosure Judgment entered in favor of NLG and against CFN200R0410013 NLG, LLC's foreclosure Judgment entered in favor of NLG and against Elizabeth Hazan on December 4, 2015, the Gordo Foreclosure Judgment recorded at Book 29902 Pages 3737-3742 CFN20150812181 affecting Debtor's homestead Property known as 6913 Valencia Drive, Miami Florida 33109 with the following legal description:

LOT 7, Block 2, LINDISFARNE ON FISHER ISLAND SECTION 10 according to the Plat thereof, recorded in PLAT Book 157 Page 64, of the Public Records of Miami-Dade County, Florida.

have been satisfied and paid, and are deemed **SATISFIED OF RECORD** and Debtor has good title to said Property against the claims or purported claims by, through, under, or against it by NLG, LLC and the title to the property is forever quieted as to all claims of NLG, LLC.

2. Selective shall give credit to NLG, LLC in the amount of $4,876,654.29 toward NLG's outstanding debt to Selective pursuant to the Quebec Judgment.

|  |  |
|---|---|
|  | 3. NLG's proof of claim #17 is disallowed and NLG, LLC has no claim against the Debtor Liza Hazan a/k/a Elizabeth Hazan under the Note, Mortgage or any court order.<br><br>4. Counts IV, V, VI, VIII, and IX of Plaintiff's Third Amended Complaint are set for trial by separate order." . |
| Total | 45453.38 |

**Equity**

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 14 | Equity Individual interest holder | no | retained |

**D.    Means of Implementing the Plan**

　　1.    *Source of Payments*

Debtor works as a business consultant specializing in identifying locations for high-end restaurants andretailers around the world. She has always earned at least $350,000 per year and in 2014 a personal income of $420,000.

Debtor has executed in the last quarter of 2016 and 2017 contracts that have earned her income comparable to past years, to be paid in installments, and additional payments throughout the construction phase, and the last remaining portion upon opening of the clients for business.

Debtor has contracts to expand a nationwide and worldwide very high end retail operator that has already over 50 existing stores and is planning to open over 100 new locations in the next five years.

Debtor has also exclusive contracts with high end restaurants and is responsible for their expansion nationwide. Debtor is in charge of finding new locations and is also responsible of their construction, architectural plans etc. all the way through their opening of their new locations.

Debtor's husband controls a company called Real Estate Holdings Group, L.D.C. ("REHG") which owns a New York condominium on Fifth Avenue and 62nd street New York Apt 1 A NYC NY 10065 appraised at $4,500,000.00 that has in excess of $2,500,000.00 in equity. The company, REHG, has agreed to refinance and also sell the condominium to fund the plan in order to assure successful reorganization and completion of the plan.

The New York condominium will be on the market listed for sale with New York Real Estate Broker The Corcoran Group.

The Debtor's primary asset is her homestead residence located at 6913 Valencia Drive, Fisher Island,Florida (the "Property") valued at $12 million.

Additionally debtor has scheduled household furniture, dishes and china, household electronics andclothing, shoes and accessories and jewelry, fixtures and art valued at $327,500.

The equity in Fisher Island would also support a refinancing, which could also be used supportfunding a plan if necessary.

2.   *Post-confirmation Management*

The Post-Confirmation Managers of the Debtor, and their compensation, shall be as follows:

| Name | Affiliations | Insider (yes or no)? | Position | Compensation |
|------|--------------|----------------------|----------|--------------|
| Liza Hazan | Debtor | yes | Debtor | n/a |

E.   **Risk Factors**

Certain substantial risk factors are inherent in most plans of reorganization in Chapter 11 cases.  If such Plans are accepted, it is usually because they represent a greater return in dividends than in a liquidating Chapter 7 case.  This Plan bears the risk that the Debtor's income may be reduced or her expenses may increase, all of which may reduce the Debtor's ability to make payments under this Plan.  However, any distribution to unsecured creditors will be greater than what would be realized in liquidation.

ALL THE RISK FACTORS INHERENT IN A PLAN OF REORGANIZATION UNDER CHAPTER 11 ARE PRESENT IN THIS CASE.  CREDITORS ARE URGED TO CAREFULLY READ THIS DISCLOSURE STATEMENT AND THE ACCOMPANYING PLAN OF REORGANIZATION SO THAT AN INFORMED JUDGMENT CAN BE MADE WITH RESPECT TO VOTING ON THE PLAN.

F.   **Executory Contracts and Unexpired Leases**

The Plan, in Article 6, lists all executory contracts and unexpired leases that the Debtor will assumeunder the Plan. There are none. Assumption means that the Debtor has elected to continue to perform theobligations under such contracts and unexpired leases, and to cure defaults of the type that must be curedunder the Code, if any. Article also lists how the Debtor will cure and compensate the other party to suchcontract or lease for any such defaults.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of anydefaults, or the adequacy of assurance of performance, you must file and serve your objection to the Planwithin the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

All executory contracts and unexpired leases that are not listed in Article 6 will be rejected under thePlan. Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Planwithin the deadline for objecting to the confirmation of the Plan.

*__The Deadline for Filing a Proof of Claim Based on a Claim Arising from the Rejection of a Lease or Contract is__*no later than thirty (30) days after the date of the order confirming this Plan. Any claim based onthe rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court ordersotherwise.

G.    **Tax Consequences of Plan**

*__Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their TaxLiability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.__*

A summary description of certain United States ("U.S.") federal income tax consequences of the Plan is providedbelow. The description of tax consequences below is for informational purposes only and, due to lack of definitivejudicial or administrative authority or interpretation,substantial uncertainties exist with respect to various U.S.federal income tax consequences of the Plan as discussed herein. Only the potential material U.S. federal income taxconsequences of the Plan to the Debtor and to a hypothetical investor typical of the holders of Claims andInterestswho are entitled to vote to confirm or reject the Plan are described below. No opinion of counsel has been sought orobtained with respect to any tax consequences of the Plan, and no tax opinion is being given in this DisclosureStatement. No rulings or determinations of the Internal Revenue Service (the "IRS") or any other tax authorities havebeen obtained or sought with respect to any tax consequences of the Plan, and the discussion below is not bindingupon the IRS or such other authorities. No representations are being made regarding the particular tax consequencesof the confirmation and consummation of the Plan to the Debtor or to any holder of Claims in Impaired Classes orClass 4 Equity Interests. No assurance can be given that the IRS would not assert, or that a court would not sustain, adifferent position from any discussed herein.

The discussion of the U.S. federal income tax consequences below is based on the InternalRevenue Code of 1986,as amended (the "Tax Code"), Treasury Regulations promulgated and proposed thereunder, judicial decisions, andadministrative rulings and pronouncements of the IRS and other applicable authorities, all as in effect on the datehereof. Legislative, judicial or administrative changes or interpretations enacted or promulgated in the future couldalter or modify the analyses and conclusions set forth below. It cannot be predicted at this time whether any taxlegislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the taxconsequences to the holders of Claims. Any such changes or interpretations

may be retroactive and couldsignificantly affect the U.S. federal income tax consequences discussed below.

**THIS DISCUSSION DOES NOT ADDRESS FOREIGN, STATE OR LOCAL TAXCONSEQUENCES OFTHE PLAN, NOR DOES IT PURPORT TO ADDRESS THE U.S. FEDERAL INCOME TAXCONSEQUENCES OF THE PLAN TO SPECIAL CLASSES OF TAXPAYERS (SUCH AS FOREIGNENTITIES, NONRESIDENT ALIEN INDIVIDUALS, PASS-THROUGH ENTITIES SUCH ASPARTNERSHIPS ANDHOLDERS THROUGH SUCH PASS-THROUGH ENTITIES, S CORPORATIONS,MUTUAL FUNDS, INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, SMALL BUSINESSINVESTMENT COMPANIES, REGULATED INVESTMENT COMPANIES, CERTAIN SECURITESTRADERS, BROKER-DEALERS AND TAX-EXEMPT ORGANIZATIONS). FURTHERMORE, ESTATEAND GIFT TAX ISSUES ARE NOT ADDRESSED HEREIN AND TAX CONSEQUENCES RELATING TOTHEALTERNATIVE MINIMUM TAX ARE GENERALLY NOT DISCUSSED HEREIN.**

**NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OFTHE PLAN TO ANY HOLDER OF CLAIMS. EACH HOLDER OF A CLAIM IS STRONGLY URGED TOCONSULT ITS OWN TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL ANDFOREIGN TAXCONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.**

## IV.   CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code. Theseinclude the requirements that: the Plan must be proposed in good faith; at least one impaired class of claimsmust accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equityinterest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidationcase, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible.These requirements are not the only requirements listed in §1129, and they are not the only requirements forconfirmation.

11 USC 1129(a)(15) provides: In a case in which the debtor is an individual and in which the holder ofan allowed unsecured claim objects to the confirmation of the plan—
(A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account ofsuch claim is not less than the amount of such claim; or
(B) the value of the property to be distributed under the plan is not less than the projected disposable incomeof the debtor (as defined in section 1325 (b)(2)) to be received during the 5-year period beginning on the datethat the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

In the case at bar, Debtor has provided for payments not less than projected disposable income of thedebtor during a five year period beginning with the first payment due under the plan.

**A.      Who May Vote or Object**

Any party in interest may object to the confirmation of the Plan if the party believes that therequirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor orequity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder hasa claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that classes are impaired and that holders of claims in each ofthese classes are therefore entitled to vote to accept or reject the Plan. The Plan Proponent believes thatclasses are unimpaired and that holders of claims in each of these classes, therefore, do not have the right tovote to accept or reject the Plan.

### 1. *What Is an Allowed Claim or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled theclaim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated,or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proofof claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holderholding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules theobjection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the FederalRules of Bankruptcy Procedure.

***The deadline for filing a proof of claim in this case was 5/17/16 for claims and 7/16/16 forgovernment units.***

### 2. *What Is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in aclass that is *impaired* under the Plan. As provided in §1124 of the Code, a class is considered impaired if thePlan alters the legal, equitable, or contractual rights of the members of that class.

### 3. *Who is NotEntitled to Vote*

The holders of the following five types of claims and equity interests are *not* entitled to vote:

• holders of claims and equity interests that have been disallowed by an order of the Court;
• holders of other claims or equity interests that are not "allowed claims" or "allowed equityinterests" (as discussed above), unless they have been "allowed" for voting purposes.
• holders of claims or equity interests in unimpaired classes;
• holders of claims entitled to priority pursuant to §§507(a)(2), (a)(3), and (a)(8) of the Code; and
• holders of claims or equity interests in classes that do not receive or retain any value under thePlan;
• administrative expenses.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of thePlan [and to the Adequacy of the Disclosure Statement].***

### 4. *Who Can Vote in More Than One Class*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim,or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, andshould cast one ballot for each claim.

## B.    **Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class ofcreditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impairedclasses have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-acceptingclasses, as discussed later in Section B.2.

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) ofthe allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at leasttwo-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept thePlan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of theallowed equity interests in the class, who vote, cast their votes to accept the Plan.

### 2. *Treatment of Non-accepting Classes*

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if thenon-accepting classes are treated in the manner prescribed by §1129(b) of the Code. A plan that bindsnonaccepting classes is commonly referred to as a "cram down" plan. The Code allows the Plan to bindnonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmationexcept the voting requirements of §1129(a)(8) of the Code, does not "discriminate unfairly," and is "fair andequitable" toward each impaired class that has not voted to accept the Plan.

41

*You should consult your own attorney if a "cramdown" confirmation will affect your claim or equityinterest, as the variations on this general rule are numerous and complex.*

C.    **Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not acceptthe Plan will receive at least as much under the Plan as such claim and equity interest holders would receive ina chapter 7 liquidation. A liquidation analysis is attached to this Disclosure Statement as exhibit B.

D.    **Feasibility**

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or theneed for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidationor reorganization is proposed in the Plan.

*1. Ability to Initially Fund Plan*

The Plan Proponent believes that the Debtor will have enough cash on hand on the effective date of thePlan to pay all the claims and expenses that are entitled to be paid on that date. Tables showing the amount ofcash on hand on the effective date of the Plan, and the sources of that cash are attached to this disclosurestatement as Exhibits C and D.

*2. Ability to Make Future Plan Payments And Operate Without Further Reorganization*

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make therequired Plan payments.

The Plan Proponent has provided projected financial information. Those projections are listed in ExhibitD.

***You Should Consult with Your Accountant or other Financial Advisor If You Have AnyQuestions Pertaining to These Projections.***

V.    **EFFECT OF CONFIRMATION OF PLAN**

A.    **DISCHARGE OF DEBTOR**

Discharge. In a case in which the debtor is an individual—

(A)unless after notice and a hearing the court orders otherwise for cause, confirmation of the plandoes not discharge any debt provided for in the plan until the court grants a discharge on completionof all payments under the plan;

(B)at any time after the confirmation of the plan, and after notice and a hearing, the court may grant adischarge to the debtor who has not completed payments under the plan if—

**(i)**the value, as of the effective date of the plan, of property actually distributed under the plan onaccount of each allowed unsecured claim is not less than the amount that would have been paid onsuch claim if the estate of the debtor had been liquidated under chapter 7 on such date;

**(ii)**modification of the plan under section 1127 is not practicable; and

**(iii)**subparagraph (C) permits the court to discharge; and

**(C)(\*)**the court may grant a discharge if, after notice and a hearing held not more than 10 days beforethe date of the entry of the order granting the discharge, the court finds that there is no reasonablecause to believe that—

**(i)**section522(q)(1) may be applicable to the debtor; and

**(ii)** there is pending any proceeding in which the debtor may be found guilty of a felony of the kinddescribed in section 522(q)(1)(A) or liable for a debt of the kind described in section 522(q)(1)(B); andif the requirements of subparagraph (A) or (B) are met.

Pursuant to 11 U.S.C. § 1141(d)(5)(A), the Debtor shall be discharged from all pre-Confirmation debts except as is provided in the Plan, pursuant to the procedures set forth herein, upon completion all payments required under the Plan to unsecured and priority creditors. Upon thesatisfaction of all payments required under the Plan to unsecured and priority creditors, the Reorganized Debtor shall file a Final Report of Estate and Motion for Final Decree Closing Case onthe Court approved local form.

(a)      Notwithstanding the above, the Debtor may request that the Court close this bankruptcyproceeding prior to the entry of an Order of Discharge, pursuant to the following procedures:

(b)      The Debtor may file a Motion to Temporarily Close Bankruptcy Case Prior to Entry ofOrder of Discharge (the "Motion to Close") after the following events have occurred: (I) payment ofthe Initial Payment (defined in the Plan) to unsecured and priority creditors; (ii) payment of alloutstanding quarterly United States Trustee Fees as of the date of the Order approving the Motion toTemporarily Close; and (iii) the filing of all outstanding federal income tax returns. The Motion toClose shall certify that each of the above conditions have been met.

(c)      The Motion to Close (and Notice of Hearing thereto) shall be served to all creditors andinterested parties. The Court may grant the Motion to Close, pursuant to 11 U.S.C. § 350(a), if eachof the above conditions have been met.

(d)      During the time that this bankruptcy case is temporarily closed, the provisions of theconfirmation order shall remain in effect with respect to thetreatment of creditor claims that existed as of the bankruptcy petition date, as long as the Debtorcontinues to be in compliance with the Plan and the Court's Order Confirming Debtor's Plan ofReorganization (the "Confirmation Order"), and as long as the Debtor timely makes all of thepayments to unsecured and priority creditors, as contemplated under the Plan.

(e)      Upon the satisfaction of all payments required under the Plan to creditors, the Debtormay file a motion to reopen this bankruptcy proceeding, pursuant to 11 U.S.C. § 350(b). Any Clerk ofCourt fees associated with filing of the motion to reopen shall be waived. The motion to reopen shallbe verified and served upon all creditors and parties in interest and shall demonstrate that the Debtorhas made all of the payments contemplated under the Plan to creditors.

(f)      Upon the re-opening of this bankruptcy proceeding, the Debtor shall promptly file a FinalReport of Estate and Motion for Final Decree Closing Case on the Court-approved local

form, whichshall certify that all payments required under the Plan to creditors have been made. The Court maythen grant the Debtor a discharge, pursuant to 11 U.S.C. § 1141(d)(5).

**B.    Modification of Plan**

The Plan Proponent may modify the Plan at any time before confirmation of the Plan. However, theCourt may require a new disclosure statement and/or revoting on the Plan.

The Plan Proponent may also seek to modify the Plan at any time after confirmation only if (1) the Planhas not been substantially consummated *and* (2) the Court authorizes the proposed modifications after noticeand a hearing.

**C.    Final Decree**

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules ofBankruptcy Procedure, the Plan Proponent, or such other party as the Court shall designate in the PlanConfirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively,the Court may enter such a final decree on its own motion.

Respectfully submittedNovember 15, 2017:

By: /s/ Liza Hazan
The Plan Proponent

By: David W. Langley, Esq
8551 W. Sunrise Blvd.
Suite 303
Plantation, FL 33322
dave@flalawyer.com
Phone 954—356-0450
By: /s/David W. Langley

Attorney for the Plan Proponent

44

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI-DADE DIVISION
#### www.flsb.uscourts.gov

In re:

LIZA HAZAN,                                    CASE NO.:  16-10389 AJC

       Debtor.                                 CHAPTER 11

_____/

## THIRD AMENDED PLAN OF REORGANIZATION

## ARTICLE I

## SUMMARY

This Third Amended Plan of Reorganization (the "Plan") under chapter 11 of the Bankruptcy Code (the "Code") proposes to pay creditors of Debtor (the "Debtor") from sources of payment, such as equity in properties and future income.

Debtor has an exclusive period during which only debtor may propose a plan. The exclusive period was extended through July 11, 2016 by motion filed on 5/10/16 at DE 63 and granted at hearing on 5/26/16 without objection and ordered on 7/7/16 at DE 99, and again extended through November 7, 2016, by Order entered on August 22, 2016 (DE 173), and again extended through April 30, 2017 by Order entered on January 26, 2017, D.E. 373, then again extended to September 11, 2017 by Order entered August 2, 2017, D.E. 518.

This Plan provides classes of claims; classes of priority claims, classes of secured claims, and classes of unsecured claims and equity. Unsecured creditors holding allowed claims will receive distributions which the proponent of this Plan has valued at a dividend of 41% to 100% of total allowed claims over up to 60 months and paid every six months with the first payment due in month 6, while undisputed unsecured claims are paid 100% within two years of the petition date, or by 1/11/18.

This Plan also provides for the payment of administrative claims. If payment is not made in full on the effective date of this Plan with respect to any such claim (to the extent permitted by the Code or the claimant's agreement), the paragraphs below will identify such claim and briefly summarize the proposed treatment.

All creditors and equity security holders should refer to Articles III through VI of this Plan for information regarding the precise treatment of their claim. A disclosure statement that provides more detailed information regarding this Plan and the rights of creditors and equity security holders has been circulated with this Plan. **Your rights may be affected. You should read these papers**

carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one).

## ARTICLE II

## CLASSIFICATION OF CLAIMS AND INTERESTS

2.01    This Plan includes a class of priority claims, classes of secured claims, classes of unsecured claims, and a class of equity interests.

## ARTICLE III
## TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS,
## U.S. TRUSTEES FEES, AND PRIORITY TAX CLAIMS

3.01    Unclassified Claims. Under section §1123(a)(1), administrative expense claims, ["gap" period claims in an involuntary case allowed under §502(f) of the Code,] and priority tax claims are not in classes.

3.02    Administrative Expense Claims. Each holder of an administrative expense claim allowed under §503 of the Code, will be paid in full on the effective date of this Plan (as defined in Article VII), in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor. Counsels for Debtor Geoffrey Aaronson, Joel Aresty and David W. Langley will be paid outside of the plan and have agreed to such treatment.

3.03    Priority Tax Claims. Each holder of a priority tax claim will be paid by terms of treatment consistent with §1129(a)(9)(C) of the Code.

3.04    United States Trustee Fees. All fees required to be paid by 28 U.S.C. §1930(a)(6)(U.S. Trustee Fees) will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Code. Any U.S. Trustee Fees owed on or before the effective date of this Plan will be paid on the effective date.

## ARTICLE IV
## TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

4.01    Claims and interests shall be treated as follows under this Plan:

| Admin | Description | Treatment |
|---|---|---|
|  | Geoffrey Aaronson | Mr. Aaronson has agreed to accept payment in the amount of $142,686.86 in fees and $2,313.13 in costs reimbursement, from a third party in full satisfaction of this claim. |

2

|  | Joel Aresty | Mr. Aresty has agreed to accept $35,000.00 in fees and $1,500.00 in costs payable as follows: $3000 within 5 days of entry of Order Approving Settlement (submitted but not yet entered) followed by 19 payments of $1500 starting May 1, 2016 and an additional $5000 at confirmation. Remaining Balance owed $29,000. |
|  | David W. Langley | Paid as awarded or agreed. |
|  | US Trustee | Paid in full at confirmation |

## Priority Claims

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| 1 | **IRS**<br><br>**Claim #3** | yes | The $24,663.00 priority tax claim will be paid within five years of the petition date. Equal Payments of $2,674.34 every six months to include interest on any unpaid claim amounts after the effective date of the plan at 3%. |

## Secured Claims

## 6913 Valencia Drive Property Fisher Island , LLCFlorida

| 2 | **Chase Bank** | no<br>yes | **First Secured Mortgage –**<br>The claim bar date has passed in this case, and Chase has not filed a Proof Of Claim.  Chase was scheduled as disputed, contingent and unliquidated.<br>Original note in the amount of $3,825,000.00 signed by Debtor on March 2007 with Washington Mutual |

3

| | | | | |
|---|---|---|---|---|
| | | | | Bank. Chase Bank filed an Assignment of mortgage on 5/26/16 alleging an interest in the loan.  Debtor has obtained stay relief on November 16, 2016 to continue State Court litigation regarding the alleged default, ownership of the loan and standing issues.  If the State Court enters a final order finding and determining the validity, amount and enforceability of the mortgage and the assignment thereof, Debtor shall commence making payments of principal and interest on the balance found by a court of competent jurisdiction to be due and owing, at the interest rate provided in the loan documents amortized over the remaining original term of the loan (maturity date 2051) commencing 30 days after the State Court Order becomes final.<br><br>Pending adjudication of Chase's alleged interest in the loan and the subject property, Chase shall have adequate protection in the form of an equity cushion that exceeds the amount of the loan.  See *In re DiMaria*, 202 B.R. 634 (S.D. Fla 1996).<br><br>**Chase has agreed to withdraw all objection to this Disclosure Statement and the Debtor has agreed that any objections to confirmation are preserved.** |
| 3 | **Selective Advisors Group, LLC** | yes | yes | Selective Advisors Group, LLC ("Selective") is the rightful assignee of the satisfied second mortgage previously held by NLG ("NLG"). Selective is the rightful assignee of the satisfied promissory Note, Mortgage and Judgment previously held by NLG against The Debtor in the amount of $1,618,068.00 plus interest at 11% per annum ("the Scola Judgment") from April 28, 2008. |

|  |  |  |  |  | Selective has recorded a Satisfaction of this Mortgage and Judgment against the Debtor and her property on August 20, 2014 and August 21, 2014 per the Final Order of Assignment of Hon. Judge Peter Lopez entered on August 20, 2014.<br><br>NLG appeared in this case but failed to timely file a proof of claim. NLG is merely a notice party. NLG is not a scheduled creditor in this case. Selective is listed in Debtor's schedule as her creditor. On May 13, 2016 NLG moved for stay relief in this court (D.E. 66) but said relief was denied (D.E. 176) on August 23, 2016.  Selective Advisors Group, LLC, an affiliate of Debtor's husband, owns NLG's claim through execution on a judgment against NLG. On August 23, 2016 the bankruptcy court entered its decision denying NLG's motion for relief from the automatic stay. ECF 176.<br><br>On August 21, 2016, Selective sued NLG in this bankruptcy Court **ADVERSARY PROCEEDINGS** ***Selective Advisors and Elizabeth Hazan v. NLG, LLC,*** Adv. Case No. 16-1439-AJC for avoidance of NLG's alleged claim lien on Debtor's Homestead property on Valencia Drive Fisher Island Florida On January 3, 2016 Hazan, additional Plaintiff and Selective filed their Motion to amend their Complaint to add a count seeking to Quiet Title to the property, and a number of tort claims, which motion was granted on January 23, 2016.<br><br>**On March 20,2017 The Court awarded a default in favor of Plaintiffs Selective and Hazan and against Defendant NLG, LLC. (D.E. 100.)** The Court granted a Default in |

| | | | | |
|---|---|---|---|---|
| | | | | favor of Plaintiffs and against Defendant NLG, LLC and ruled as follows: "The Court also finds that the withdrawal and retention of multiple counsel by the Defendant does not constitute "cause" or "excusable neglect" warranting an extension of time to comply with filing requirements. The Court sets deadlines in this case for the filing of pleadings, specifically the filing of a responsive pleading to the second amended complaint; but the Defendant did not meet those deadlines and has failed to demonstrate sufficient cause exists to extend those deadlines. Accordingly, the Court believes the Plaintiff is entitled to a default..."D.E 100<br><br>The default against NLG, LLC was set aside on May 8, 2017 D.E 132 and the Court entered an order setting forth trial on July 13, 2017. The Trial in the Adversary proceedings 16-10389-AJC was concluded on July 13, 2017 and Proposed Orders by all parties were submitted on August 14, 2017. The parties are waiting on the Court's ruling. |
| 4 | **6913 Valencia LLC** | yes | yes | **Second Secured Mortgage** in the amount of $2,000.000.00 plus accrued interest from March 14, 2012.<br><br>The Debtor does not contest the validity or extent of 6913 Valencia LLC's Mortgage on her Homestead property.<br><br>Insider claim will subordinate and not be paid until all other allowed claims but reserves right to vote for the plan |
| 5 | **Valencia Estates Community Assn, Inc claim #10** | | yes | **Valencia Estates Community Association ("Valencia")**'s Claim #10 |

6

| | | | | |
|---|---|---|---|---|
| | | | no | in the amount of $195,072.14. Treated in settlement as follows:<br><br>1. Debtor paid $2,193.17 Aug 17, 2016 for due maintenance.<br><br>2. Debtor has paid 4 months in advance for September, October, November and December 2016 assessments for a total amount of $4,484.00 as per the Stipulation.<br><br>3. Debtor has paid the 2016 special assessment in the amount of $6250.00 as per the Stipulation.<br><br>4. The Parties agreed that Claim Number 10 shall be paid in the amount of $195,000.00 with 3.5% interest in the Chapter 11 Plan, over forty-eight (48) months, with one payment on the Effective Date of $4,062.00, and payments every five (5) months thereafter in the amount of $20,312.50 following the Effective Date until paid in full, with the interest payments to be made annually on the twelfth month.<br><br>**Valencia Estate Community Association withdrew its objections to Debtor's disclosure and has agreed to vote for Debtor's plan.**<br><br>**<u>Claim settled</u>.**<br><br>Agreed Order Approving Stipulation of Settlement of Claim 10 filed by Valencia Estates Homeowners' Association entered on 11/18/16 D.E 302. |
| 6 | **<u>Fisher Island Community Ass'n, Inc Claim #18</u>** | | yes | Late filed Proof Of Claim in the amount of $216,278.97 on 10/20/16 - **<u>Disputed by Debtor and disallowed by this court</u>**.<br><br>The Debtor has filed an objection to the amount of the Claim challenging |

7

| | | | | |
|---|---|---|---|---|
| | | no | | Fisher Island's standing as a "party in interest." In re E.S. Bankest, L.C. 321 B.R. 590 (Bankr. S.D. Fla. 2005). Fisher Island Community Association, Inc. did not timely file a Proof Of Claim and its Motion to Allow a Late Filed Claim has been denied on November 16, 2016.<br><br>Claimant 3343 West Commercial Blvd. 100 (Fisher Island Community Association).<br><br>Order granting Fisher Island Community Association, Inc.'s Motion for relief from Stay entered on 11/23/16<br>**Claim Disallowed by this Court. No payment through Plan.** |
| 7 | **Miami-Dade Water and Sewer claim #7** | no | yes | **Claim #7  $1502.54 to be paid on the Effective Date of The Plan** |
| 8 | **IRS claim #3** | no | yes | $393,985.17 - Secured claim shall be paid over ten years with interest Equal payments in the amount of $22,948.00 every 6 months to include interest on any unpaid claim amounts after the effective date of the plan at 3%. |
| 9 | **Miami-Dade County Tax Collector Claim #6** | no | yes | $57649.47 Miami-Dade County Tax Collector Secured claim on 6913 Valencia Drive property Fisher Island FL 33109 has been paid in full.<br><br>**Claim #6 paid in full** |

**Other Disputed Claims**

8

| Class # | Description | Insider | Impairment | Treatment |
|---------|-------------|---------|------------|-----------|
| 10 | **Real Time Resolutions, Inc claim #8** | no | yes | Claim 8 in the amount of $322,846.72 allegedly secured second mortgage Line of credit on property located at 1 East 62nd Street Apt 1 A NYC NY 10065 is disputed by Debtor.<br><br>Alleged Creditor has agreed to complete stay relief in settlement of this claim in this case and has agreed to support Debtor's plan of reorganization and vote the entire amount of its alleged claim in favor of Debtor's plan. (ECF 163).<br><br>**Claim settled.** |

| Class # | Description | Insider | Impairment | Treatment |
|---------|-------------|---------|------------|-----------|
| 11 | **Board of Managers Spencer Condominium claim #14** | | yes | The Debtor disputes the Claim #14 filed by The Board of Managers Spencer Condominium ("Spencer"). The parties reached a Confidential Stipulation Of Settlement executed in March 2015 in New York. The Debtor is only personally liable for the amount of $109,554.86 representing the alleged disputed outstanding maintenance fees owed by Debtor prior to her transfer of ownership of the property located at 1 East |

| | | no | | 62nd Street Apt 1 A NYC NY 10065. This amount will be paid by Real Estate Holdings Group, L.D.C. ("REHG"), the owner of the New York condominium located at 1 East 62nd Street Apt 1A, New York, NY 10065. REHG, Spencer and Hazan and other parties are bound by the Confidential Stipulation of Settlement executed in March 15, 2015 ("Settlement"). The vast remaining portion of the Spencer Condo Board of Managers' claim is to be paid by the owner of the unit, REHG, per the Settlement executed in March 2015 by the parties. **On March 1, 2017 this Court granted Debtor's Motion for Stay relief, allowing the New York Court to exercise jurisdiction over and enforce the confidential Settlement Agreement.** **On March 2, 2017, New York Supreme Court Judge Singh granted REHG's Motion to Enforce The Confidential Stipulation entered in March 2015 between the parties.** **No payment through the plan. Claim settled.** |
|---|---|---|---|---|

|  |  |  |  | **SETTLEMENT ENFORCED BY NEW YORK COURT** |
|  |  |  |  |  |

|  |  |  |  |  |
|  |  |  |  |  |

### Convenience Class Undisputed Unsecured Small Claims

### Paid in full on the Effective Date

| Class # | Description | Insider? (Yes or No) | Impairment | Treatment |
|---|---|---|---|---|
| 12 | IRS claim #3 | no |  | 1085.00 |
|  | American InfoSource T Mobile Claim #2 | no |  | 1130.00 |
|  | American InfoSource Direct TV Claim #9 | no |  | 461.00 |
|  | FPL Claim #11 | no |  | 2906.93 |
|  | Mount Sinai | no |  | 3,240.00 |
|  | Mount Sinai | no |  | 295.91 |
|  | HSBC Bank USA NA | no |  | 1070.66 |
|  | Sterling Emerg Svc | no |  | 2445.30 |
|  | Bank of America NA | no |  | 3301.00 |
|  | Wells Fargo Claim #12 | no |  | 323.24 |
|  | Real Time Resolution Claim #5. | no |  | 12,000.00 |
|  | **S&S Collections Simon & Sigalos claim #13 partial amount $1740.96** |  |  | 0.00 |
|  | Total |  |  | 28,259.04 |

11

**Settled Unsecured Claims**

**Allowed Undisputed Unsecured Claims**

| Class # | Description | Insider? (Yes or No) | Impaired | treatment |
|---|---|---|---|---|
| 13 | JMB Urban 900 Dev. claim #4* | no | X | Claim # 4 in the amount of $664,380.47. Claim # 4 will be paid 41% of the amount or 275,000.00 per settlement before the second anniversary of the entry of the agreed final judgment on July 20, 2017 in favor of JMB in case **Adversary proceedings 16-01188-AJC. Adversary proceeding case closed on 7/22/16 and Case settled 16-01188-AJC. DOC 21 Case 16-01188-AJC Order approving e agreed final Judgment in favor of JMB entered on July 20, 2017.**<br><br>**CLAIM SETTLED** |
| | S&S Collections Simon &Sigalos claim #13 | no | X | Claim # 13 in the amount of $21,242 Claim settled for 41% $8,709.22. Amount of $1740.96 moved to convenience class. Amount of $1740.96 paid by third party on July 10, 2017. Remaining balance owed $6,968.04 to be paid same treatment as JMB.<br><br>**CLAIM SETTLED** |

| | | | | |
|---|---|---|---|---|
| | **Southeast Financial LLC** | no | X | Stipulation Of Settlement DE 98 approved by this Court DE 101.<br><br>Vehicle owned by Holdings Trust Management Group LLC. Southeast Financial LLC's Secured Lien is guaranteed by the Debtor.<br><br>Secured claim allowed $17,000 value to be paid at 5.25% for 48 months payments in the amount of $393 began on August 1, 2016 and are current.<br><br>**CLAIM SETTLED** |
| | | | | |
| | | | | |
| | | | | |

### Disputed Unsecured Claims

### not paid until and unless allowed

| | | | | |
|---|---|---|---|---|
| | **Cross & Simon Claim #1** | no | | Claim #1 in the amount of $11,023.83 Legal Bill for corporation other than Debtor.<br><br>**Unallowed claim.**<br><br>**No payment through Plan** |

| | | | | |
|---|---|---|---|---|
| | **Newman Ferrara LLP claim #15** | no | | Claim #15 in the amount of $24,818.44 Legal bill Legal work for Corporation other than the Debtor.<br><br>**The Claims bar date has passed. No payment through plan. Unallowed claim.** |
| | **Fuerst Ittleman David & Joseph, P.L. Claim #16** | | | Disputed Proof of Claim filed after Claim Bar Date. Fuerst Ittleman David & Joseph, P.L. is not a creditor of this Debtor. Debtor has filed an objection to this claim. Fuerst Ittleman David & |

| | | | | Joseph, P.L. have agreed that they are not a creditor of this estate. **No payment through plan.** **Unallowed Claim.** |
|---|---|---|---|---|
| | | | | |

## Unsecured Scheduled Disputed and No Claim Filed

### Therefore Disallowed

| | |
|---|---|
| Allied Collection | 318 |
| ATT Mobility | 3919 |
| First National Collection | 246.08 |
| Focus Mgt | 772 |
| Marzec Law Firm | 0 |
| Mount Sinai Medical | 31414.15 |
| Ray Garcia PA | 7026.15 |
| Verizon | 1758 |
| US Bank NA | Unknown<br><br>The Debtor entered into a Stipulation of Settlement with US Bank NA (D.E. 345) granting the parties complete stay relief which was approved by the Court by Order dated 1/18/2017, D.E. 371.<br><br>US Bank did not file a proof of claim and will not be paid through the Plan. **Claim settled.** |
| NLG, LLC | NLG, LLC did not timely file a proof of claim and **NLG, LLC's alleged Claim has been judicially assigned** per The Final Order entered by Judge Peter Lopez on August 2014. **NLG, LLC will not be paid through the Plan.**<br><br>NLG, LLC has no standing in this case and is not a creditor of the Debtor's Estate.<br><br>NLG appeared in this case but failed to timely file a proof of claim. NLG is merely a notice |

| | |
|---|---|
| | party. NLG is not a scheduled creditor in this case. Selective is listed in Debtor's schedule as her creditor. **On May 13, 2016 NLG, LLC moved for stay relief in this court (D.E. 66).** Selective Advisors Group, LLC, an affiliate of Debtor's husband, owns NLG, LLC's claim through execution on a judgment against NLG, LLC. **On August 23, 2016 the bankruptcy court entered its decision denying NLG's motion for relief from the automatic stay. ECF 176** **On 03/17/17 this Court granted in part Plaintiff's Motion for Default against Defendant NLG, LLC in the Adversary, Case No. 16-1439 Selective Advisors Group, LLC and Liza Hazan AKA Elizabeth Hazan V. Defendant NLG, LLC. See D.E. 100. This Court granted a Default in favor of Plaintiffs Selective Advisors Group, LLC and Debtor Liza Hazan AKA Elizabeth Hazan and against Defendant NLG, LLC** The default against NLG, LLC was set aside on May 8, 2017 D.E 132 and the Court entered an order setting forth trial on July 13, 2017. The Trial in the Adversary proceedings 16-10389-AJC was concluded on July 13, 2017 and Proposed Orders by all parties were submitted on August 15, 2017. The parties are waiting on the Court's ruling. |
| Total | 45453.38 |

**Equity**

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 14 | Equity Individual interest holder | no | retained |

## ARTICLE V

## ALLOWANCE AND DISALLOWANCE OF CLAIMS

5.01    Disputed Claim. A disputed claim is a claim that has not been allowed or disallowed by a final non-appealable order, and as to which either: (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

5.02    Delay of Distribution on a Disputed Claim. No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order.

5.03    Settlement of Disputed Claims. The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

## ARTICLE VI

## PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.01    Assumed Executory Contracts and Unexpired Leases.

(a)    The Debtor assumes the following executory contracts and/or unexpired leases effective upon the date of the entry of the order confirming this Plan: none.

(b)    The Debtor will be conclusively deemed to have rejected all executory contracts and/or unexpired leases not expressly assumed under section 6.01(a) above, or before the date of the entry of the order confirming this Plan. A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than thirty (30) days after the date of the order confirming this Plan.

## ARTICLE VII

## GENERAL PROVISIONS

7.01    Definitions and Rules of Construction. The definitions and rules of construction set forth in §§101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan.

7.02    Effective Date of Plan. The effective date of this Plan is the fourteenth business day following the date of the entry of the order of confirmation. But if a stay of the confirmation order is in effect on that date, the effective date will be the first business day after that date on which no stay of the confirmation order is in effect, provided that the confirmation order has not been vacated.

7.03    Severability. If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

16

7.04    Binding Effect. The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

7.05    Captions. The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

7.06    Controlling Effect. Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Florida govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

## ARTICLE VIII

## DISCHARGE

8.01.    **Debtor is an individual.**

11 USC 1129(a)(15) provides: In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan—

(A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325 (b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

In this case the Debtor has provided for payments not less than Projected disposable income of the debtor during a five year period beginning with the first payment due under the plan.

Discharge. In a case in which the debtor is an individual—

(A)unless after notice and a hearing the court orders otherwise for cause, confirmation of the plan does not discharge any debt provided for in the plan until the court grants a discharge on completion of all payments under the plan;

(B)at any time after the confirmation of the plan, and after notice and a hearing, the court may grant a discharge to the debtor who has not completed payments under the plan if—

(i)the value, as of the effective date of the plan, of property actually distributed under the plan on account of each allowed unsecured claim is not less than the amount that would have been paid on such claim if the estate of the debtor had been liquidated under chapter 7 on such date;

(ii)modification of the plan under section 1127 is not practicable; and

(iii)subparagraph (C) permits the court to discharge; and

(C)(*)the court may grant a discharge if, after notice and a hearing held not more than 10 days before the date of the entry of the order granting the discharge, the court finds that there is no reasonable cause to believe that—

17

(i)section522(q)(1) may be applicable to the debtor; and

(ii)there is pending any proceeding in which the debtor may be found guilty of a felony of the kind described in section 522(q)(1)(A) or liable for a debt of the kind described in section 522(q)(1)(B); and if the requirements of subparagraph (A) or (B) are met.

Pursuant to 11 U.S.C. § 1141(d)(5)(A), the Debtor shall be discharged from all pre-Confirmation debts except as is provided in the Plan, pursuant to the procedures set forth herein, upon completion all payments required under the Plan to all unsecured and deficiency creditors. **Upon payment of all required Plan payments the Debtor shall be discharged of all allowed and disallowed claims.** Upon the satisfaction of all payments required under the Plan to unsecured creditors, the Reorganized Debtor shall file a Final Report of Estate and Motion for Final Decree Closing Case on the Court approved local form.

(a) Notwithstanding the above, the Debtor may request that the Court close this bankruptcy proceeding prior to the entry of an Order of Discharge, pursuant to the following procedures:

(b) The Debtor may file a Motion to Temporarily Close Bankruptcy Case Prior to Entry of Order of Discharge (the "Motion to Close") after the following events have occurred: (I) payment of the Initial Payment (defined in the Plan) to unsecured creditors; (ii) payment of all outstanding quarterly United States Trustee Fees as of the date of the Order approving the Motion to Temporarily Close; and (iii) the filing of all outstanding federal income tax returns. The Motion to Close shall certify that each of the above conditions have been met.

(c) The Motion to Close (and Notice of Hearing thereto) shall be served to all creditors and interested parties. The Court may grant the Motion to Close, pursuant to 11 U.S.C. § 350(a), if each of the above conditions have been met.

(d) During the time that this bankruptcy case is temporarily closed, the provisions of the confirmation order shall remain in effect with respect to the treatment of creditor claims that existed as of the bankruptcy petition date, that being 1/11/16, as long as the Debtor continues to be in compliance with the Plan and the Court's Order Confirming Debtor's Plan of Reorganization and Setting Bar Date for Lease and Executory Contract Rejection Claims (the "Confirmation Order"), and as long as the Debtor timely makes all of the payments to unsecured creditors, as contemplated under the Plan.

(e) Upon the satisfaction of all payments required under the Plan to unsecured creditors, the Debtor may file a motion to reopen this bankruptcy proceeding, pursuant to 11 U.S.C. § 350(b). Any Clerk of Court fees associated with filing of the motion to reopen shall be waived. The motion to reopen shall be verified and served upon all creditors and parties in interest and shall demonstrate that the Debtor has made all of the payments contemplated under the Plan to unsecured creditors.

(f) Upon the re-opening of this bankruptcy proceeding, the Debtor shall promptly file a Final Report of Estate and Motion for Final Decree Closing Case on the Court-approved local form, which shall certify that all payments required under the Plan to unsecured creditors have been made. The Court may then grant the Debtor a discharge, pursuant to 11 U.S.C. § 1141(d)(5).

Respectfully submitted, 9/9/17

By: /s/ Liza Hazan

The Plan Proponent

By: /s/ David W. Langley, Esq.
8551 W. Sunrise Blvd.
Suite 303
Plantation, FL 33322
dave@flalawyer.com
Phone 954—356-0450
By: /s/ David W. Langley
Attorney for the Plan Proponent

Page 1

1              UNITED STATES BANKRUPTCY COURT
               SOUTHERN DISTRICT OF FLORIDA
2

3                            Case No.:  16-10389-AJC
4    In re:
5    LIZA HAZAN,
     a/k/a ELIZABETH HAZAN,
6

         Debtor.
7    _____/

     SELECTIVE ADVISORS GROUP, LLC,
8

         Plaintiff,
9

     v.                       Adv. No.:  16-01439-AJC
10

     NLG, LLC, a Delaware limited
11   liability company,
12       Defendant.
     _____/
13

14            ECF # 384, 391, 416, 438
15                  May 4, 2017
16            The above-entitled cause came on for
17   hearing before the HONORABLE A. JAY CRISTOL, one of
18   the Judges of the UNITED STATES BANKRUPTCY COURT, in
19   and for the SOUTHERN DISTRICT OF FLORIDA, at 301 N.
20   Miami Avenue, Miami, Miami-Dade County, Florida, on
21   Thursday, May 4, 2017, commencing at or about 11:40
22   a.m., and the following proceedings were had:
23

24        Transcribed from a digital recording by:
              Helayne Wills, Court Reporter
25

**OUELLETTE & MAULDIN  COURT REPORTERS, INC.**
**(305) 358-8875**

Page 2

```
 1   APPEARANCES:
 2        DAVID W. LANGLEY, ESQ.
          on behalf of the Debtor/Plaintiff
 3
 4        MARSHALL SOCARRAS GRANT, P.L., by
          MELISSA A. DURSI, ESQ., (via telephone)
 5        on behalf of Plaintiff Selective Advisors Group
 6
          DIAZ REUS, P.A., by
 7        NICHOLAS B. BANGOS, ESQ.,
          on behalf of Defendant/Counter-Plaintiff NLG,
 8        LLC
 9
          FURR AND COHEN, P.A., by
10        JASON S. RIGOLI, ESQ.,
          on behalf of the Board of Managers of Spencer
11        Condominium
12
          OFFICE OF THE UNITED STATES TRUSTEE, by
13        JOHANNA P. ARMENGOL, ESQ.,
          on behalf of the U.S. Trustee
14
15        ALSO PRESENT:
          ECRO - Electronic Court Reporting Operator
16        ELIZABETH HAZAN
          CHRIS KOSACHUK (via telephone)
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              THE COURT:  11:30 calendar, the matter of
 2    Liza Hazan.  Counsel may state their appearances, in
 3    the courtroom.
 4              MR. LANGLEY:  Good morning, Your Honor.
 5    David Langley here for the debtor, Liza Hazan, and
 6    Ms. Hazan is with us here in the courtroom today.
 7              THE COURT:  Anyone else on this matter in
 8    the courtroom?
 9              MR. RIGOLI:  Good morning, Your Honor.
10    Jason Rigoli, Furr and Cohen, for the creditor Board
11    of Managers of Spencer Condominium.
12              THE COURT:  And spell your name again,
13    sir.
14              MR. RIGOLI:  Last name is R-I-G-O-L-I.
15              THE COURT:  And you are representing
16    again?  Say your client.
17              MR. RIGOLI:  The Board of Managers of
18    Spencer Condominium.
19              THE COURT:  Okay.  Anyone else in the
20    courtroom?
21              MS. ARMENGOL:  Good morning, Your Honor.
22    Johanna Armengol, A-R-M-E-N-G-O-L, for the U.S.
23    Trustee.
24              MR. BANGOS:  Good morning, Your Honor.
25    Nick Bangos, B-A-N-G-O-S, for NLG, LLC.
```

Page 4

1          THE COURT:  And out in telephone land?  Is

2     there a Melissa Dursi out there?

3          MS. DURSI:  Good morning, Your Honor.

4     Melissa Dursi on behalf of Selective Advisors Group,

5     LLC.

6          THE COURT:  And you need to spell your

7     last name for our electronic recorder.

8          MS. DURSI:  D-U-R-S-I.

9          THE COURT:  And anyone else out in

10    telephone land?

11         MR. KOSACHUK:  Yes, Your Honor.  Chris

12    Kosachuk, K-O-S-A-C-H-U-K, on behalf of myself.

13         THE COURT:  Very well.  We have a number

14    of matters on the calendar.  The first one, of

15    course, is the disclosure statement.  And there have

16    been objections to the disclosure statement.

17         The objecting parties are, let's see.

18    Where are they?

19         MR. LANGLEY:  No creditors objected,

20    Judge, just NLG, who's already been defaulted, and

21    we have a motion to strike their objection, Docket

22    Entry 438, which is also set for today.

23         THE COURT:  Let's hear from NLG as to what

24    their objections are.

25         MR. LANGLEY:  Could we, Judge, first take

Page 5

1    a run at the motion to strike?

2            Your Honor has defaulted NLG.  You've

3    denied their motion to vacate default.  By

4    defaulting them they've admitted the well-pleaded

5    allegations in our third amended complaint.  They

6    have no claim in this case.  They have no standing

7    in this case under your Bankest opinion.  They've

8    been defaulted.

9            We're set for trial.  As Your Honor may

10   recall, Mr. Bangos may not be aware of this, because

11   he wasn't here for the pretrial on April 24th, but

12   we're set for a two-day trial July 13th on damages

13   only.  That's Ms. Hazan's damages against NLG.

14   Their claim has been wiped out by the default.  They

15   should have no standing to object to our disclosure.

16           THE COURT:  Well, Mr. Bangos, do you wish

17   to be heard?

18           MR. BANGOS:  Judge, with respect to

19   default, I was under the impression that the Court

20   advised the parties last week that the Court was

21   going to have a hearing on the 13th on both Counts

22   I, II and III of the plaintiff's complaint, as well

23   as the counterclaim that's been asserted by NLG

24   against the debtors.

25           Insofar as the debtor claims that my

Page 6

1   client is not a creditor, there is a final judgment

2   entered by a court of competent jurisdiction that

3   stated that my client has a lien, and that lien is

4   valid, and it has greater priority than any interest

5   of the debtor or anyone claiming through them.

6          THE COURT:  Except that there was an order

7   of another court of competent jurisdiction

8   transferring the ownership of that property to

9   Selective.

10          MR. BANGOS:  Those issues were litigated

11   by Judge Gordo, and they were resolved against the

12   debtor, as well as Selective.

13          THE COURT:  Well, I'm not sure about that,

14   but anyhow, what is your objection to the disclosure

15   statement?

16          MR. BANGOS:  I'll tell you, Judge.  Number

17   one, NLG, as I indicated, has a counterclaim against

18   the debtor.  Number one is, the disclosure statement

19   is nothing more than a personal attack on

20   Mr. Kosachuk.  It makes no mention of the

21   counterclaim that NLG has against the debtor that

22   the debtor's defaulted against.

23          And I'm not here to argue the merits of

24   anything, and I'm not here to argue confirmation,

25   but it seems to me that what the debtor ought to do

Page 7

```
 1   is address the issue of NLG's counterclaim and the

 2   final judgment and the disclosure statement, and

 3   say, "This is what we're going to do if we do not

 4   prevail."

 5            I'm not asking the debtor to say this is

 6   what you're going to do, but the debtor ought to

 7   disclose to creditors what's going to happen if the

 8   debtor doesn't prevail.

 9            THE COURT:  Well, the debtor is not in a

10   position to profess today what's going to happen in

11   the future.  The disclosure statement is supposed to

12   contain information that would allow people to make

13   an intelligent decision on whether to vote for or

14   against the plan.

15            You're saying that the litigation that

16   you're talking about is not mentioned?

17            MR. BANGOS:  No, sir, it's not.

18            THE COURT:  All right.  So that may be

19   very important.

20            MR. BANGOS:  Correct.  My position is, if

21   NLG prevails on its counterclaim, NLG has a claim

22   around $5 million, they're going to have to say --

23   they should say, "This is how we propose to treat

24   it," period, because that affects their cash flow,

25   because there's another issue, Chase, who has a
```

Page 8

1    mortgage on that same Fisher Island property.

2            The debtor says that, "This is what we're

3    going to do," but the debtor says, "If we don't lose

4    we're going to pay the claim," but the projections

5    don't have any indication of the payment of that

6    claim.

7            THE COURT:  All right.  Anything else?

8            MR. BANGOS:  Yes, sir.  Number two, Judge,

9    the debtor's plan is premised upon the notion that

10   the debtor is going to make $750,000 this year.  The

11   debtor's plan is premised upon the notion that the

12   debtor is going to make $500,000 from here to the

13   end of eternity.

14           According to the debtor-in-possession

15   reports, beginning in August, Judge, or September,

16   the debtor had a total income of $6,636.67.

17           THE COURT:  $6,000?

18           MR. BANGOS:  Yes, sir, exactly.  And most

19   of that, 5,735 of that, was from the liquidation of

20   personal holdings, basically her luxury holdings.

21           In October, the debtor had total

22   collections on receivables of $19,000, but had --

23   and other income of $9,000.  The debtor's best month

24   seems to have been in October, when the debtor

25   generated $134,000 worth of receivables, but as we

Page 9

1    stand here today, the debtor has not collected

2    $95,000 of that receivable -- of those receivables.

3           This is what the debtor says in her

4    disclosure statement.  "The debtor has closed

5    contracts that will earn her significant funds

6    (comparable to past earnings) in the next six

7    months.  Debtor has contracts of major hospitality

8    brands, restaurants, lounges, nightclubs, that will

9    earn her millions in the future."

10           We don't know if these entities that the

11    debtor has these contracts with are the same

12    entities that haven't paid her the $140,000 or

13    $190,000 in receivables.  We don't really know who

14    these entities are.  We don't know what the terms of

15    the contracts are.

16           So the debtor ought to either attach the

17    contracts that she claims that she has with these

18    entities that are going to earn millions of dollars,

19    or at least at a minimum set forth the terms of the

20    contracts, so that the creditors can say, "Well, if

21    she's getting 4 percent on this or she's getting

22    6 percent every time she does that," then we know

23    and we have a basis for making an estimation.

24           My final objection, Judge, is that in

25    August of 2011, the debtor transferred her

Page 10

```
 1    condominium in New York to a gentleman named Raymond

 2    Houle, and then it was re-transferred back to her

 3    husband, an entity owned by her husband.

 4              I want to tell you what the debtor says in

 5    her disclosure statement.  In terms of projected

 6    recovery of avoidable transfers the debtor says the

 7    following:  "The debtor has completed her

 8    investigation with regard to pre-petition

 9    transactions.  11 U.S.C. 548 fraudulent transfers

10    has a two year look back and incorporates Florida

11    Statute 726 which has a four year look back, but

12    only as to avoidance for intentional hinder, delay

13    or defraud, or lack of reasonable equivalent value,

14    which facts are not relevant to the plan in this

15    case."

16              Well, Judge, if she made a transfer in

17    2011 of a piece of property in New York --

18              THE COURT:  That's more than four years

19    ago.

20              MR. BANGOS:  Exactly, Judge.  It's a six

21    year statute of limitation.  Moreover, Judge, you're

22    probably familiar with Judge Mark's decision, In re:

23    Kipnis, and in that case, Judge, Judge Mark said

24    that if the IRS is a secured creditor, the trustee

25    has up until ten years to pursue that.
```

Page 11

1            THE COURT:  Is the IRS in this case?

2            MR. BANGOS:  Yes, sir.  The IRS is owed

3    more than half a million dollars in this case.

4            THE COURT:  Mr. Langley, is that accurate?

5            MR. LANGLEY:  No.  As to the amount, I

6    don't believe --

7            THE COURT:  Not as to amount, as to a

8    penny.  Is there something owed to IRS?

9            MR. LANGLEY:  Yes.

10           THE COURT:  Then you've got ten years.

11           MR. BANGOS:  So the debtor ought to at

12   least say, even if she's going to give lip service,

13   say, "The debtor's been advised that this claim

14   exists," the reason why the debtor doesn't believe

15   or the reason why the debtor isn't pursuing this

16   claim, but when the debtor has a disclosure

17   statement that materially misstates the applicable

18   statute of limitations and says, "I've done an

19   investigation and there's nothing within four

20   years," and the reality is that there's a six-year

21   statute and a ten-year statute, the debtor ought to

22   address that.

23           Those are my three principal objections,

24   Judge.

25           THE COURT:  All right.  Mr. Langley, what

Page 12

1    say you, if anything?

2              MR. LANGLEY:  Judge, Mr. Bangos seems to

3    be throwing everything up against the wall.

4              THE COURT:  Let's go as to Mr. Bangos'

5    client.  Although they're defaulted, supposedly on,

6    I think, three counts, aren't there nine counts in

7    the complaint?

8              MR. LANGLEY:  Yes.

9              THE COURT:  So they're still in here, so

10   they have standing.  Mr. Bangos has had standing to

11   be heard.

12             Go ahead and tell me what you think.

13             MR. LANGLEY:  The remaining counts are

14   tort claims against NLG.

15             Judge, what Mr. Bangos is apparently not

16   aware of is that his client, NLG, brought a

17   fraudulent transfer action raising those same

18   allegations in New York years ago, and it was

19   dismissed.  Nobody is claiming a fraudulent

20   transfer.  It's over five years ago.  The IRS is not

21   challenging it.  They never have.  They're fully

22   secured by the assets of the case.

23             We're prepared to go to a June

24   confirmation hearing with a 100 percent consensual

25   plan.  He mentioned Chase.  Chase has agreed to this

Page 13

1   disclosure statement.  Everybody has agreed to this

2   disclosure statement.

3              THE COURT:  Except Mr. Bangos' client.

4              MR. LANGLEY:  Except Mr. Bangos.

5              THE COURT:  And he's raised some points on

6   which it will be necessary to amend the disclosure

7   statement.

8              MR. LANGLEY:  Well, I think we can tell

9   you, Judge, Ms. Hazan has earned income of over

10  $100,000 just in the last six months.  We're

11  prepared to -- we could confirm today and meet the

12  payments on the effective date.  Everything is ready

13  to go here.  He's cherry picking some monthly

14  operating reports where there was a lower amount of

15  income.

16             There's been a significant amount of

17  income, and it's increasing, and there are

18  significant receivables out there.  By the time we

19  get to confirmation there will be quite a bit of

20  additional income coming in.  Ms. Hazan has her

21  consulting business back up and running very strong.

22  She's doing very well.

23             We also have the New York condo owned by

24  REHG, controlled by her husband, which is being

25  viewed daily for sale.  And that's going to generate

Page 14

```
 1    significant funds which will be contributed towards

 2    confirmation.

 3            We may not only have confirmation, but a

 4    fully paid plan within a matter of months.  There

 5    are no financial concerns here, Judge.

 6            And as far as the NLG litigation, if you

 7    look at our third amended disclosure statement,

 8    Pages 7 and 8, there's two full pages entitled NLG

 9    Litigation.  We disclose all the litigation.

10            THE COURT:  Pardon me.  Let me interrupt.

11            What about those pages, Mr. Bangos?  Does

12    that cover the NLG litigation?

13            MR. BANGOS:  No, sir.  They don't address

14    the counterclaim.

15            MR. LANGLEY:  Judge, if you look at the

16    counterclaim, I happened to bring it with me, Count

17    I of our complaint is to determine the nature and

18    extent of liens.

19            THE COURT:  What about priority and

20    amount?  That's in both the counterclaim and in

21    the --

22            MR. LANGLEY:  The counterclaim is actually

23    a defense.  It doesn't raise anything new.  It says

24    the same thing, mirror image of what our Count I

25    says.  It's a determination as to whether or not
```

Page 15

```
 1   there's any kind of a lien, and by being defaulted

 2   on Count I, where we pled, the well-pleaded

 3   allegations of Count I clearly state a cause of

 4   action for determining that there's no lien on the

 5   property.

 6            You granted the default.  You denied their

 7   motion to vacate default.  So they've admitted those

 8   allegations.  There's no longer a counterclaim.

 9            And if you took at the Taylor case we

10   cited in our motion to strike, Judge, it says once a

11   default is entered, a party cannot pursue a

12   counterclaim or an affirmative defense.  And they've

13   admitted to our allegations, which not only entitle

14   us to a judgment on Count I, but does away with

15   their Count I.

16            We've asked for the same relief, a

17   determination as to the nature and extent of lien.

18   So they have no lien.  It's been wiped out.  The

19   only thing remaining is Ms. Hazan's claim against

20   NLG for tort.  There's nothing else that really is

21   of substance that needs to be disclosed in the

22   disclosure statement.

23            THE COURT:  Mr. Bangos brought up three

24   points.  One was --

25            MR. LANGLEY:  Income.
```

Page 16

```
 1              THE COURT:  -- the income.  What do you
 2    say about the income?
 3              MR. LANGLEY:  That's what I was saying
 4    before, Judge.  Ms. Hazan is showing very
 5    significant income in her operating report.
 6              THE COURT:  But what does it say in the
 7    disclosure statement about the income?  Does that
 8    advise people as to what it is?
 9              MR. LANGLEY:  Yes.  It discusses her past
10    year's earnings, that she's back in business, that
11    she has the capability of earning sufficient funds
12    to pay the plan.
13              THE COURT:  Mr. Bangos said that she
14    referred to numerous contracts without identifying
15    who they're with.  I don't think that the contracts
16    need to be part of the disclosure statement, but
17    doesn't she at least need to indicate with more
18    detail what those contracts are about?
19              MR. LANGLEY:  Well, the concern there,
20    Judge, is in past litigation Mr. Kosachuk, who's on
21    the phone, and NLG contacted -- found out who some
22    of her customers were, contacted those people.  One
23    of our tort claims is tortious interference with a
24    business relationship, because NLG harassed her
25    business contacts to the point where they stopped
```

Page 17

1   doing business.  Significant entities stopped doing

2   business with Ms. Hazan, because of the harassment

3   by Chris Kosachuk and NLG.

4           We're very concerned about putting in too

5   much in the way of detail that might cause that to

6   happen again, but she's been in the same business.

7   She places high-end chains into locations.  This is

8   what she's been doing for years, and she's back at

9   it.  We don't want to disclose the names of the

10  customers.  We'd be happy to give you an in camera

11  view of all the contracts.

12          THE COURT:  I don't want an in camera

13  view.  I'm not the one that votes on the plan.

14          MR. LANGLEY:  Yes, I know, Judge.

15          THE COURT:  I think that perhaps an

16  addendum that would indicate the nature of the

17  contract and some detail about it, while redacting

18  the name of the contracting party, would be

19  sufficient.

20          MR. LANGLEY:  I think we have given quite

21  a bit of detail.  Debtor generated $400,000 per year

22  with the one exception of the year preceding filing.

23  Debtor's again earning rates comparable to previous

24  years.

25          Through her consulting business she has an

Page 18

```
 1   exclusive contract to place new locations for an
 2   international beauty and skin care company -- I
 3   mean, that's one of the main customers she's dealing
 4   with, we don't want to disclose their name -- an
 5   international beauty and skin care company selling
 6   luxury brand products to high-end clientele, and she
 7   has the exclusive contract to place all of their
 8   stores.
 9            THE COURT:  And does it indicate what that
10   would generate?  Is it going to be a nickel or is it
11   going to be $5 million?
12            MR. LANGLEY:  We've said that in the past
13   she earned approximately $400,000 per year, and
14   she's earning that rate again now.  I think we can
15   clearly project that in the next coming year she'll
16   be earning that much again, Judge.
17            THE COURT:  All right.  Anything else you
18   wish to address on Mr. Bangos' objections?
19            MR. LANGLEY:  Only if you have questions,
20   Your Honor.  I think we've clearly covered the
21   litigation with NLG.  There is no real issue as far
22   as any fraudulent transfer.  Nobody else is claiming
23   that.  The parties that are involved are not
24   claiming that.
25            You heard from Spencer's own attorney.
```

Page 19

1    This is the Spencer Condo we're talking about.  And

2    counsel is here, and they're not objecting to the

3    disclosure statement, counsel for the Spencer Condo

4    board.  And we've addressed --

5              THE COURT:  What does it say about that in

6    the disclosure statement?

7              MR. LANGLEY:  There's really nothing to

8    discuss, Judge.  It does state that the unit was

9    transferred in August of 2011.

10             THE COURT:  All right.  I'm going to

11   direct you to modify the disclosure statement to

12   include a statement that the condo -- just what

13   happened to it, it was sold, sold and whatever, and

14   on whatever dates, and that in the debtor's opinion

15   it is not being contested by IRS, notwithstanding

16   the fact that they have a ten year look back.

17             How much time do you need to make that

18   amendment?

19             MR. LANGLEY:  Twenty-four hours.

20             THE COURT:  All right.  Then we'll

21   continue the disclosure hearing until -- well,

22   today's Thursday.  What's the first time we have

23   next week, Ms. Cargill?

24             ECRO:  Judge, we could do Tuesday at

25   2 o'clock.  That will be the 9th.

Page 20

1          THE COURT:  So we're going to continue

2    to -- that's the 9th of May?

3          ECRO:  Yes, sir.

4          THE COURT:  9th of May at 2:00 p.m.

5    Within the 24 hours -- do you have e-mail or other

6    fax way to provide a copy to Mr. Bangos?

7          MR. LANGLEY:  Judge, Ms. Hazan just

8    mentioned to me she made a $40,000 deposit just in

9    her last monthly operating report.  So the monthly

10   operating reports do show sufficient income.

11         THE COURT:  Well, I repeat, amend the

12   complaint -- I mean, the disclosure statement, in

13   accordance with what I just stated, in 24 hours, and

14   get a copy to Mr. Bangos before the sun goes down on

15   Friday, and we'll then reconsider the disclosure

16   statement next Tuesday, the 9th of May, at 2:00 p.m.

17         MR. LANGLEY:  Great.  Thank you, Judge.

18         THE COURT:  Now, so that takes care of

19   Court Paper 438, as well as Court Paper 416.

20         Now, we have a motion to convert 11 to 7

21   filed by Mr. Furr on behalf of Spencer Condominium.

22   Let's see.  Who is representing Spencer?  That was

23   Mr. Rigoli.  Tell me about it.

24         MR. RIGOLI:  Good morning, Your Honor.

25   Actually, Your Honor, Mr. Furr and Mr. Langley have

Page 21

1   spoken, and we've agreed to continue this matter to

2   allow the process to play out here a little bit and

3   see if this motion actually needs to be prosecuted.

4   We have an agreed order to continue it until

5   confirmation.

6               THE COURT:  Reset to confirmation.  All

7   right then.  Mr. Rigoli, you'll draw that order

8   resetting it to the time of confirmation.

9               MR. RIGOLI:  Will do, Your Honor.  Thank

10  you.

11              THE COURT:  That was R-I-G-O-L-I; is that

12  right?

13              MR. RIGOLI:  That's correct, Your Honor.

14              THE COURT:  You'll draw that order, run it

15  by Mr. Langley and Mr. Bangos.

16              MR. RIGOLI:  Absolutely, Your Honor.

17  Thank you.

18              THE COURT:  This case is becoming -- or I

19  shouldn't say it's becoming, it is -- I guess that's

20  all we need from you -- it is very complicated, by

21  virtue of the fact that we have this court, we have

22  two Circuit Courts in Florida involved, apparently

23  one court in New York involved.

24              There's an interesting question that I

25  guess is going to have to be resolved.  You have the

Page 22

```
 1    foreclosure judgment here, which has already been
 2    through the Third District Court of Appeal, but we
 3    also have the position of Selective, and Selective
 4    was not a party to that foreclosure judgment in
 5    Florida, and yet Selective apparently has a judgment
 6    from a court of competent jurisdiction giving it
 7    certain rights, which would have a material effect
 8    on the court in Florida.
 9              I'm not sure just how we're going to
10    untangle this mess, but it is a mess.  So if anybody
11    has any thoughts that they'd like to put on the
12    record before we adjourn until next Tuesday, I'd be
13    happy to hear anyone's comments on how we're going
14    to resolve this matter.
15              First we'll start with you -- let's see.
16    Ms. Dursi, anything?  Ms. Dursi, are you still out
17    there?  Apparently not.
18              How about -- well, anything you'd like to
19    say, Mr. Rigoli?
20              MR. RIGOLI:  Your Honor, not on that
21    issue.
22              THE COURT:  All right.  United States
23    Trustee, have any thoughts about the complications
24    of this matter?
25              MS. ARMENGOL:  Not today, Your Honor.
```

Page 23

 1   Johanna Armengol.

 2            THE COURT:  What seems to be -- all right.

 3   Let me see.  We didn't talk yet to Mr. Bangos.

 4            Any thoughts?

 5            MR. BANGOS:  Judge, I was under the

 6   impression that the Court had stated last week that

 7   all these issues were going to be vetted out in

 8   July.  I thought that would make --

 9            THE COURT:  Hopefully they'll be vetted

10   out by then, but as I say, in preparing for where

11   we're going forward with this case, the more that I

12   read the various documents, the more complicated it

13   gets.  I'm trying to figure out how to resolve the

14   matter.

15            As I say, what I think is a very

16   significant matter that needs resolution is the

17   position of Selective.  Selective, as I say, has

18   apparently some rights from a court of competent

19   jurisdiction, and which were not considered in the

20   matter where NLG had a foreclosure.

21            MR. BANGOS:  Actually, they were, Judge.

22   I would just like to differ on that.

23            THE COURT:  How were they considered?

24            MR. BANGOS:  They tried to intervene.

25            MR. LANGLEY:  Judge, if I may --

Page 24

```
 1              THE COURT:  Well, if they tried to

 2    intervene and they weren't allowed to, then their

 3    rights weren't dealt with.

 4              MR. BANGOS:  They didn't appeal the

 5    intervention.  They had the right to appeal that.

 6              THE COURT:  Maybe.

 7              MR. BANGOS:  And the debtor asserted --

 8    well, I won't go down that rabbit hole, but --

 9              MR. LANGLEY:  I think it's somewhat

10    simple, Judge, if you really look at it here.

11    You're the only Judge that has at any time had all

12    the parties in one proceeding, in this adversary

13    proceeding.

14              THE COURT:  Well, I'm not -- do we have

15    all the parties?

16              MR. LANGLEY:  Yes.  Selective and

17    Ms. Hazan are co-plaintiffs.  We filed Count I on a

18    motion to determine nature and extent of the NLG

19    lien.  Count III is a quiet title action.  We pled

20    all the necessary facts for a quiet title action,

21    pointing out how, as you say, there are various

22    courts, Judge Gordo, Judge Lopez.  Judge Gordo can't

23    act as an appellate court for Judge Lopez.  Those

24    are conflicting orders.

25              You've got the -- since there was no --
```

Page 25

1    since Selective was not a party to the action --

2              THE COURT:  Mr. Bangos says that they

3    tried to intervene and were not allowed.  So does

4    that mean that their rights were determined in that

5    case, or does that mean that their rights were not

6    determined in that case?

7              MR. LANGLEY:  Clearly their rights were

8    not determined.

9              THE COURT:  That's a significant issue.

10             MR. LANGLEY:  Right.  Clearly their rights

11   were not determined.

12             THE COURT:  All right.  So if they were

13   determined in that case, then we certainly have one

14   road to travel.  On the other hand, if their rights

15   were not determined in that case, and initial

16   examination suggests that they probably weren't, but

17   maybe they were, but if they weren't, then where do

18   we go?

19             MR. LANGLEY:  Well, they weren't a party.

20   I think that's the simple answer, Judge.  They

21   weren't a party.  They are here.

22             You have jurisdiction over Selective, over

23   Ms. Hazan, over NLG.  And because of the default and

24   your denying their motion to vacate default, they

25   admitted the well-stated allegations of the third

Page 26

1    amended complaint.   Count I is the nature and extent

2    of the lien and Count III is quiet title.   So

3    they've admitted to our allegations which say they

4    have no lien on this property, and Ms. Hazan is

5    entitled to quiet title to the Fisher Island

6    property.

7              And when we were here on the 24th, and

8    Mr. Bangos was not here, what you did tell us is,

9    we're set for trial July 13th and 14th on Counts IV

10   through IX, only on damages.   Everything else --

11   liability has been resolved because of the default.

12   We're only going in on the amount of damages on

13   July 13th.   You haven't signed the order yet, but we

14   uploaded the order that you requested that sets the

15   matter for trial on damages.

16             I believe every issue concerning the

17   claimed lien by NLG has been resolved.

18             THE COURT:   Well, I wonder if Mr. Bangos

19   agrees with you.

20             MR. BANGOS:   Obviously not, Judge.

21             THE COURT:   All right.   Do you disagree

22   with the fact that a default was appropriate in this

23   matter?

24             MR. BANGOS:   I don't agree that a default

25   was appropriate in this matter, but you've already

Page 27

1    entered it and --

2           THE COURT:  But wait a minute.  Why don't

3    you agree that it was appropriate?

4           Your client had numerous opportunities to

5    come in with counsel and to comply with court orders

6    and didn't do so until a point when they were

7    defaulted.  And now, after the default, after

8    they're the ones who were the party not in the

9    right, they go out and finally find a competent

10   attorney to come in and argue their case.  It seems

11   to me that very well is too late.

12          MR. BANGOS:  I appreciate the compliment

13   that I'm competent counsel first and foremost,

14   Judge.

15          Number one, I disagree with what you found

16   in your order denying the motion to vacate the

17   default, because Mr. Miller filed a notice of

18   appearance on February -- I believe it was

19   February 22nd, and prior to the deadline you gave

20   NLG until, I believe it was March 1st, to file an

21   answer.

22          And Mr. Miller filed a motion to withdraw,

23   and I believe -- I don't have it in front of me, but

24   his motion to withdraw said, "Emergency motion to

25   withdraw and extend time."

Page 28

1           And at the bottom of the document it says,
2    "Request further time for NLG to file an answer."
3           What really happened, I looked at the
4    transcript.  You came in and you were going to give
5    him seven days -- you were going to give NLG another
6    seven days to file an answer, and then when
7    Mr. Langley brought up the fact that he said that
8    she said that he said that she was an F'ing Jew, you
9    decided that you weren't going to give him an
10   extension of time.  And that's what the transcript
11   says.
12          And then Mr. Miller came in, as I
13   indicated, and he had asked in writing in that
14   document that he filed for an extension of time, and
15   you made a finding that he didn't ask for that
16   extension of time.  So with all due respect, within
17   the time frame my client asked for an additional
18   seven days for counsel, and I appeared, I think, two
19   days later and I filed an answer.
20          And let me respond to this, because I
21   think this is the most important fact, I've already
22   argued it, is that this is the fifth complaint, I
23   believe, and on every other occasion, the first two
24   complaints were the same complaint in the sense that
25   they were seeking a determination as to whether the

Page 29

1    issues that you just brought up, whether Judge Lopez

2    was right or Judge Gordo was right, and that was the

3    first two complaints.

4              Then what Mr. Langley did and the debtor

5    did was, they decided that they were going to assert

6    tort claims, that were not disclosed in the

7    schedules, they were not disclosed in any other

8    prior filing, and you let them.  And the beauty of

9    those tort claims, Judge, is that the debtor had

10   previously in 2008 filed that same tort claim

11   against Mr. Kosachuk and against NLG, and they were

12   dismissed with prejudice by the debtor.

13             And so what the debtor did --

14             THE COURT:  In what court?

15             MR. BANGOS:  In New York.

16             And what the debtor did was come back and

17   reassert those same claims in this lawsuit.  So with

18   all due respect, from my perspective, my client, on

19   three different occasions, answered and manifested

20   an intent to dispute these allegations.  My client

21   filed a motion for summary judgment on these claims,

22   my client filed a counterclaim on these claims.  So

23   throughout this process these claims concerning the

24   heart of the issue were contested by NLG.

25             So you defaulted it, NLG, because with all

Page 30

1  due respect, I believe that you misread the motion

2  by Mr. Miller, because Mr. Miller had, in fact,

3  asked for an extension of time within that period of

4  time.  And so what you ended up doing, in my humble

5  opinion, was defaulting a debtor -- I'm sorry --

6  defaulting a party who had consistently disputed the

7  allegation, and the only reason why they got

8  defaulted, because the answer would have been the

9  same, was you had the court claims that were

10  previously the subject of a dismissal with

11  prejudice, and I pointed out, most of these claims

12  are barred by statute of limitations.

13        So you defaulted NLG, because NLG did not

14  respond in time to what is essentially a frivolous

15  complaint, as far as the tort claims are concerned,

16  but as far as all the property claims are concerned,

17  two answers saying we deny it, motion for summary

18  saying we win it, counterclaim saying we win it.  So

19  how do you default it, other than to punish my

20  client, when my client had asked for an extension of

21  time, and at the hearing you said no?

22        THE COURT:  First of all, the significant

23  question in this case is, what is the effect of

24  these competing -- or I shouldn't say competing --

25  conflicting judgments from two different Circuit

Page 31

1    Courts?  That still seems to be an open issue.  So I

2    don't see where your client is harmed on that issue.

3              If you prevail -- I forget which judge is

4    which -- the foreclosure judge was correct, or the

5    assigning judge was not correct, then you've got

6    what you're looking for for your client.  On the

7    other hand, if it goes the other way then, of

8    course, you'd lose that issue.

9              What else of importance that your client

10   needs in order to go forward with this case?  You

11   say these matters on the tort claims were resolved

12   in New York.  Why isn't there a motion for summary

13   judgment on that?

14             MR. BANGOS:  Because you defaulted us.

15   You didn't give us an answer -- the opportunity to

16   answer.

17             THE COURT:  We're not talking about on the

18   tort claims.

19             MR. BANGOS:  You defaulted the debtor --

20   you defaulted NLG completely.  So if I can file an

21   answer --

22             THE COURT:  Well then, why are we going to

23   trial?

24             MR. BANGOS:  For damages.

25             MR. LANGLEY:  On damages.

Page 32

```
 1              MR. BANGOS:  That does matter, because not
 2    only do they have frivolous complaints that were
 3    prior to dismissal, statute of limitations claims,
 4    but now they've dismissed Mr. Kosachuk, and now
 5    they're trying to seek vicarious liability against
 6    NLG for intentional tort that's Mr. Kosachuk.  So
 7    those are also meritless.
 8              So from my perspective, if you're going to
 9    say you're going to basically treat the default of
10    the plaintiff's complaint as a wash, because of the
11    counterclaims, then I guess I agree with you, then
12    there's no harm, no foul.  But until you do that,
13    which is what I thought you were getting at, as how
14    you resolve these competing issues, it seems to me
15    that there has to be a mechanism, and before you
16    enter a judgment of default, if you're going to
17    address the default by the debtor on the
18    counterclaim, then if you're going to adjudicate the
19    counterclaim, you've got to -- it makes more sense
20    to do them both at once.
21              THE COURT:  Well --
22              MR. LANGLEY:  Judge, if I could --
23              THE COURT:  Oh, please, Mr. Langley.
24              MR. LANGLEY:  Mr. Bangos is clearly
25    confused on a number of matters.  I mean, he keeps
```

 1   talking about this 2008 settlement.  None of the

 2   issues we're raising in Counts IV through IX concern

 3   what happened before 2008.

 4          It just so happens that Mr. Kosachuk and

 5   NLG have been fighting with Ms. Hazan and harassing

 6   her for over ten years.  So there was a lawsuit

 7   before over some of the things that Mr. Kosachuk and

 8   NLG did, but what we're raising in the third-party

 9   complaint are matters that have happened in the past

10   four years.

11          A little earlier in the hearing today I

12   mentioned that we didn't want to disclose the name

13   of Mr. Hazan's customers, because of what had

14   happened in the past.  Well, what I was talking

15   about that happened in the past where NLG --

16   Mr. Kosachuk claims to be the principal of NLG, but

17   it was NLG that harassed and contacted Ms. Hazan's

18   clients.  That's been in the past few years, well

19   after 2008, to the point where they stopped doing

20   business with her.  We have a very significant claim

21   against NLG for that, and that happened while --

22          THE COURT:  You're saying that was not

23   resolved in that New York dismissal with prejudice?

24          MR. LANGLEY:  Right, right.  This happened

25   since then.  All of these claims that we raised have

Page 34

1   happened since 2008.  They all happened in the last

2   four years.

3         THE COURT:  As you just pointed out, this

4   litigation has been going on for ten years.  It's

5   been up to the Third District Court of Appeal.  It's

6   been in at least four or five courts.

7         My goal is to figure out a way to bring

8   all these matters to a conclusion, rather than -- I

9   mean, I anticipate that no matter what we do here

10  there will be an appeal.  If it goes up on appeal

11  and it gets reversed and it has to be tried again,

12  we're looking to 2025 before we wind it up.  I would

13  like to find out a way to resolve the matter whereby

14  we can bring it to a conclusion.  In most cases ten

15  years is enough.

16        MR. LANGLEY:  Judge, if you look at Docket

17  Entry 100, that's the order in which you granted a

18  default.  You didn't give us a final default

19  judgment.  You said the nature of the judgment still

20  has to be determined.

21        If you look at Docket Entry 105, that's

22  our motion for final default judgment, where we go

23  through and we copied in the allegations in Counts

24  I, II and III, to make the point that by defaulting,

25  they admitted to those allegations.  Those

Page 35

1    allegations resolve all these issues you're talking

2    about.  So we believe, and we believe you actually

3    were in agreement with that on the 24th at the

4    status conference.

5                THE COURT:  And I presume that you are

6    quite confident that Mr. Bangos is not going to

7    appeal that?

8                MR. LANGLEY:  Oh, I'm sure they're going

9    to appeal whatever happens.

10               THE COURT:  All right.  So then we go on

11   for another couple of years.

12               MR. LANGLEY:  We're ready for the appeal,

13   Judge.

14               THE COURT:  Well, I mean, I'm glad you

15   enjoy it.  I hope you're being paid by the hour.

16               In any event, what I just stated was,

17   we've got this trial coming up.  We have other

18   proceedings, such as the modification of the

19   disclosure statement.  If there was some way we

20   could bring this matter to a resolution, so that

21   when it's over, it's over, rather than clogging up

22   the five courts around the country with papers and

23   arguments and appeals, I would see that as a better

24   solution than continuing to litigate ad infinitum.

25               So let's see.  Is there anyone that I had

Page 36

1    recognized that had wished to be heard further on

2    where we're at, that has not yet been heard on that

3    issue?

4              Ms. Dursi, are you still there or no?

5              MS. DURSI:  Your Honor, Melissa Dursi, on

6    behalf of Selective Advisors.  I'm sorry.  I was

7    having issues with my phone earlier.  I heard

8    everything, but apparently you couldn't hear me.

9              THE COURT:  Oh.

10             MS. DURSI:  We were of the impression

11   also, Your Honor, that the default that the Court

12   entered would have resolved all of these issues.

13             THE COURT:  I see.  Okay.  So we've got

14   Ms. Dursi.  We have -- Mr. Bangos has been heard and

15   Mr. Rigoli has been heard and Mr. Langley has been

16   heard.  So I guess we'll be back on the 9th of May

17   to consider further the disclosure statement.

18             Anything else we can do here today?

19             MR. LANGLEY:  Two more things, Judge.  One

20   is, like I mentioned, Docket Entries 100 and 105, I

21   think if you look at those two, that somewhat

22   resolves the issue.

23             When we were here on the 24th, I mentioned

24   to Your Honor, and I believe you agreed with us,

25   that we only needed a trial on damages.  You gave us

Page 37

1    two days for trial on damages.   I advised Your Honor

2    at the time that we had a proposed order on that,

3    and at your direction I left it with your secretary.

4            So that does go through all of the issues

5    of your default, Docket Entry 100, our motion for

6    final default judgment, Docket Entry 105.   And I

7    think that resolves all of those issues, everything

8    but the tort claims, if you have an opportunity to

9    look at that.

10           One other thing is, we had the amended

11   motion for abstention, Docket Entry 391, which we

12   also want to continue, along with the Spencer

13   motion, to confirmation.   The Spencer motion, 384,

14   motion to convert, and the abstention motion, 391,

15   we had submitted proposed orders continuing to

16   confirmation, but they were changed to continue to

17   today.

18           THE COURT:   Very well.   So that includes

19   391 in with the 384 motion on resetting?

20           MR. LANGLEY:   Yes.   We don't have a date

21   yet for confirmation, but we can just put in what we

22   attempted before.

23           THE COURT:   Well, let's talk about that

24   after we see if we can approve the disclosure

25   statement.   The disclosure statement, as you all

Page 38

1    know, got its genesis from the idea that the SEC,

2    when they are going to issue a new issue, they had

3    to send out a prospectus so that people could

4    intelligently decide whether to buy the security,

5    and it turns out that in most cases people went out

6    and bought the security and then got the prospectus

7    in the mail.  And so some people call that

8    retrospective.

9          Likewise, the disclosure statement in

10   these cases, the parties that are really interested

11   probably already have all the information they need

12   in order to make an intelligent decision on whether

13   or not to vote for a plan, but it's part of the

14   bankruptcy law, having been adopted from the SEC

15   law, and so we have to deal with it.

16         Rather than create any issues over the

17   disclosure statement, I think it's important to be

18   very liberal in getting whatever information is

19   necessary together to solve the problem.

20         Anything else we can do here today?

21   Mr. Langley?

22         MR. LANGLEY:  Just so I'm clear, do you

23   want Mr. Rigoli and I to submit orders on those

24   continuations?

25         THE COURT:  Yes.  Mr. Rigoli will submit

Page 39

1   the order resetting Court Papers 384 and 391 to

2   confirmation.  You can submit an order continuing

3   the disclosure hearing until the 9th of May at 2:00

4   p.m.  And everyone that's here or on the phone knows

5   about it, so whether or not they get any further

6   notice, they have actual notice.

7            I guess that's all we can do here today.

8   I guess it would be redundant and probably not

9   effective to suggest that if the parties ever got

10  together and resolved all the issues, it would be a

11  good thing, but from what I can see of the way this

12  case has been going, that doesn't seem to be a

13  likely possibility.

14            Anyhow, good luck, and we'll adjourn.

15            (Thereupon, the hearing was concluded.)

16

17

18

19

20

21

22

23

24

25

Page 40

1                           CERTIFICATION

2

3    STATE OF FLORIDA:

4    COUNTY   OF   DADE:

5

6                I, HELAYNE F. WILLS, Shorthand

7    Reporter and Notary Public in and for the State of

8    Florida at Large, do hereby certify that the

9    foregoing proceedings were taken by electronic

10   recording at the date and place as stated in the

11   caption hereto on Page 1; that the foregoing

12   computer-aided transcription is a true record of my

13   stenographic notes taken from said electronic

14   recording.

15                WITNESS my hand this 12th day of May,

16   2017.

17

18

19   _____

20              HELAYNE F. WILLS
            Court Reporter and Notary Public
          In and For the State of Florida at Large
21        Commission No:   FF034198   Expires:   8/2/17

22

23

24

25

| | | | | |
|---|---|---|---|---|
| | | | | In April 25, 2017 Honorable New York Supreme Judge Singh ordered that the Plaintiff REHG's Motion to enforce the terms of the settlement agreement dated 3/2015 is granted . "After a conference held today the Court finds that all parties are in compliance with the terms of stipulation dated 3/2015."<br><br>The Deadline for *Board of Managers of Spencer Condominium* toFile Complaint to determine the Debtor's Dischargeability of Certain Debt has expired.<br><br>**No payment through the plan. Claim settled.**<br><br>**SETTLEMENT ENFORCED BY NEW YORK COURT** |

**Convenience Class Undisputed Unsecured Small Claims**

**Paid in full on the Effectiver Date at confirmation**

| Class # | Description | Insider? (Yes or No) | Impairment | Treatment |
|---------|-------------|---------------------|------------|-----------|
| 12 | IRS Claim #3 | no | | 1085.00 |
| | American InfoSource T Mobile Claim #2 | no | | 1130.00 |
| | American InfoSource Direct TV Claim # 9 | no | | 461.00 |
| | FPL Claim #11 | no | | 2906.93 |
| | Mount Sinai | no | | 3,240.00 |
| | Mount Sinai | no | | 295.91 |
| | HSBC Bank USA NA | no | | 1070.66 |
| | Sterling Emerg Svc | no | | 2445.30 |
| | Bank of America NA has waived all prepetition fees | no | | 0.00 |
| | Wells Fargo Claim #12 | no | | 323.24 |
| | Real Time Resolutions ("RTR") Claim #5<br><br>Although Debtor settled this claim for $12,000 after | | | 0.00 |

| | | | |
|---|---|---|---|
| | misrepresentations made by alleged creditor Real Time Resolutions that it had a valid claim. Debtor after further investigation has determined that statute of limitations has run and that Claim #5 is not a valid claim. Real time Resolutions has sued the debtor in case 08-47664 CA 32 in Miami-Dade County Court in October 21, 2008. The case 08-47664 CA 32 was dismissed in for lack of prosecution on January 08, 2010. The Statute of limitations has run. | no | | |
| | <u>**S&S Collections**</u><br><br><u>**Simon &Sigalos**</u><br><br><u>**claim #13 partial paid amount $1740.96**</u> | no | | 0.00 |
| | Total | | | 12958.04 |

**Settled Unsecured Claims**

**Allowed Undisputed Unsecured Claims**

| Class # | Description | Insider? (Yes or No) | Impaired | Treatment |
|---|---|---|---|---|
| 13 | JMB Urban 900 Dev. claim #4* | no | X | Claim # 4 in the amount of $664,380.47. Claim # 4 will be paid 41% of the amount or 275,000.00 per settlement before the second anniversary of the entry of the agreed final judgment on or before July 20, 2018 in favor of JMB in case **Adversary proceedings 16-01188-AJC. Adversary proceeding case closed on 7/22/16 and Case settled 16-01188-AJC. DOC 21 Case 16-01188-AJC Order approving agreed final Judgment in favor of JMB entered on July 20, 2016..** **CLAIM SETTLED** |
| | S&S Collections Simon &Sigalos claim #13 | no | X | Claim # 13 in the amount of $21,242 **Claim settled** for 41% $8,709.22. Amount of $1740.96 moved to convenience class. Amount of $1740.96 paid by third party on July 10, 2017. Remaining balance owed $6,968.04 to be paid same treatment as JMB. **CLAIM SETTLED** |

| | | | | |
|---|---|---|---|---|
| | **Southeast Financial LLC** | no | X | Stipulation Of Settlement DE 98 approved by this Court DE 101.<br><br>Vehicle owned by Holdings Trust Management Group LLC. Southeast Financial LLC's Secured Lien is guaranteed by the Debtor.<br><br>Secured claim allowed $17,000 value to be paid at 5.25% for 48 months payments in the amount of $393 began on August 1, 2016 and are current.<br><br>CLAIM SETTLED |
| | | | | |

## Disputed Unsecured Claims

### not paid until and unless allowed

### and then paid within 5 years after confirmation

| | | | | |
|---|---|---|---|---|
| | **Cross & Simon<br>Claim #1** | no | | Claim #1 in the amount of $11,023.83 Legal Bill for corporation other than Debtor.<br><br>**Unallowed claim.**<br><br>**No payment through Plan** |

| | | | | |
|---|---|---|---|---|
| | **Newman Ferrara LLP<br>claim #15** | no | | Claim #15 in the amount of $24,818.44 Legal bill Legal work for Corporation other than the Debtor.<br><br>**The Claims bar date has passed. No payment through plan. Unallowed claim.** |

22

| | | | | |
|---|---|---|---|---|
| | | | | |
| | **FuerstIttleman David & Joseph, P.L.**<br><br>**Claim #16** | **no** | | Disputed Proof of Claim filed after Claim Bar Date. FuerstIttleman David & Joseph, P.L. is not a creditor of this Debtor. Debtor has filed an objection to this claim. FuerstIttlemanDavid & Joseph, P.L. have agreed that they are not a creditor of this estate.<br><br>**No payment through plan.Unallowed Claim.** |

## Unsecured Scheduled Disputed and No Claim Filed

## Therefore Disallowed

| Allied Collection | 318 |
|---|---|
| ATT Mobility | 3919 |
| First National Collection | 246.08 |
| Focus Mgt | 772 |
| Marzec Law Firm | 0 |
| Mount Sinai Medical | 31414.15 |
| Ray Garcia PA | 7026.15 |
| Verizon | 1758 |
| US Bank NA | Unknown<br><br>The Debtor entered into a Stipulation of Settlement with US Bank NA (D.E. 345) granting the parties complete stay relief which was approved by the Court by Order dated 1/18/2017, D.E. 371. |

| | |
|---|---|
| | US Bank did not file a proof of claim and will not be paid through the Plan. **Claim settled.** |
| NLG, LLC | NLG, LLC did not timely file a proof of claim and **NLG, LLC's alleged Claim has been judicially** assigned per The Final Order entered by Judge Peter Lopez on August 2014. **NLG, LLC will not be paid through the Plan**. |
| | NLG, LLC has no standing in this case and is not a creditor of the Debtor's Estate. |
| | NLG appeared in this case but failed to timely file a proof of claim. NLG, LLC is merely a notice party. NLG, LLC is not a secured creditor in this case. Selective Advisors Group, LLC ("Selective"), is listed in Debtor's schedule as her creditor. |
| | The Trial in the Adversary proceedings 16-10389-AJC was concluded on July 13, 2017 and Proposed Orders by all parties were submitted on August 15, 2017. |
| | In November 1, 2017 Honorable Judge AJ Cristol issued Final Judgment on Counts I, II and III of Plaintiffs' Selective and Liza Hazan aka Elizabeth Hazan Third Amended Complaint and NLG's Amended Counterclaim as follows: |
| | "The Scola Judgment obtained by NLG against the Debtor, and all rights, claims and benefits held by NLG against Debtor related to said Judgment, were judicially assigned to Selective pursuant to the Lopez Assignment Order, and the right to foreclose securing the debt traveled to the assignee Selective . Although NLG's right to foreclose against Hazan, as established by the Third District of Appeal, had been assigned to Selective, the Gordo Foreclosure Judgment granted NLG the right to foreclose, Assuming the validity of the Gordo Foreclosure Judgment, the Debtor exercised her right to redeem the property by |

satisfying said judgment prior to the foreclosure sale. Satisfactions of the Note and Mortgage are recorded in the official records and several courts have recognized that Debtor's Debt to NLG has been paid, including the New York State Supreme courts, wherein Judge Jaffe found that NLG's judgment on the Note, the Scola Judgment, was judicially assigned to Selective and was thereafter satisfied. Upon satisfaction, NLG was credited for the Scola Judgment and Mortgage to partially satisfy NLG's debt to Selective under the domesticated Quebec Judgment.

The Court believes that credit should, however, be adjusted to reflect the amounts determined to be due and owing by the Gordo Foreclosure. NLG was owed $4,876,654.29 from Hazan on account of the Note and Mortgage, pursuant to the Gordo Final Judgment. Giving full faith and credit to the Gordo Foreclosure Judgment and viewing the amount determined in the judgment to be the greater amount NLG established it was owed for the Note and Mortgage pursuant to the Lopez Assignment Order, Selective should give credit to NLG for $4,878,654.29, which credit will leave the mortgage redeemed.

This Court concludes that NLG has no further rights to any claims against Debtor with respect to the Note and Mortgage, as the public records of Miami-Dade County reflect that the Scola Judgment and consequently the Mortgage were assigned and satisfied, and the property fully redeemed prior to foreclosure sale, as provided in the Gordo case, as provided in the Gordo foreclosure sale, as provided in the Gordo Foreclosure Judgment. NLG's Proof of Claim #17, having been filed after the bar date., it is disallowed and the Court finds that NLG has no staning in this case based upon the note, claim or lien emanating therefrom. Accordingly it is

ORDERED AND ADJUDGED that Count I, II

and III of Plaintiff's Third Amended Complaint and NLG's Amended Counterclaim are GRANTED IN PART AND DENIED IN PART as follows:

1. NLG, LLC's judgment on the promissory note, the Scola Judgment, recorded at Book 26406, Page 3259-3260, CFN2008R0446831, also recorded at Book 26357 Pages 3948-3949 CFN20080361591, the Note and the Mortgage recorded at Book 25559 Pages 4266-4272 CFN2007R0410013, NLG, LLC's foreclosure Judgment entered in favor of NLG and against CFN200R0410013 NLG, LLC's foreclosure Judgment entered in favor of NLG and against Elizabeth Hazan on December 4, 2015, the Gordo Foreclosure Judgment recorded at Book 29902 Pages 3737-3742 CFN20150812181 affecting Debtor's homestead Property known as 6913 Valencia Drive, Miami Florida 33109 with the following legal description:

LOT 7, Block 2, LINDISFARNE ON FISHER ISLAND SECTION 10 according to the Plat thereof, recorded in PLAT Book 157 Page 64, of the Public Records of Miami-Dade County, Florida.

have been satisfied and paid, and are deemed **SATISFIED OF RECORD** and Debtor has good title to said Property against the claims or purported claims by, through, under, or against it by NLG, LLC and the title to the property is forever quieted as to all claims of NLG, LLC.

2. Selective shall give credit to NLG, LLC in the amount of $4,876,654.29 toward NLG's outstanding debt to Selective pursuant to the Quebec Judgment.

| | |
|---|---|
| | 3. NLG's proof of claim #17 is disallowed and NLG, LLC has no claim against the Debtor Liza Hazan a/k/a Elizabeth Hazan under the Note, Mortgage or any court order.<br><br>4. Counts IV, V, VI, VIII, and IX of Plaintiff's Third Amended Complaint are set for trial by separate order." . |
| Total | 45453.38 |

**Equity**

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 14 | Equity Individual interest holder | no | retained |

## ARTICLE V

## ALLOWANCE AND DISALLOWANCE OF CLAIMS

5.01    Disputed Claim. A disputed claim is a claim that has not been allowed or disallowed by a final non-appealable order, and as to which either: (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

5.02    Delay of Distribution on a Disputed Claim. No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order.

5.03    Settlement of Disputed Claims. The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

## ARTICLE VI

## PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.01    Assumed Executory Contracts and Unexpired Leases.

(a)    The Debtor assumes the following executory contracts and/or unexpired leases effective upon the date of the entry of the order confirming this Plan: none.

(b)    The Debtor will be conclusively deemed to have rejected all executory contracts and/or unexpired leases not expressly assumed under section 6.01(a) above, or before the date of the entry of the order confirming this Plan. A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than thirty (30) days after the date of the order confirming this Plan.

## ARTICLE VII

## GENERAL PROVISIONS

7.01    Definitions and Rules of Construction. The definitions and rules of construction set forth in §§101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan.

7.02    Effective Date of Plan. The effective date of this Plan is the fourteenth business day following the date of the entry of the order of confirmation. But if a stay of the confirmation order is in effect on that date, the effective date will be the first business day after that date on which no stay of the confirmation order is in effect, provided that the confirmation order has not been vacated.

7.03    Severability. If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

7.04    Binding Effect. The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

7.05    Captions. The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

7.06    Controlling Effect. Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Florida govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

## ARTICLE VIII

## DISCHARGE

8.01.    **Debtor is an individual.**

11 USC 1129(a)(15) provides: In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan—

(A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325 (b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

In this case the Debtor has provided for payments not less than Projected disposable income of the debtor during a five year period beginning with the first payment due under the plan.

Discharge. In a case in which the debtor is an individual—

(A) unless after notice and a hearing the court orders otherwise for cause, confirmation of the plan does not discharge any debt provided for in the plan until the court grants a discharge on completion of all payments under the plan;

(B) at any time after the confirmation of the plan, and after notice and a hearing, the court may grant a discharge to the debtor who has not completed payments under the plan if—

(i) the value, as of the effective date of the plan, of property actually distributed under the plan on account of each allowed unsecured claim is not less than the amount that would have been paid on such claim if the estate of the debtor had been liquidated under chapter 7 on such date;

(ii) modification of the plan under section 1127 is not practicable; and

(iii) subparagraph (C) permits the court to discharge; and

(C)(*) the court may grant a discharge if, after notice and a hearing held not more than 10 days before the date of the entry of the order granting the discharge, the court finds that there is no reasonable cause to believe that—

(i)section522(q)(1) may be applicable to the debtor; and

(ii)there is pending any proceeding in which the debtor may be found guilty of a felony of the kind described in section 522(q)(1)(A) or liable for a debt of the kind described in section 522(q)(1)(B); and if the requirements of subparagraph (A) or (B) are met.

Pursuant to 11 U.S.C. § 1141(d)(5)(A), the Debtor shall be discharged from all pre-Confirmation debts except as is provided in the Plan, pursuant to the procedures set forth herein, upon completion all payments required under the Plan to all unsecured and deficiency creditors. **Upon payment of all required Plan payments the Debtor shall be discharged of all allowed and disallowed claims**. Upon the satisfaction of all payments required under the Plan to unsecured creditors, the Reorganized Debtor shall file a Final Report of Estate and Motion for Final Decree Closing Case on the Court approved local form.

(a) Notwithstanding the above, the Debtor may request that the Court close this bankruptcy proceeding prior to the entry of an Order of Discharge, pursuant to the following procedures:

(b) The Debtor may file a Motion to Temporarily Close Bankruptcy Case Prior to Entry of Order of Discharge (the "Motion to Close") after the following events have occurred: (I) payment of the Initial Payment (defined in the Plan) to unsecured creditors; (ii) payment of all outstanding quarterly United States Trustee Fees as of the date of the Order approving the Motion to Temporarily Close; and (iii) the filing of all outstanding federal income tax returns. The Motion to Close shall certify that each of the above conditions have been met.

(c) The Motion to Close (and Notice of Hearing thereto) shall be served to all creditors and interested parties. The Court may grant the Motion to Close, pursuant to 11 U.S.C. § 350(a), if each of the above conditions have been met.

(d) During the time that this bankruptcy case is temporarily closed, the provisions of the confirmation order shall remain in effect with respect to the treatment of creditor claims that existed as of the bankruptcy petition date, that being 1/11/16, as long as the Debtor continues to be in compliance with the Plan and the Court's Order Confirming Debtor's Plan of Reorganization and Setting Bar Date for Lease and Executory Contract Rejection Claims (the "Confirmation Order"), and as long as the Debtor timely makes all of the payments to unsecured creditors, as contemplated under the Plan.

(e) Upon the satisfaction of all payments required under the Plan to unsecured creditors, the Debtor may file a motion to reopen this bankruptcy proceeding, pursuant to 11U.S.C. § 350(b). Any Clerk of Court fees associated with filing of the motion to reopen shall be waived. The motion to reopen shall be verified and served upon all creditors and parties in interest and shall demonstrate that the Debtor has made all of the payments contemplated under the Plan to unsecured creditors.

(f) Upon the re-opening of this bankruptcy proceeding, the Debtor shall promptly file a Final Report of Estate and Motion for Final Decree Closing Case on the Court-approved local form, which shall certify that all payments required under the Plan to unsecured creditors have been made. The Court may then grant the Debtor a discharge, pursuant to 11 U.S.C. § 1141(d)(5).


Respectfully submitted, 11/15/17


By: /s/ Liza Hazan

The Plan Proponent

By: /s/ David W. Langley, Esq.
8551 W. Sunrise Blvd.
Suite 303
Plantation, FL 33322
dave@flalawyer.com
Phone 954356-0450


By: /s/ David W. Langley
Attorney for the Plan Proponent

31



**ORDERED in the Southern District of Florida on December 6, 2018.**

_A. Jay Cristol_

A. Jay Cristol, Judge
United States Bankruptcy Court

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re:                                          Case No. 16-10389-BKC-AJC

LIZA HAZAN a/k/a ELIZABETH HAZAN,               Chapter 11

            Debtor.
_____/

**ORDER GRANTING MOTION TO REOPEN CASE TO APPROVE FINAL REPORT,
AND ENTER DISCHARGE TO REORGANIZED DEBTOR**

    **THIS MATTER** came before the Court for hearing on August 9, 2018 at 10:30 a.m. upon

the Reorganized Debtor, Liza Hazan a/k/a Elizabeth Hazan ("Reorganized Debtor")'s Corrected

Motion to Reopen this Chapter 11 case to grant the Reorganized Debtor's Discharge and enter a

Final Decree and to re-close the case [ECF No. 713] (the "Motion"), and again on October 24,

2018 at 2:00 p.m. upon the Court's Order Setting Further Hearing to Consider Issuance of

Discharge and Dismissal of Pending Non-Core Personal Injury Tort Claims for October 24, 2018

[ECF 745].  The Court has further considered the following:

*CASE NO. 16-10389-BKC-AJC*

- The Final Report [ECF No. 703] ("Final Report");

- The Notice of Deadline to Object to Debtor's[1] Statement Re: 11 U.S.C. § 522(q)(1) Applicability, *et al*. [ECF No. 704];

- NLG, LLC's Opposition to Debtor Motion to Reopen Case and Motion for Discharge (ECF No. 733);

- NLG, LLC's Objection to Debtor Statement and Discharge [ECF No. 729], which the Court notes was withdrawn on the record by counsel for NLG during the August 9, 2018 hearing;

- NLG, LLC's *ore tenus* Objection to Debtor's Discharge during the October 24, 2018 hearing;

- Creditor Valencia Estates Homeowners' Association, Inc.'s Limited Objection to Debtor's Corrected Motion for Discharge [D.E. 713] [ECF No. 728], which was resolved by Agreed Order [ECF No. 734];

- Real Time Resolutions, Inc.'s Objection to Debtor's Motion to Reopen, Final Report and Motion for Discharge, and Motion for Entry of Final Decree and to Reclose [ECF No. 731], which was withdrawn prior to the hearing [ECF No. 732]; and

- NLG, LLC's motion to reopen Chapter 11 case [ECF No. 757], and amended and expedited motion to reopen case [ECF No. 763].

---

[1] For purposes of this Order, the term "Debtor" shall also mean the "Reorganized Debtor" pursuant to this Court's Order Confirming Plan of Reorganization [ECF No. 691] (the "Confirmation Order").

*CASE NO. 16-10389-BKC-AJC*

Having considered the record, including NLG's Objection and Opposition,[2] and finding

that due and adequate notice has been given and no additional notice is required, the Court grants

the Motion in part and herein enters the discharge of the Reorganized Debtor, and approves the

Final Report.  The Motion and Final Report demonstrate the Reorganized Debtor is entitled to

a discharge pursuant to 11 U.S.C. § 1141(d)(5).  However, a Final Decree will not yet be issued

and the case shall not be re-closed at this time.

**I.      11 U.S.C. § 1141(d)(5)(B) – authorizes issuance of discharge to individual debtor who has not completed all plan payments**

The Bankruptcy Code provides that an individual debtor's discharge shall not be entered

by the Court until completion of all payments under the confirmed plan.  *11 U.S.C. §1141(d)(5)(A).*

An exception exists, however, pursuant to 11 U.S.C. § 1141(d)(5)(B), if, *inter alia*, an individual

debtor has made all plan payments to unsecured creditors.  Section 1141(d)(5)(B) provides:

> (B) at any time after the confirmation of the plan, and after notice
> and a hearing, the court may grant a discharge to the debtor who has
> not completed payments under the plan if –
>
>     (i) the value, as of the effective date of the plan, of property
> actually distributed under the plan on account of each allowed
> unsecured claim is not less than the amount that would have been
> paid on such claim if the estate of the debtor had been liquidated
> under chapter 7 on such date;
>     (ii) modification of the plan under section 1127 is not
> practicable; and
>     (iii) subparagraph (C) permits the court to grant a discharge.

---

[2] Although this Court previously determined that NLG is not a creditor and has no claim against the
Reorganized Debtor [*see*, *Final Judgment on Counts I, II and III of Plaintiffs' Third Amended Complaint
Determining Validity, Priority and Extent of Liens and Setting Trial on Counts IV Through IX*, Adv. No.
16-1439-BKC-AJC-A, ECF No. 238], the Court has reviewed the Objection and Opposition and overrules
same.

CASE NO. 16-10389-BKC-AJC

Subsection (C) of that same statue further states:

> (C) the court may grant a discharge if, after notice and a hearing held not more than 10 days before the date of the entry of the order granting the discharge, the court finds that there is no reasonable cause to believe that –
>> (i) section 522(q)(1) may be applicable to the debtor; and
>> (ii) there is pending any proceeding in which the debtor may be found guilty of a felony of the kind described in section 522(q)(1)(A) or liable for a debt of the kind described in section 522(q)(1)(B);
>> and if the requirements of subparagraph (A) or (B) are met.

11 U.S.C. § 1141(d)(5)(C).

Section 1141(d)(5) allows an individual debtor to seek a discharge after confirmation but before plan payments are completed as long as the debtor satisfies the requirements of 11 U.S.C. § 1141(d)(5)(B). *See, 11 U.S.C. § 1141(d)(5)*; *see also*, *In re Necaise*, 443 B.R. 483 (Bankr. S.D. Miss. 2010) ("after the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005), completion of plan payments (rather than plan confirmation) discharges an individual debtor. In the alternative, an individual debtor may seek a discharge before completion of his plan payments, an early discharge, under either 11 U.S.C. § 1141(d)(5)(A) or (B).").

The Court finds that the Reorganized Debtor has complied with the provisions of 11 U.S.C. § 1141(b)(5)(B) so as to be entitled to an early discharge.[3]  Exhibit "A" attached to both the Motion

---

[3]  The Court notes that during the hearing, counsel for the United States Trustee concurred with the Debtor's position regarding her entitlement to entry of discharge upon payment to unsecured creditors:

> MS. ARMENGOL:

> ... I can speak as to the procedural propriety of the Court awarding a discharge now. I concur with Mr. Pugatch -- and for the record, the code section is 1141(d)(5)(A) and (B) -- that if unsecured claims are paid, the

CASE NO. 16-10389-BKC-AJC

and Final Report demonstrates that the general unsecured creditors, whose claims were to be paid

in the Plan, have been paid in full.  As a result, the value of property [payments] distributed under

the Fourth Amended [Chapter 11] Plan of Reorganization [ECF No. 563] (the "Fourth Amended

Plan") on account of each unsecured claim is not less than the amount that would have been paid

on such claim if the bankruptcy estate would have been liquidated under chapter 7.  Therefore, the

Reorganized Debtor has complied with 11 U.S.C. § 1141(b)(5)(B)(i).  The Court takes judicial

notice of Debtor's Monthly Operating Report (Individual) Corrected for the Period May 1, 2018

to May 31, 2018 [ECF No. 727] and Debtor's Monthly Operating Report (Individual) for the

Period June 1, 2018 to June 30, 2018 [ECF No. 725] evidencing the total disbursements made

pursuant to the Fourth Amended Plan and Confirmation Order.  Moreover, the Court finds 11

U.S.C. § 1141(b)(5)(B)(ii) is not applicable as modification of the Fourth Amended Plan is not

practicable under 11 U.S.C. § 1127.

## II.   The Fourth Amended Plan, the Confirmation Order and this Court's prior Orders provide additional bases to grant relief

The Fourth Amended Plan, together with the Confirmation Order and this Court's prior

rulings provide additional authority for issuance of a discharge to the Reorganized Debtor prior to

completion of payments under the Plan.  The foregoing documents indicate that the Reorganized

---

individual debtor can receive a discharge.
Looking at the plan, Your Honor, the only other claims were secured.  So
even if she gets a discharge – Ms. Hazan gets a discharge and doesn't pay
pursuant to the plan, they still have that security and that lien.  And a
priority claim with the IRS – and I'm not sure where that stands, but Your
Honor, I believe that under 1141(d)(5)(B), Your Honor has the authority
to grant the discharge at this time.

Transcript, August 9, 2018 Hearings [17:15-25, 18:1-4].

*CASE NO. 16-10389-BKC-AJC*

Debtor intended to seek the issuance of a discharge upon payments in full to unsecured creditors.

For instance, Article VIII of the Fourth Amended Plan, as confirmed by the Court, provides, in

pertinent part:

> (e) Upon the satisfaction of all payments required under the Plan to **unsecured creditors**, the Debtor may file a motion to reopen this bankruptcy proceeding, pursuant to 11 U.S.C. § 350(b). Any Clerk of Court fees associated with filing of the motion to reopen shall be waived. The motion to reopen shall be verified and served upon all creditors and parties in interest and shall demonstrate that the Debtor has made all of the payments contemplated under the Plan to **unsecured creditors**.

*See, Fourth Amended Plan, Article VIII* [ECF No. 563], page 30 of 31. [Emphasis added].  The

Court finds that the Reorganized Debtor complied with Article VIII(e) of the Fourth Amended

Plan by filing the Motion which attached as Exhibit "A" a list of payments demonstrating that the

Reorganized Debtor made all plan payments to Class 12 unsecured creditors.

In addition, Article VIII of the Fourth Amended Plan, as confirmed by the Court, states, in

relevant part:

> (f) Upon the re-opening of this bankruptcy proceeding, the Debtor shall promptly file a Final Report of Estate and Motion for Final Decree Closing Case on the Court-approved local form, which shall certify that all payments required under the Plan to **unsecured creditors** have been made.  The Court may then grant the Debtor a discharge, pursuant to 11 U.S.C. § 1141(d)(5).

*See, Fourth Amended Plan, Article VIII* [ECF No. 563], page 31 of 31. [Emphasis added].  The

Court finds that the Reorganized Debtor complied with Article VIII(f) of the Fourth Amended

Plan by filing the Final Report which attached as Exhibit "A" a list of payments demonstrating

that the Reorganized Debtor made all plan payments to Class 12 unsecured creditors.

*CASE NO. 16-10389-BKC-AJC*

On or about June 12, 2018, this Court entered its Confirmation Order which confirmed the Fourth Amended Plan and contemplated the issuance of a discharge to the Reorganized Debtor upon the completion of plan payments to unsecured creditors under the Plan. Specifically, paragraph 18(e) of the Confirmation Order states:

> (e) Upon the satisfaction of all payments required under the Plan to **Unsecured Creditors**, the Debtor may file a motion to reopen this bankruptcy proceeding, pursuant to 11 U.S.C. § 350(b). Any Clerk of Court fees associated with filing of the motion to reopen shall be waived. The motion to reopen shall be verified and served upon all creditors and parties in interest and shall demonstrate that the Debtor has made all payments contemplated under the Plan to **Unsecured Creditors**.

*See, Confirmation Order* [ECF No. 691], page 7 of 8. [Emphasis added]. The Court finds that the Reorganized Debtor complied with paragraph 18(e) of the Confirmation Order, by filing the Motion which attached as Exhibit "A" a list of payments demonstrating that the Reorganized Debtor made all plan payments to Class 12 unsecured creditors.

In addition, paragraph 18(f) of the Confirmation Order states:

> (f) Upon the re-opening of this bankruptcy proceeding, the Debtor shall promptly file a Final Report of Estate and Motion for Final Decree Closing Case on the Court-approved local form, which shall certify that all payments required under the Plan to **Unsecured Creditors** have been made. The Court may then grant the Debtor a discharge, pursuant to 11 U.S.C. § 1141(d)(5).

*See, Confirmation Order* [ECF No. 691], page 7 of 8. [Emphasis added]. The Court finds that the Reorganized Debtor complied with paragraph 18(f) of the Confirmation Order by filing the Final Report which attached as Exhibit "A" a list of payments demonstrating that the Reorganized Debtor made all plan payments to Class 12 unsecured creditors.

CASE NO. 16-10389-BKC-AJC

On or about June 13, 2018, this Court entered its Agreed Order Granting Reorganized

Debtor's Ore Tenus Motion to Administratively Close Individual Chapter 11 Case After

Confirmation [ECF No. 692] (the "Agreed Order"). The Agreed Order provides, *inter alia*:

> Upon the re-opening of this bankruptcy case, the Reorganized
> Debtor shall promptly file a Final Report and Motion for Final
> Decree Closing Case on the Court-approved local form in effect at
> that time, which shall certify, that all payments required under the
> Plan to the ***unsecured creditors*** have been made. The Court may
> then grant the Reorganized Debtor a discharge, pursuant to 11
> U.S.C. § 1141(d)(5) if all other conditions are satisfied.

*See*, *Agreed Order* [ECF No. 692], page 2 of 3. [Emphasis added]. The Court finds that the

Reorganized Debtor complied with the Agreed Order by filing the Motion and Final Report, with

Exhibit "A" attached to both pleadings, indicating all payments were made by the Debtor to Class

12 unsecured creditors.

### III. NLG's Objection and Opposition

NLG, LLC is the only entity objecting to the granting of a discharge in this case. NLG,

whose claim the Court disallowed, asserted that a discharge should not be granted at this time

because the Debtor has not yet paid Creditor JMB Urban Development Partners, LTD in full. The

Court took the matter under advisement to consider the objection; and upon further consideration

and review of the record, the Court overrules the objection.

NLG argues that the Court may not enter a discharge order until the Reorganized Debtor

pays JMB in full. The Court disagrees. JMB is not affected by the relief sought and has not objected

to the Debtor receiving a general discharge. Pursuant to the settlement of the adversary proceeding,

in Adv No. 16-1188-BKC-AJC-A [ECF No. 21], the Reorganized Debtor and JMB agreed that

CASE NO. 16-10389-BKC-AJC

JMB has a non-dischargeable judgment of $275,000.00. Thus, after receiving its *pro rata* share of distributions under the Plan, JMB may continue to pursue payment of its claim outside the Plan. Likewise, the Reorganized Debtor and the Board of Managers of Spencer Condominium have agreed that Debtor's liability in the amount of $109,554.06 to the Board of Managers of Spencer Condominium would be non-dischargeable. Therefore, this Creditor has also agreed to the granting of Debtor's discharge.

Section 1141(5)(B) of the Bankruptcy Code provides for the granting of a discharge to a debtor who has not completed payments, if modification of a plan is not practicable and creditors have received value "not less than the amount that would have been paid on such claim if the estate of the debtor had been liquidated under chapter 7." *In re Belcher*, 410 B.R. 206, 215 (Bankr. W.D. Va. 2009) (explaining that "§ 1141(d)(5)(B) provides for early discharge in a manner similar to the 'hardship discharge' in chapter 13 cases under § 1328(b)."). In this case, all unsecured creditors were to be paid in accordance with the Plan, and those payments have been made in full. JMB and the Board of Managers of Spencer Condominium may pursue the remaining amounts of their respective non-dischargeable debts outside the Plan. Because the entry of a discharge [of the claims of the unsecured creditors who were paid in full under the Plan] will not affect JMB or the Board of Managers of Spencer Condominium, the Court sees no reason to withhold the discharge when the Debtor has otherwise established entitlement to same.

The entry of a non-dischargeable judgment, and the outstanding debt thereunder, does not prevent the early entry of an order of discharge, because a discharge in no way impacts the non-dischargeable debts. Unsecured creditors holding nondischargeable claims are entitled to collect the balance of their debts outside the plan. In *Newman v. United States (In re Newman)*, 399 B.R.

*CASE NO. 16-10389-BKC-AJC*

541, 548 (Bankr. M.D. Fla. 2008), the court held that a creditor holding a nondischargeable claim is not prevented from pursuing post-confirmation collection efforts outside of bankruptcy, regardless of whether such claim was provided for in the confirmed plan. A nondischargeable debt may remain after a debtor has emerged from bankruptcy.

Although the Court believed that, following the August 9, 2018 hearing, the Debtor had demonstrated compliance with the requirements of 11 U.S.C. § 1141(d)(5), the Court set another hearing for October 24, 2018 to address whether a discharge should be issued while the Reorganized Debtor's non-core tort claims remained pending in an adversary proceeding. [ECF No. 745]. At the October 24, 2018 hearing, the Reorganized Debtor announced she was withdrawing her non-core tort claims, thereby alleviating the Court's concerns. Adv. No. 16-1439-BKC-AJC-A [ECF No. 358].

For the foregoing reasons, the Court finds that the Reorganized Debtor has complied with 11 U.S.C. § 1141(d)(5)(B) by demonstrating her completion of all plan payments to general unsecured creditors under the Fourth Amended Plan and Confirmation Order and has otherwise complied with the requirements to receive a discharge. However, the Court will refrain from closing this case at this time as there remains pending the parties' motions for sanctions and for contempt, as well as several appeals. It is the policy of the Court to not close a case until all appeals are finally resolved and over. Therefore, it is

**ORDERED AND ADJUDGED**:

1. The Motion [ECF No. 713] is **GRANTED IN PART,** and this bankruptcy case is **RE-OPENED** for the sole purpose of approving the Final Report and entering the Reorganized Debtor's discharge consistent with the terms of this order.

*CASE NO. 16-10389-BKC-AJC*

2.  The Final Report is **APPROVED.**

3.  NLG, LLC's motion and amended motion to re-open Chapter 11 case [ECF Nos. 757 and 763] are **GRANTED IN PART** with respect to reopening this case, and not closing the case until the final disposition of all pending motions and appeals herein, but NLG, LLC's Opposition and Objection to the granting of the discharge are **DENIED** and **OVERRULED**.

4.  The Reorganized Debtor is entitled to a discharge in accordance with the provisions of 11 U.S.C. § 1141(d)(5), and the Fourth Amended Plan and the Confirmation Order; thus, the Reorganized Debtor is **DISCHARGED** pursuant to the provisions of 11 U.S.C. § 1141(d) from any debt that arose before the date of such confirmation and any debt of any kind specified in Section 502(g), 502(h) or 502(i) of Title 11 in accordance with the provisions of 11 U.S.C. § 1141(d).

5.  The discharge issued to the Reorganized Debtor does not discharge or otherwise affect the JMB non-dischargeable judgment.

6.  The discharge issued to the Reorganized Debtor does not discharge the Reorganized Debtor from her personal monetary liability in the amount of One Hundred Nine Thousand Five Hundred Fifty-Four and 06/100 Dollars ($109,554.06) to the Board of Managers of Spencer Condominium. The Reorganized Debtor has other non-monetary obligations under the Settlement Agreement with the Board of Managers of Spencer Condominium, as provided for in the treatment of Class 11 under the Fourth Amended Plan and the Confirmation Order, and such non-monetary obligations are not impacted by the discharge. The New York courts have exclusive

*CASE NO. 16-10389-BKC-AJC*

jurisdiction over the settlement between those parties.

7. This case shall remain open pending the final disposition of all motions herein and the outstanding appeals, after which the Court will direct the Clerk of Court to enter a Final Decree closing this case.

<div align="center">###</div>

Submitted by:

Geoffrey S Aaronson, Esq
Aaronson Schantz Beiley P.A.
Florida Bar No. 349623
One Biscayne Tower, 34th Floor
2 South Biscayne Boulevard
Miami, Florida 33131
Tel. 786.594.3000
Fax 305.424.9336
Email gaaronson@aspalaw.com
*Attorney for Reorganized Debtor*

*Attorney Geoffrey Aaronson is directed to serve a copy of this Order on all interested parties and to file a certificate of service with the Court.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**www.flsb.uscourts.gov**

In re:                                                    Case No: 16-10389 AJC
                                                          Chapter 11
Liza Hazan
 Debtor.                        /

**CORRECTED MOTION TO REOPEN,**
**FINAL REPORT AND MOTION FOR DISCHARGE,**
**AND MOTION FOR ENTRY OF FINAL DECREE AND TO RECLOSE**

Reorganized Debtor Liza Hazan a/k/a Elizabeth Hazan, by and through her undersigned counsel, files this Motion to Administratively Reopen Individual Chapter 11 Case to Obtain Discharge and Final Decree and to reclose ("Motion") and Pursuant to Local Rule 3022-1(A), the undersigned files this Final Report and Motion for discharge and Final Decree and represents:

1. On May 30, 2018, the Court granted the Confirmation of the Chapter 11 Plan. The Order granting confirmation of the Fourth amended plan filed on November 15, 2017 ("Doc 563") was entered on June 12, 2018 and was docketed at Doc 691. The plan provided for 41% payment of the unsecured allowed claims. On June 13, 2018 the Court entered an Agreed Order Granting Reorganized Debtor's Ore Tenus Motion to Administratively Close Individual Chapter 11 Case After Confirmation docketed at Doc 692.

2. As evidenced by the attached detailed accounting, the reorganized Debtor has now completed all payments called for under the Confirmed Plan and Confirmation Order.  The payments required by the plan have been distributed and  all  matters to be completed upon the effective date of the confirmed plan have been fulfilled or completed; Doc 684 Declaration of Disbursements.

3. Having completed all plan payments, the reorganized Debtor is now eligible to discharge pursuant to §1141 (d)(5)(A).

4. There is no reasonable cause to believe that §522(q)(1) is applicable to the reorganized Debtor, and there is no pending proceeding in which the reorganized Debtor may be found guilty of a felony of the kind described in §522(q)(1)(A) or liable for a debt of the kind described in §522(q)(1)(B).

5 . All administrative claims and expenses have been paid in full, or appropriate arrangements have been made for the full payment thereof. A summary of fees and expenses is as follows:

$  n/a Trustee Compensation (If trustee received compensation under more than one chapter)

$ <u>n/a</u> Fee for Attorney for Trustee

$ arranged -Fees for Attorneys for Reorganized Debtor, awarded and appropriate arrangements have been made

$ paid U.S. Trustee (fees required by 28  U.S.C. §1930)

$ <u>paid</u> Clerk of Court (fees required by 28 U.S.C. §1930)

$ <u>n/a All</u> expenses, including Trustee's

6. Attached as Exhibit A is a distribution report detailing the payments made under the plan on and after the effective date.

7. Pursuant to Fed. R. Bankr. P.1007(b)(7), the undersigned represents that 11 U.S.C. § 1141(d)(3) is not applicable to the reorganized Debtor, or the reorganized Debtor has filed a statement of completion of the personal financial management course.

WHEREFORE, The reorganized Debtor respectfully requests that this court (1) grant this Motion and administratively reopen this case, (2) enter a discharge of the reorganized Debtor, (3) enter a final decree closing this fully administered individual Chapter 11 case, and (4) grant such other and further relief as the Court deems appropriate..

I certify that a copy of this report and attachments was emailed to the U.S. Trustee's office on 7/7/18.

JOEL M. ARESTY, P.A.
Counsel for
Reorganized Debtor
Liza Hazan
309 1st Ave S
Tierra Verde, FL
33715
Phone: 305-904-1903
Fax: 800-559-1870
E-mail: Aresty@Mac.com
By: <u>/s/Joel M. Aresty</u>
Fla. Bar No. 197483

**EXHIBIT  A**

LIST ALL PAYMENTS MADE ON OR BEFORE THE EFFECTIVE DATE OF THE PLAN,
OR IF INDIVIDUAL CHAPTER 11, ALL PAYMENTS MADE UNDER THE PLAN.*
SEPARATE CLAIMANTS BY CLASSIFICATION UNDER THE PLAN AND PROVIDE A
TOTAL FOR EACH CLASSIFICATION. LIST THE NAME OF EACH RECIPIENT,
AMOUNT OF THE ALLOWED CLAIM AND THE AMOUNT THAT WAS PAID (USE
CONTINUATION PAGE IF NECESSARY).

| Name Of Creditor | Claim Number | Class Number | Payment In Plan |
|---|---|---|---|
| IRS priority | Claim # 3 | Class 1 | $2,674.34   Paid   at Confirmation |
| Valencia Estates Community Association, Inc. | Claim # 10 | Class 5 | $4,062.00 Paid at confirmation |
| Miami-Dade  Water  & Sewer Department | Claim # 7 | Class 7 | $1,502.54 Paid at confirmation |
| IRS secured | Claim # 3 | Class 8 | $22,948.00 Paid after confirmation |
| American   InfoSource TMobile Class 12 | Claim # 2 | Class 12 | $1,130.00 Paid at confirmation |
| S&S Collections | Claim # 13 | Class 13 | $6,968.04 Paid after confirmation |
| IRS unsecured | Claim # 3 | Class 12 | $1,085.00   Paid   at confirmation |
| American  info  Source Direct TV Class 12 | Claim # 9 | Class 12 | $461.00    Paid    at Confirmation |
| FPL Class 12 | Claim # 11 | Class 12 | $2,906.93   Paid   at Confirmation |
| Sterling Emer Svcs | | Class 12 | $2,445.30   Paid   at Confirmation |

| | | | Confirmation |
|---|---|---|---|
| Mount Sinai Phys Practice | | Class 12 | $295.91   Paid   at Confirmation |
| | | | $3,240.00   Paid   at Confirmation |
| HSBC Bank USA NA | | Class 12 | $1,070.66   Paid   at Confirmation |
| Wells Fargo | Claim # **12** | Class 12 | $323.24   Paid   at Confirmation |
| Total class 12

Total
Total | | | $12,958.04   Paid   at Confirmation |
| | | | $651.07   Paid   at Confirmation |
| | | | $51,764.03 |

\*Class **13 JMB Urban 900** in the amount of $275,000 is the subject of a **Non-dischargeable Judgment** and therefore is not sought to be discharged.

# EXHIBIT D



**ORDERED in the Southern District of Florida on March 12, 2019.**

_____

**A. Jay Cristol, Judge**
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**

In re:                                                    Case No 16-10389-BKC-AJC

LIZA HAZAN, a/k/a ELIZABETH
HAZAN,                                                    Chapter 11

     Debtor.
_____/

NLG, LLC, a Delaware limited liability
company and CHRIS KOSACHUK, an
interested party,                                         Adv. No 18-1492-BKC-AJC-A

     Plaintiffs,

v.

LIZA HAZAN a/k/a ELIZABETH
HAZAN,

     Defendant/Debtor.
_____/

## ORDER GRANTING MOTION TO DISMISS
## <u>AMENDED COMPLAINT WITH PREJUDICE</u>

    **THIS MATTER** came before the Court on February 13, 2019 on Defendants' Liza Hazan

1

a/k/a Elizabeth Hazan, Sean Neil Meehan, Portfolio Onesource Advisors, LLC, Portefolio Onesource Advisor, LLC, and Horizon Hospitality Holdings, LLC's Motion to Dismiss Amended Complaint to Revoke Confirmation Order and Discharge Order with Prejudice (ECF 26). On January 16, 2019, this Court entered an Order granting Debtor Liza Hazan a/k/a Elizabeth Hazan's Motion to Dismiss Adversary Complaint and granting Plaintiffs leave to amend. Plaintiffs filed an Amended Complaint on January 14, 2019 (ECF 18).

Plaintiffs' Amended Complaint contains seven Counts. Count I fails to state a claim. Plaintiffs allege that Defendants defrauded the Court because Liza Hazan a/k/a Elizabeth Hazan ("Hazan") returned three checks to the bank that were presented to show proof of payment. Under the Federal Rules of Civil Procedure, exhibits are part of the pleading "for all purposes." Fed. R. Civ. P. 10(c); *Griffin Industries, Inc. v. Irvin*, 496 F.3d 1189, 120 (11th Cir. 2007). The attachments to the Amended Complaint show that Hazan replaced the returned checks at issue in identical amounts with the corrected payee names. The Amended Complaint fails to state a claim based on the checks because replacing incorrect checks with checks made out to, and payable to the proper parties does not amount to fraud on the Court. *See, e.g., In re Longardner & Associates, Inc.*, 855 F.2d 455, 460 (7th Cir. 1988) (explaining that fraud on the court is the only ground for revoking confirmation); *Tenn-Fla Partners v. First Union Nat. Bank of Florida*, 229 B.R. 720, 730 (W.D. Tenn. 1999) ("For the order of confirmation to be revocable," the "fraud must be directed at the court."), *aff'd sub nom. In re Tenn-Fla Partners*, 226 F.3d 746 (6th Cir. 2000).

Similarly, Plaintiffs allege that Hazan committed a fraud on the court by failing to disclose that the transfer of the New York condominium was potentially voidable. Taking judicial notice of the documents and pleadings filed in this case, the Court notes that Hazan's Disclosure Statement states precisely the point that Plaintiffs now allege Hazan failed to disclose:

2

> **Debtor transferred this New York Condominium in August, 2011. The Board of Managers alleges that the transfer was made without the consent of Spencer Condominium. The Board of Managers has agreed to the approval of this Disclosure Statement. The Internal Revenue Service has filed a Proof of Claim in this case.** *The statute of limitations for the IRS to contest the transfer has not yet run,* **but IRS has taken no such position and has not appeared in the case other than the filing of a Proof of Claim. The New York Condominium had no equity at the time of the transfer.**

Disclosure Statement, ECF 9-3, at 7 (bold emphasis in original; italicized emphasis added).

This is not a new or undisclosed matter. Indeed, the New York condominium association was actively represented during these proceedings. Given that the Court was made aware of the issue, it could not have been defrauded by any alleged failure of Hazan to disclose it. *See In re Bennington*, 519 B.R. 545, 549 (Bankr. D. Utah 2014) ("allegations of fraud" that "were made known to the Court and creditors…before the hearing on confirmation…cannot serve as a basis to revoke the Debtors' confirmation order."); *In re Level Propane Gases, Inc.*, 438 B.R. 354 (B.A.P. 6th Cir. 2010) (affirming dismissal of revocation claims where "the same allegations were known by the bankruptcy court" and had been rejected by it during the confirmation process). As such, Count I fails to state a claim.

In Counts II-VI, Plaintiffs purport to bring claims for criminal bankruptcy fraud under 18 U.S.C. §§ 152, 153, and 157. These counts fail to state cognizable claims for revocation of confirmation or discharge. First, "section 1144 is the ***only*** avenue for revoking confirmation of a plan of reorganization." *In re Longardner & Associates, Inc.*, 855 F.2d 455, 460 (7th Cir. 1988). Accordingly, Plaintiffs cannot obtain revocation of confirmation by asserting claims under 18 U.S.C. §§ 152, 153, or 157. Importantly, 18 U.S.C. §§ 152, 153, and 157 are criminal statutes, violations of which may be prosecuted only by the United States government; there is no private right of action to enforce them. *See, e.g., In re Nordeen*, 495 B.R. 468, 484–85 (B.A.P. 9th Cir.

3

2013) ("Any alleged perjury committed in the filing of a claim in a bankruptcy case is subject to criminal sanctions under 18 U.S.C. § 152, not to any private right of action by the Nordeens."). Thus, this Court lacks jurisdiction to adjudicate such claims. *See* 28 U.S.C. § 157. Finally, in Count VII, Plaintiffs allege that Hazan's discharge should be revoked based on the facts and claims set forth in the count seeking revocation of plan confirmation. However, because Counts I-VI fail to state a claim, Count VII also fails to state a claim.

The Court notes that Defendants have also raised other meritorious reasons for dismissing the Amended Complaint. For instance, Plaintiff Chris Kosachuk, who has not filed a proof claim or otherwise participated in an individual capacity in Hazan's bankruptcy case, lacks standing to seek revocation. Pursuant to 11 U.S.C. §1109(b), only "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." A party in interest must have "a direct legal interest in the case" and may only "assert that interest with respect to any issue to which it pertains." *In re JMP-Newcor International, Inc.*, 225 B.R. 462, 464 (Bankr. N.D. Ill. 1998) (citations omitted). As Kosachuk has no claim against Hazan, he is unaffected by the confirmation of Hazan's plan. NLG also lacks standing regarding confirmation of Hazan's plan because it holds no allowed claim. *See, e.g., In re Flintkote Co.*, 526 B.R. 515, 520 (D. Del. 2014) (purported creditor lacked standing to challenge plan confirmation "because all of its asserted claims were untimely or disallowed"); *In re Delta Air Lines, Inc.*, 374 B.R. 516 (Bankr. S.D.N.Y. 2007).

Defendants further argue that Plaintiffs' action for revocation of confirmation is precluded by the doctrine of equitable mootness. "Although equitable mootness is often applied on appeal, it applies to proceedings under Section 1144." *In re Delta Air Lines, Inc.*, 386 B.R. 518, 537 (Bankr.

S.D.N.Y. 2008). The Eleventh Circuit has explained that in considering equitable mootness, courts should evaluate "the balance of equities, including whether a stay pending appeal has been obtained and if not, why not; whether the plan has been 'substantially consummated;' what type of relief is sought; and what the effect of granting such relief would be." *In re Ferguson*, 683 Fed. Appx. 924, 926 (11th Cir. 2017) (citing *In re Club Assocs.*, 956 F.2d 1065, 1069 n. 11 (11th Cir. 1992)). The Court has previously found that Hazan's plan has been substantially consummated and that NLG failed to timely seek a stay. After considering the balance of the equities, the Court believes Plaintiffs' claims for revocation are equitably moot.  Accordingly, it is

ORDERED and ADJUDGED that Defendants' Motion to Dismiss Amended Complaint to Revoke Confirmation Order and Discharge Order with Prejudice is GRANTED. Plaintiffs' Amended Complaint to Revoke Confirmation Order and Discharge Order is DISMISSED WITH PREJUDICE.

<div align="center">###</div>

Geoffrey S Aaronson, Esq. is directed to serve a copy of this
Order on all interested parties and to file a Certificate of Service.

Page 1

1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF FLORIDA
2                            MIAMI DIVISION

3

4

5
     IN RE:                        CASE NO. 16-10389-AJC
6
     LIZA HAZAN,
7
                    Debtor.
8    _____/

9

10

11              ECF# 563, 590, 599, 605, 607, 610

12

13                        May 8, 2018

14

15              The above-entitled cause came on for hearing

16   before the Honorable A. JAY CRISTOL,  one of the Judges in

17   the  UNITED  STATES  BANKRUPTCY  COURT,  in  and  for  the

18   SOUTHERN  DISTRICT  OF FLORIDA, at 301 North Miami Avenue,

19   Miami, Miami-Dade County, Florida on Tuesday, May 8, 2018,

20   commencing  at  or  about  3:04 p.m.,  and  the  following

21   proceedings were had:

22

23

24      Transcribed from a Backup Digital Audio Recording by:
                 Margaret Franzen, Court Reporter
25

Page 2

1                          APPEARANCES:

2

3                    DAVID W. LANGLEY, ESQUIRE
                       On behalf of the Debtor

4

5

                         FURR & COHEN, by
6               ROBERT C. FURR, ESQUIRE (CourtCall)
     On behalf of the Board of Managers of Spencer Condominium

7

8

                     MARSHALL SOCARRAS GRANT, by
9                JOE M. GRANT, ESQUIRE (CourtCall)
                  On behalf of Selective Advisors Group

10

11

                      DAVID B. HABER, P.A., by
12              DAVID B. HABER, ESQUIRE (CourtCall)
        On behalf of Valencia Estates Homeowners' Association

13

14

                  JUAN RAMIREZ, ESQUIRE (CourtCall)
15                    On behalf of NLG, LLC

16

17        OFFICE OF THE UNITED STATES TRUSTEE, by
              JOHANNA ARMENGOL, ATTORNEY-AT-LAW
18                     Attorney/Advisor
             On behalf of the United States Trustee

19

20

                       ALSO PRESENT:

21

22

                     LIZA HAZAN, Debtor
23        ECRO - Electronic Court Reporting Operator

24

                    - - - - - - -

25

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 3

```
 1              THE COURT:  Good afternoon.  Be seated,
 2   please.  Three o'clock calendar, appearances.
 3              Robert Furr is reported to be out in
 4   telephone land, are you out there?
 5              MR. FURR:  Yes.  Good afternoon, Your Honor.
 6   Robert Furr, attorney for the Board of Governors of the
 7   Spencer Condominium.
 8              THE COURT:  Very well.  Joe Grant?
 9              MR. GRANT:  Good afternoon, Your Honor.
10   Joe Grant on behalf of Selective Advisors.
11              THE COURT:  You need to spell your last name
12   for the electronic recorder.
13              MR. GRANT:  Yes, Your Honor, G-r-a-n-t.
14              THE COURT:  Did I get your spelling,
15   Mr. Furr?  I didn't.
16              MR. FURR:  Sir, you did not.  Robert Furr,
17   F-u-r-r.
18              THE COURT:  And David Haber, are you out
19   there?
20              MR. HABER:  Your Honor, David Haber,
21   H-a-b-e-r, on behalf of Valencia Estates.
22              THE COURT:  Very well, and in the courtroom,
23   appearances.
24              MS. ARMENGOL:  Good afternoon, Your Honor.
25   Johanna Armengol, A-r-m-e-n-g-o-l, for the U.S. Trustee.
```

Page 4

```
 1              MR. LANGLEY:  And good afternoon,
 2   Your Honor.  David Langley for the ---
 3              MR. RAMIREZ:  Your Honor --
 4              THE COURT:  Hello.  Is someone ---
 5              MR. RAMIREZ:  -- I -- I was having trouble
 6   with the -- the CourtCall.  Juan Ramirez, R-a-m-i-r-e-z,
 7   for NLG.
 8              THE COURT:  Oh, okay.  Mr. Ramirez, and who
 9   do you represent?
10              MR. RAMIREZ:  NLG, LLC.
11              THE COURT:  Okay.  You didn't appear on the
12   list, and welcome.
13              And now in the courtroom, Mr. Langley, your
14   appearance.
15              MR. LANGLEY:  Yes, Your Honor, thank you.
16   David Langley here for the debtor, Elizabeth Hazan, and
17   she's here in the courtroom with us today.
18              THE COURT:  Very well, and we have a number
19   of matters on the calendar, and let's -- let's proceed
20   with them.
21              Do you have a particular order, Mr. Langley?
22   I see the first matter, 590, was filed by David Haber,
23   that's an objection to confirmation that we have an
24   amended Chapter -- plan, 563, filed by you, Mr. Langley.
25              MR. LANGLEY:  Yes, Judge.
```

Page 5

1          THE COURT:  599, objection to confirmation.

2     Then we have 610, objection to confirmation; and then

3     we've got a fee application, 605; and we have a motion to

4     strike a ballot, 607; and I think that pretty well covers

5     it.

6               What are we going to do first, Mr. Langley?

7          MR. LANGLEY:  My preference, Your Honor, if

8     it's okay with you, those first two I think we can deal

9     with together, and I'd like to take those last and just go

10    through the -- the other motions and things that are set.

11         THE COURT:  All right.  Well, tell me which

12    one and we'll talk about it.

13         MR. LANGLEY:  599 --

14         THE COURT:  599 --

15         MR. LANGLEY:  -- that's a motion to strike.

16         THE COURT:  -- objection to confirmation.

17         MR. LANGLEY:  It's a motion to strike an

18    objection to confirmation.

19         THE COURT:  To strike.  Okay.

20         MR. LANGLEY:  And the basis of our motion to

21    strike NLG's objection, Judge, is the ruling in the

22    adversary of November 1 that found that -- and it's quoted

23    in our motion to strike, but that the title to the

24    property, the debtor's property, is forever quieted as to

25    all claims of NLG, and later in your final order, NLG has

Page 6

1   no claim against the debtor, Liza Hazan, and has no

2   standing.

3                   So we've got NLG with no claim, no standing,

4   no lien and after that ruling, they filed Docket Entry

5   592, an objection to the disclosure statement, which has

6   already been approved by Your Honor.  I'm sorry, that was

7   the objection to confirmation.

8                   They filed an objection to the amended

9   disclosure statement, 578, and then related to this is our

10  motion to strike, 610, which raises that same argument as

11  to NLG's amended objection to confirmation.

12                  So since the finding that they have no

13  standing, they have filed three objections, which we

14  believe should all be stricken, 592, 578 and 606, we would

15  request all be stricken.

16                  THE COURT:  And, Mr. Ramirez, is that

17  your -- your response?

18                  MR. RAMIREZ:  Yes, Judge.  We, as

19  Mr. Langley knows, have appealed the order, and I find it

20  ironic that Mr. Langley would call that a final order

21  because you just filed a pleading with Judge Gayles saying

22  that it was not final, and now he's saying it's final.

23  He's -- he's playing the system here, Judge.

24                  THE COURT:  Well, have the -- if the orders

25  are on appeal, was -- was a supersedeas posted?  Is it --

Page 7

1   are the -- are the orders stayed or are they not?

2                   MR. LANGLEY:  No motion to stay, no bond

3   posted and the appeal has been dismissed.

4                   THE COURT:  Oh, really?  Are you aware,

5   Mr. Ramirez, Mr. Langley says the appeal has been

6   dismissed, is that accurate?

7                   MR. RAMIREZ:  No, the motion ---

8                   MR. LANGLEY:  There's a motion to reinstate

9   the appeal, but the appeal stands --

10                  MR. RAMIREZ:  (Inaudible.)

11                  MR. LANGLEY:  -- as dismissed as of this

12  moment.

13                  THE COURT:  Pardon me, one at a time,

14  Mr. Langley.

15                  Go ahead, Mr. Ramirez.

16                  MR. RAMIREZ:  Yeah, we filed a motion for

17  relief from the dismissal because it was based on an order

18  of a receiver in the state court action now that has been

19  vacated nunc pro tunc, so we anticipate the appeal will be

20  reinstated.

21                  And Mr. Langley called our appeal premature

22  because the order you signed was not a final order, now

23  that -- now he's saying that it is final.  I wish he would

24  make up his mind.

25                  THE COURT:  Well, if the appeal was

Page 8

```
 1    dismissed, that sort of makes it final.

 2              Then you say that there's a motion to

 3    reconsider the dismissal; is that ---

 4              MR. RAMIREZ:  That is correct, that's the

 5    motion to reconsider filed timely, and it's been under

 6    advisement with Judge Gayles for two or three weeks.

 7              MR. LANGLEY:  Judge, I ---

 8              THE COURT:  All right.  When you're

 9    finished, Mr. Ramirez, we'll hear Mr. Langley's response.

10              MR. LANGLEY:  Yes, Judge.  I refer to it as

11    a final judgment because the title of the document is a

12    final judgment.

13              The finality for appellate purposes is

14    obviously something very different, but you just hit the

15    nail on the head.

16              The order -- order out of the adversary says

17    they have no standing, they have no claim, and until an

18    appellate court says otherwise, that's the law of the

19    case, and they have not moved for a stay and they have not

20    posted a bond.

21              So they have no -- and we cited the Tucker

22    case in our motion that specifically says that without a

23    motion to stay, without an order staying the effect of the

24    order or judgment, they have no standing and they have no

25    right to be objecting to confirmation, and they're raising
```

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 9

1   frivolous issues, in any event.

2             And, Judge, as we've mentioned to you a

3   number of times, there are, I believe, five motions for

4   sanctions filed by NLG.  There -- NLG has been the subject

5   of several motions for violating the automatic stay and

6   now after we win the adversary proceeding, they file three

7   more objections in the case, just trying to cause the

8   debtor to incur additional fees, and we need --

9             THE COURT:  These objections are filed --

10            MR. LANGLEY:  -- to ask the Court to ---

11            THE COURT:  -- in the District Court; is

12   that correct?

13            I mean, the -- the appeal was in the

14   District Court; is that correct?

15            MR. LANGLEY:  Yes, and we filed back in

16   November, I believe it was, a motion to dismiss, which was

17   granted in the ---

18            THE COURT:  What's pending over there, is

19   that -- you said that's Judge Gayles?

20            MR. LANGLEY:  Judge Gayles.  We filed a

21   motion to dismiss, he granted it.

22            They have filed a motion for reconsideration

23   of the dismissal, that has not been ruled on, that's

24   pending before Judge Gayles, but ---

25            THE COURT:  Anything scheduled for hearing

Page 10

```
 1    in the District Court?
 2                 MR. LANGLEY:  Not to my knowledge, no.
 3                 THE COURT:  How about you, Mr. Ramirez,
 4    anything scheduled for hearing?
 5                 MR. RAMIREZ:  Not (inaudible).  We're
 6    waiting for a ruling on the motion for relief from the
 7    dismissal.
 8                 THE COURT:  All right.  Well, there's a
 9    question of whether or not -- of course, if the
10    reinstatement is granted, we have a different situation
11    then if it is denied.
12                 So we'll hold off ruling on 599 and 607 and
13    610 pending what comes out of the District Court.
14                 Let's move on to the other matters on the
15    calendar.
16                 MR. LANGLEY:  Also, Judge, just related to
17    that is the very last one, 607, that's NLG's motion to
18    strike a ballot, and again, if they have no standing, they
19    have no right to be objecting to a ballot.  The ballot
20    is ---
21                 THE COURT:  607 and 610 --
22                 MR. LANGLEY:  That is their motion to
23    strike.
24                 THE COURT:  -- and 6 -- and 599, all three
25    of them are objections, and if the order is final, then
```

Page 11

```
 1    the objections should be overruled.
 2                MR. LANGLEY:  Okay.
 3                THE COURT:  If the order is -- if the
 4    District Court takes the matter up, then we have to wait
 5    and see what comes out of it.
 6                So as I said, I'm going to defer ruling on
 7    those three matters pending a report from the
 8    District Court as to how they're going to deal with it.
 9                MR. RAMIREZ:  Thank you, Judge.
10                THE COURT:  So I'm going to mark it, mark
11    599, 610, and 607 as deferred.
12                Now, what's next, Mr. Langley?
13                MR. LANGLEY:  We've got 605, which is a fee
14    application.
15                THE COURT:  All right.  Tell me about it.
16                MR. LANGLEY:  This was actually filed some
17    time ago, it's come up a couple of times, you just haven't
18    ruled on it yet.
19                Fees, net fees, in the amount of
20    $129,377.50, and costs of $813.89.
21                THE COURT:  Very well.  Has the
22    United States Trustee reviewed this matter?
23                MS. ARMENGOL:  Johanna Armengol.  Yes, Your
24    Honor.  We do not have an objection with an 80 percent
25    award and a -- a holdback.
```

Page 12

1              THE COURT:  Anyone else need to be heard on

2    that matter?

3              Very well, then, we'll approve subject to

4    80 percent for fees and a hundred percent on costs.

5              Okay.  What's next?

6              MR. LANGLEY:  Well, Judge, that brings us to

7    the plan and to confirmation.

8              So where we stand with that, setting aside

9    NLG for a moment, the only party that was -- that we had a

10   concern with about this is Valencia represented by

11   Mr. Haber, who's on the phone.

12             We've been speaking with him on and off,

13   including about ten minutes ago, and where we stand on

14   confirmation, Judge, is after two years and all this

15   litigation and successful outcomes on two adversaries, and

16   working out resolutions with just about everybody else,

17   and now very, very, very close with Mr. Haber and his

18   client, we're in a position to be ready for a consensual

19   confirmation, but we're a few days away from some funds

20   being released to the debtor to pay Mr. Haber's client and

21   to be able to say we have effective date payment money

22   sitting there.

23             So what we came here today to request, is

24   that we go through the confirmation process today.  We're

25   working with Mr. Haber to -- we agree that his client is

Page 13

1   due the special assessment of 62,500.  We're a few dollars

2   apart on agreeing on attorney's fees, so we've agreed to

3   submit on paper to Your Honor to work out the attorney's

4   fees.

5              What we're asking for is to give us until

6   Friday to work this out with Mr. Haber and get his okay,

7   get him to remove his objection, which is 590, by paying

8   his client an agreed amount or whatever the Court says,

9   file the affidavits showing -- of the debtor showing that

10  the funds are on hand to pay all the effective date

11  payments, and then some, and administrative expenses, and

12  with everybody's consent, upload an order confirming the

13  plan.

14             THE COURT:  Well, Friday is the 11th and on

15  the 11th I'm getting on a plane to California to go to my

16  granddaughter's graduation, so I'm not sure if the 11th is

17  a workable date.

18             Can that maybe done on the 10th or the ---

19             MS. ARMENGOL:  Your Honor, if I may?

20             THE COURT:  Yes, Madam United States

21  Trustee.

22             MS. ARMENGOL:  Johanna Armengol.

23  Your Honor, we cannot support a conditional confirmation

24  today --

25             THE COURT:  Oh, I would agree.

Page 14

1            MS. ARMENGOL:  -- because the funds are not

2   there, it's putting the cart before the horse.

3            THE COURT:  I agree.  We'll just ---

4            MS. ARMENGOL:  So we -- we would have to

5   come back.

6            THE COURT:  We'll have to roll the

7   confirmation.

8            As I say, if we can do it on the 10th, or

9   else we'll roll it to when I come back, which is -- I

10  think I come back on the 16th, is that right, Sue?

11           ECRO:  You'll be here on the 17th, Judge.

12           THE COURT:  I'll be here on the 17th.

13  So what works for you, Mr. Langley, the 10th or the 17th?

14           MR. HABER:  Your Honor, may I -- this is

15  Mr. Haber.

16           May I be heard on the issue of ---

17           THE COURT:  Certainly, Mr. Haber, you may be

18  heard.  What do you wish to be heard about?

19           MR. HABER:  There is a difference between

20  what Mr. Langley has said and what the Court's prior order

21  is.

22           It says that we have to be paid the $62,500,

23  and it was not timely paid pursuant to stipulation and

24  court order approving same, as well as the declaration,

25  but we're also entitled to interest from the date the

Page 15

1    payment was due, as well as obviously whatever association

2    charges, late charges there are, which they have in the

3    estoppel letter.

4                    And then, of course, there's the $14,000 of

5    fees that we've agreed to submit no more than three pages

6    explaining why we feel we should get it, and why they feel

7    they shouldn't have to pay.

8                    But I want to make sure Mr. Langley

9    understands, it's not just the $62,500, but it's the other

10   amounts in the estoppel, including interest until the date

11   of confirmation, the late fees to the association, as well

12   as an amount of attorney's fees that Your Honor awards.

13                   THE COURT:  What about it, Mr. Langley?

14                   MR. LANGLEY:  Well, Judge, up until ten

15   minutes before the hearing started, Mr. Haber and I were

16   just talking about 62.5, plus fees.  So without going back

17   and going through everything he said to us, I'm not sure

18   how significant the interest is.  This is the first I've

19   heard about late fees.

20                   THE COURT:  Well, in any event, we're not

21   ready to go forward today anyhow, so it will give you time

22   to work with Mr. Haber --

23                   MR. LANGLEY:  Sure.

24                   THE COURT:  -- and come up with a number

25   that solves the problem if you're able to do so.

Page 16

```
 1                   MR. LANGLEY:  And we can always include that
 2    in our three-page submission.
 3                   MR. HABER:  Your Honor, this is Mr. Haber
 4    again.
 5                   THE COURT:  Yes.
 6                   MR. HABER:  We have a court order requiring
 7    them to pay the interest.  They have received an estoppel
 8    that gives them a per diem on the interest.  This is not
 9    rocket science, and I don't need to be repeating it to
10    Mr. Langley because he and his client are well aware of
11    the stipulation, and the last three times we were in court
12    they have reconfirmed the same issue that says we're
13    entitled to pay -- be paid the late fees, as well as the
14    interest.
15                   And there's been no objection to that
16    previously, and the Court has even admonished Mr. Langley
17    and his client, and said whatever the deal you struck was
18    and the court order approved and your client signed,
19    that's the deal you're stuck with whether you like it or
20    not, good deal, bad deal, that's the deal she made.
21                   So to now say, well, we don't know that we
22    have got to pay interest, is just ridiculous.
23                   THE COURT:  Well, Mr. Haber, if that's the
24    status of the court order, that is what it is.
25                   However, since we're not going ahead with
```

Page 17

1    confirmation today, we can wait until we come back and

2    determine whether you resolve your other problems with

3    Mr. Langley, and if you have, and this remains -- still

4    remains a problem and the order says what you say it says,

5    then that would be a further impediment.

6                    On the other hand, if Mr. Langley knows

7    something I don't know, you know, perhaps he can discuss

8    that with you, and this is an opportunity for the two of

9    you to get together and come up with whatever number is

10   necessary to solve the problem.

11                   MR. LANGLEY:  If nothing else, Judge, we

12   would just like to know the amount.  The letter that I --

13   the last letter I have from Mr. Haber is addressed to me

14   and Ms. Hazan, and it gives that amount, 62,500, it gives

15   the 14,392 in attorney's fees, and $14.04 in costs, and no

16   mention of ---

17                   THE COURT:  $14.04 in costs?

18                   MR. LANGLEY:  Yes.

19                   THE COURT:  What are you doing, Mr. Haber --

20                   MR. LANGLEY:  We're going to ---

21                   THE COURT:  -- riding first class on the

22   airlines?

23                   MR. LANGLEY:  We're going to fight him on

24   that, Judge, but it doesn't mention interest or --

25                   MR. HABER:  (Inaudible.)  Your Honor.

Page 18

```
 1                    MR. LANGLEY:  -- it doesn't mention anything
 2   else.
 3                    MR. HABER:  I was driving a NASCAR in
 4   Daytona at a hundred fifty-five miles an hour.
 5                    THE COURT:  Wow.  Well, be careful, we want
 6   to make sure you get back to collect your money.
 7                    MR. HABER:  I am on my way back, and I
 8   survived it.  If I can survive confirmation of this case,
 9   it will be more difficult than riding at a hundred
10   fifty-five miles an hour, but thank you, Your Honor,
11   for -- for being worried about my safety.
12                    THE COURT:  Okay.  So, anyhow, did we select
13   a date, are we doing the 10th or the 16th?
14                    MR. LANGLEY:  Your Honor ---
15                    THE COURT:  I mean, on the 17th.
16                    MR. LANGLEY:  Judge, Ms. Hazan is going to
17   be out of town after your return until May 27th.
18                    THE COURT:  Well, by then I've got to go to
19   Jacksonville for another granddaughter's graduation.
20   Let's see, I'm trying to remember when I leave on that.  I
21   think I ---
22                    MR. LANGLEY:  The 28th is Memorial Day.
23                    THE COURT:  The 28th is Memorial Day and --
24   well, what about the 30th?
25                    MR. HABER:  Your Honor, is there any way for
```

Page 19

1    you to do it by phone?  I have been told you'll extend the

2    hearings by phone when you're out of town, when we're all

3    here.  I would hate to see another month go by when we're

4    already two and a half years in.

5                    THE COURT:  Well, we're not talking about

6    another month, we're talking about a few more days.  I'm

7    back on the 29th or 30th, am I not?

8                    ECRO:  You're back on the 29th.

9                    THE COURT:  29th, and when -- when does

10   Ms. Hazan get in?

11                   MR. LANGLEY:  The 27th, so the 30th would be

12   fine with us.

13                   THE COURT:  30th or the 29th?

14                   MS. HAZAN:  The 30th.

15                   MR. LANGLEY:  30th.

16                   THE COURT:  All right.  Mr. Haber, the 30th

17   work for you?

18                   MR. HABER:  I'm checking right now,

19   Your Honor, hold on one second.

20                   MR. LANGLEY:  And what time would that be?

21                   THE COURT:  Well, let's find out if it's

22   going to work first.

23                   MR. HABER:  I have a mediation that day,

24   Your Honor, but what time, and I will break out and either

25   appear by phone or in person?

Page 20

1              THE COURT:  Well, what works best for you,

2    morning or afternoon?

3              MR. HABER:  I would either want it first

4    thing in the morning at nine o'clock or at the end --

5    towards the end of the day --

6              THE COURT:  All right.  How about

7    three o'clock?

8              MR. HABER:  -- or first thing after lunch.

9              THE COURT:  How about three o'clock on the

10   30th, does that work?

11             MR. HABER:  That's fine.

12             THE COURT:  Does that work for you,

13   Mr. Langley?

14             MR. LANGLEY:  Yes, Judge, that's terrific.

15   Thank you.

16             THE COURT:  All right.  So then we're set to

17   30 May ---

18             ECRO:  Your Honor, you have an evidentiary

19   hearing at three o'clock.

20             THE COURT:  Oh, I do?  Hold on, and well,

21   then ---

22             ECRO:  We can do the eleven o'clock, if the

23   attorneys are available.

24             MR. LANGLEY:  Would two o'clock work?

25             THE COURT:  Would two o'clock work,

Page 21

1    Mr. Haber?

2                        MR. HABER:  Yes.

3                        THE COURT:  Do you think we can get it done

4    in an hour?

5                        MR. LANGLEY:  Yes.

6                        THE COURT:  Two o'clock.  Okay.

7                        MR. HABER:  (Inaudible.)

8                        THE COURT:  2:00 p.m., and Mr. Langley will

9    draw that order subject to no objection by the

10   United States Trustee.

11                       MS. ARMENGOL:  No objection, Your Honor.

12                       THE COURT:  Very well.  Okay.  So that takes

13   care of that matter, and 563 is the amended plan, so now

14   they're together.

15                       Now, what else do we have to do here today?

16                       MR. LANGLEY:  That's it, Judge.

17                       THE COURT:  And Ms. United States Trustee,

18   anything to add?

19                       MS. ARMENGOL:  Johanna Armengol.  No,

20   Your Honor.

21                       THE COURT:  All right, and Mr. Haber?

22                       MR. HABER:  This is Mr. Haber.  I would just

23   like to be able to appear by phone on the 30th

24   (inaudible).

25                       THE COURT:  Well, that's -- no objection,

Page 22

1    and -- and you know how to do it, you're out there now.

2                    MR. HABER:  Yes.  Thank you.

3                    THE COURT:  How about Mister -- Mr. Grant,

4    anything to add?

5                    MR. GRANT:  Nothing to add, Your Honor.

6    Thank you.

7                    THE COURT:  Mr. Furr?

8                    MR. FURR:  No, sir, Judge.  That time is

9    fine with me.

10                   THE COURT:  Mr. Ramirez?

11                   MR. RAMIREZ:  Nothing, Judge.

12                   THE COURT:  Very well.  Then we'll adjourn

13   this hearing and we'll look forward to seeing you all on

14   the 30th at two o'clock.

15                   MR. LANGLEY:  Thank you, Judge.

16                   THE COURT:  If we don't do it then, we'll do

17   it in 2021 or 2023.

18                   Thank you all.

19                   (Thereupon, the hearing was concluded.)

20

21

22

23

24

25

Page 23

```
 1
 2
 3                          CERTIFICATION
 4
 5    STATE OF FLORIDA        :
 6    COUNTY OF MIAMI-DADE    :
 7
 8                I, Margaret Franzen, Court Reporter and
 9    Notary Public in and for the State of Florida at Large, do
10    hereby certify that the foregoing proceedings were
11    transcribed by me from a digital recording held on the
12    date and from the place as stated in the caption hereto on
13    Page 1 to the best of my ability.
14                WITNESS my hand this 11th day of May 2018.
15
16
17              _____
18                     MARGARET FRANZEN
19             Court Reporter and Notary Public
               in and for the State of Florida at Large
20                  Commission #GG187411
                     April 14, 2022
21
22
23
24
25
```

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875